**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

DIPESH SINGLA,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent.

**No. 26-2788**

# **PETITIONER'S REPLY BRIEF IN RESPONSE TO THE NLRB'S BRIEF IN OPPOSITION TO PETITIONER'S JURISDICTIONAL MEMORANDUM**

**Date:** September 15, 2026

***"Justice shall not be a jewel of top percentile; it shall embed in each breath."***

~Dipesh Singla

## TABLE OF AUTHORITIES

**CASES (Not limited to these)**

**Supreme Court of the United States**

*Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65 (1991)

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998)

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)

*Clark County School District v. Breeden*, 532 U.S. 268 (2001)

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)

*Clayton v. International Union, UAW*, 451 U.S. 679 (1981)

*DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983)

*Erickson v. Pardus*, 551 U.S. 89 (2007)

*Goldberg v. Kelly*, 397 U.S. 254 (1970)

*Goss v. Lopez*, 419 U.S. 565 (1975)

*Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554 (1976)

*In re Murchison*, 349 U.S. 133 (1955)

*Leedom v. Kyne*, 358 U.S. 184 (1958)

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024)

*Mathews v. Eldridge*, 424 U.S. 319 (1976)

*McCarthy v. Madigan*, 503 U.S. 140 (1992)

*Miranda Fuel Co.*, 140 NLRB 181 (1962), enfd. 326 F.2d 172 (2d Cir. 1963)

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)

*Nash v. Florida Industrial Commission*, 389 U.S. 235 (1967)

*NLRB v. Indiana & Michigan Electric Co.*, 318 U.S. 9 (1943)

*NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975)

*NLRB v. Noel Canning*, 573 U.S. 513 (2014)

*NLRB v. Scrivener*, 405 U.S. 117 (1972)

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)

*NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344 (1953)

*NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983)

*NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112 (1987)

*Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025)

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943)

*SEC v. Jarkesy*, 603 U.S. 109 (2024)

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020)

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)

*Staub v. Proctor Hospital*, 562 U.S. 411 (2011)

*Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192 (1944)

*Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 268 (1965)

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)

*Vaca v. Sipes*, 386 U.S. 171 (1967)

*Withrow v. Larkin*, 421 U.S. 35 (1975)

*Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982)

**United States Courts of Appeals**

*Abercrombie v. Office of the Comptroller of the Currency*, 833 F.2d 672 (7th Cir. 1987)

*Baker v. NLRB*, 691 F.2d 1293-95 (9th Cir. 1982) (cited by Respondent) (Link Unfounded)

*Columbia College Chicago v. NLRB*, 858 F.3d 473 (7th Cir. 2017)

*Containair Systems Corp. v. NLRB*, 521 F.2d 1166 (2d Cir. 1975)

*Culver v. Gorman & Co.*, 416 F.3d 540 (7th Cir. 2005)

*J.P. Stevens & Co. v. NLRB*, 623 F.2d 322 (4th Cir. 1980)

*NLRB v. ADT LLC*, No. 21-2680 (7th Cir. Dec. 2, 2022)

*Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466 (9th Cir. 1966)

*SpaceX v. NLRB* (5th Cir. 2025)

*Sparks v. NLRB*, 835 F.2d 705 (7th Cir. 1987)

*Textile Workers Union v. NLRB*, 475 F.2d 973 (D.C. Cir. 1973) *(Check)*

*United States v. Naud*, 830 F.2d 768 (7th Cir. 1987)

*United Steelworkers of America v. NLRB (Florida Steel)*, 646 F.2d 616 (D.C. Cir. 1981)

*Zipp v. Geske & Sons, Inc.*, 103 F.3d 1379 (7th Cir. 1997)

*University of Chicago v. NLRB*

**STATUTES AND REGULATIONS**

5 U.S.C. § 706(2)(A)

28 U.S.C. § 1331

28 U.S.C. § 1361

28 U.S.C. § 1631

29 U.S.C. § 151

29 U.S.C. § 153(d)

29 U.S.C. § 157

29 U.S.C. § 158(a)(1), (2), (3), (4)

29 U.S.C. § 158(b)(1)(A), (2)

29 U.S.C. § 160(b), (c), (f)

29 U.S.C. § 794 (Rehabilitation Act of 1973)

29 C.F.R. §§ 101.4, 101.8, 101.10–11.12

29 C.F.R. § 102.19

**OTHER AUTHORITIES/FILINGS**

NLRB Casehandling Manual, Part 1, Chapter 3

NLRB, Section 10(j) Categories, https://www.nlrb.gov/what-we-do/investigate-charges/10j-injunctions/section-10j-categories

NLRB Region 13 (Chicago), https://www.nlrb.gov/about-nlrb/who-we-are/regional-offices/region-13-chicago

U.S. Const. pmbl., https://constitutioncenter.org/the-constitution/full-text

Petition and Opening Brief, Singla v. NLRB, No. 26-2788 (filed Aug. 31, 2026)

Petitioner's Brief Memorandum Regarding Jurisdiction (ECF No. 9)

Petitioner's Motion for a Stay or Abeyance (ECF No. 12)

Respondent's Brief in Response to Petitioner's Jurisdictional Memorandum (ECF No. 14)

Office of Appeals Denial Letters (four cases) (Aug. 27, 2026) (ECF No. 1)

Regional Director Dismissal Letters (four cases) (Apr. 30, 2026)

Email from NLRB Region 13 to Petitioner (Aug. 29, 2026)

Email from Elicia L. Watts, Director, Office of Appeals, to Petitioner (Sept. 1, 2026)

Letter from Office of Appeals to Petitioner (Sept. 8, 2026) (acknowledging "timely" motion for reconsideration)

Combined Memo of All Exhibits, https://drive.google.com/file/d/1nns6_sZC7Tpts_SwV90XOm-WIXOPZF4h/view?usp=sharing

Research Compilation of Approx. 350 NLRB Cases Involving the University of Chicago, https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7wcqBy8HAUTJM?e=TDfnf3

Whistleblower Protection in the United States, https://en.wikipedia.org/wiki/Whistleblower_protection_in_the_United_States

## INTRODUCTION

Respondent National Labor Relations Board ("NLRB" or "Board") asks this Court to dismiss Petitioner Dipesh Singla's petition for review, arguing that a decision of the General Counsel not to issue a complaint is never a reviewable "final order of the Board." Citing *NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112 (1987) ("*UFCW*"). That argument depends on a fundamentally incomplete account of what this agency actually did in these four cases an account that omits the Office of Appeals' merits adjudications, the agency's own written representations of finality, its after-the-fact reversal inviting the motion for reconsideration now pending before it, and the constitutional and Administrative Procedure Act claims that the Board's brief does not even attempt to address. The Board's brief (ECF No. 14) is a masterclass in misdirection: it recites the general rule of unreviewability while saying nothing about the specific agency conduct that takes these four cases outside that rule.

The Board's reliance on *UFCW* is misplaced. *UFCW* held unreviewable an informal settlement agreement entered into by a Regional Director before any hearing. Here, there was no settlement the Board's own agent, Zachary Manor, refused Petitioner's good-faith requests to initiate settlement or mediation meetings. There was no consent. Instead, the Office of Appeals, acting under the General Counsel, issued final letters that adjudicated the ultimate question of liability, expressly finding that "the Employer had a legitimate nondiscriminatory reason for its decision and satisfied its burden under *Wright Line* to establish that it would have taken the same action even in absence of the employee's protected concerted activities." (ECF No. 1, at 3.) That is not a decision to decline to prosecute; it is a final, binding adjudication on the merits rendered without a hearing, without a neutral trier of fact, **without a single witness under oath, without cross-examination, and by an office whose sole investigator was the subject of an unresolved formal bias complaint. Without any due process, and in violation of principles of natural justice. Plaintiff Singla contends that the complete process was and is a sham to destroy every avenue of justice through NLRA and otherwise for other cases that plaintiff have against UChicago.**

This case also presents the rare and compelling circumstance that falls squarely within the narrow exception of *Leedom v. Kyne*, 358 U.S. 184 (1958): the Board has acted "in excess of its delegated powers and contrary to a specific prohibition in the Act." *Id.* at 188. It failed to apply the mandatory *Wright Line* burden-shifting framework approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983), and instead placed the burden on Petitioner. It ignored "smoking gun" forensic evidence of document fabrication. It denied Petitioner a neutral trier of fact. It refused to investigate a formal bias complaint against the very agent who recommended the dismissals of all four charges, and it dismissed those charges against two different unions and a major university, on four distinct statutory theories simultaneously, in a display of institutional predetermination. These are not mere errors of judgment; they are actions that strip the agency's decisions of the very legitimacy that the doctrine of unreviewability presupposes.

Finally, the Board's conduct in this matter is procedurally unconscionable. On August 29, 2026, NLRB Region 13 told Petitioner in writing: "Since the appeal process has been exhausted in these cases, the cases will be closed." Petitioner answered the same day that he intended to seek review in this Court precisely because the orders were final and the agency said nothing. Relying on the agency's representation, Petitioner filed his petition on August 31, 2026. Only on September 1, 2026 after the petition was filed did the Office of Appeals reverse course and inform Petitioner

that he "is able to file a motion for reconsideration," which the agency then accepted as "timely" on September 8, 2026. (ECF No. 12.) An agency that certifies exhaustion, watches a litigant file a timely petition in reliance on that certification, and then reopens its internal process cannot be heard to complain that the petition was premature. The Board should be estopped from asserting non-finality; alternatively, this case should proceed to the merits, or be held in abeyance (ECF No. 12), or be transferred in the interest of justice under 28 U.S.C. § 1631. What may not happen is what the Board requests: outright dismissal, leaving a disabled, international, pro se litigant with nothing but a closed agency portal and a **recidivist employer effectively immunized from the Act.**

As a matter of right in a country that is believe to be democratic, plaintiff **demands** the court that Singla exceptions have to be made to halt all such illegal acts of NLRB acting in concert with UChicago like recidivist actors, and serial retaliators, where dismissals especially after exhaustion shall be reviewable by the court of appeals such that due process of such baseless dismissals can be prosecuted as a matter of right. See: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7wcqBy8HAUTJM?e=TDfnf3 . And final decision shall not be with people that are non-neutral and not under oath to take any decision, and in no way immune to answer to higher courts till SCOTUS as they so imply in this case. Absolute immunity of NLRA is lethal for justice to many see in UChicago example one of the most qualified individuals are suing the UChicago over and over and over again, still despite knowing that NLRA is willing to not take any action over and over again. This not only shows aid and abet, but the ill motive of the parties working together for a greater bad. There's no democratic value, no due process, no natural justice, and nothing that can be called good or just in this process. Plaintiff also attaches some exhibits with this documents and questions; those shall also be considered when answering questions and determining this good faith appeals in the pursuit of justice through the law. There are abundance of questions in this case that have to be answered by the appeals courts, the failing of appeals will also fail the class of people who complain for good believing laws and/or NLRA is there, howsoever when they choose to do it NLRA is the one that goes fast and sits in the corner leaving individuals vulnerable to the abusive employers, and incompetent unions who took protection money from us to not protect us in sum. Plaintiff using it's absolute litigation privileges files this document with no fear of adverse action from the court of any kind, mentioning that Retaliation is a grievous hurt, and it's equivalent to hitting a person with a rock wilfully to do intentional harm to destroy for complaint filing. This appeal in itself is novel and nuances needing court to hold a precedent.

**Working Framework of Fraud:**

1. Union files grievance on individual behalf
2. Employer with intention to hurt terminate plaintiff from all avenues possible for utter destruction of plaintiff. (Serial Killer step per ADT implications (Killer word used in that case, serial retaliation was used various times by plaintiff)
3. Unions Backs off
4. NLRB dismiss cases, not mention anything against employer or union(victim shaming)
5. NLRB Claims that not appealability
6. Employer dances on graves of various individuals: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7wcqBy8HAUTJM?e=TDfnf3

**"If they don't get caught, doesn't mean they're innocent"**

## ARGUMENT

## I. THIS COURT HAS JURISDICTION BECAUSE THE OFFICE OF APPEALS' DECISIONS WERE FINAL ORDERS THAT WERE ADJUDICATORY IN NATURE, NOT MERE PROSECUTORIAL DISCRETION

The NLRB's entire jurisdictional argument rests on the distinction between prosecutorial and adjudicatory functions articulated in *UFCW*. The Board conveniently ignores the fact that, in this case, the Office of Appeals did far more than decline to prosecute. It made a final, merits-based adjudication and then closed the agency's doors behind it. Further it appears the board is confused about order from the board and order from the office of appeals both are different and interpretation of UFCW is contingent upon the legally actual understanding of the exact definition of it which board carefully did not talk about.

### A. The NLRB's Reliance on UFCW Is Misplaced; Here, the Agency Did Not Settle a Case, It Adjudicated and Dismissed It on the Merits

The holding in *UFCW* is narrow. The Supreme Court was faced with an "informal settlement agreement" entered into by the Regional Director before a hearing was held. 484 U.S. at 119. The Court held that the settlement decision was prosecutorial in nature, akin to a decision to dismiss a charge. *Id.* at 118–19. The Court's rationale was that "until a hearing is held, the Board has taken no action; no adjudication has yet taken place." *Id.* at 126. The Board's own brief concedes the dichotomy on which that rationale depends: a charge "may be disposed of by withdrawal before hearing, settlement, or formal adjudication," and if not settled, the case proceeds to an evidentiary hearing before an Administrative Law Judge, with decision by the five-member Board. (Resp. Br. at 4–5 (citing 29 U.S.C. § 160(c); 29 C.F.R. §§ 101.10–11.12).) What the Act nowhere contemplates is what happened here: a final adjudication on the merits performed inside the prosecutor's own office without a hearing or due process, without an Administrative Law Judge, and without any of the safeguards that attend adjudication.

In its August 27, 2026 denial letter in Case 13-CA-366016, the Office of Appeals expressly found that "the Employer had a legitimate non-discriminatory reason for its decision and satisfied its burden under *Wright Line* to establish that it would have taken the same action even in absence of the employee's protected concerted activities." (ECF No. 1, at 3.) This is a textbook adjudicatory finding. The agency applied a legal standard the *Wright Line* framework to the facts and resolved the ultimate question of liability in the employer's favor. That is precisely the finding an Administrative Law Judge would make after a trial-type hearing under 29 U.S.C. § 160(c), except that no hearing was held, no witness testified under oath, no document was authenticated or tested, and Petitioner was never permitted to confront or rebut the University's evidence.

The other three letters are no different. In Case 13-CA-383755, the Office of Appeals "determined that the evidence did not support finding that the Employer violated Section 8(a)(1), (2) and (4) as alleged." In Case 13-CB-376044, it determined that "the allegation that the Union's failure to process a grievance on your behalf when you contacted it in December 2025 was a continuing violation and/or an independent violation is unsupported by the evidence." In each letter, the agency resolved contested questions of fact and law timeliness, causation, motive, and the sufficiency of the evidence that only a neutral trier of fact may resolve after a hearing. As the Supreme Court explained in *UFCW*, the relevant distinction is between a decision "whether to file a complaint" (prosecutorial) and "the resolution of contested unfair labor practice cases" (adjudicatory). 484 U.S. at 125. The Office of Appeals here resolved contested

cases. Its findings were final and conclusive, and the agency confirmed that no further internal remedies remained. These are "final order[s] of the Board" reviewable under 29 U.S.C. § 160(f). There's no evidence that any respondent (unions or university) pleaded guilty to NLRA violations, and hence the dispute between parties is not solved at all. Hence pursuant to Cooper case(State of Illinois level alleged) like similar doctrine to weigh the facts the case should have been to the trier of fact. https://www.law.cornell.edu/wex/trier_of_fact says: "A trier of fact is a judge or jury responsible for evaluating the evidence presented in a legal proceeding and making findings of fact. The trier of fact assesses the credibility of witnesses, weighs the evidence, draws reasonable inferences, and reaches a verdict or decision based on these factual determinations.". A neutral fact finder, which is absent in current NLRB way of non-solving of almost all disputes.

The Board leans heavily on *UFCW*'s statement that "[t]he structure of the Act … leads inescapably to the conclusion that Congress distinguished orders of the General Counsel from Board orders." (Resp. Br. at 14 (quoting 484 U.S. at 128).) But that structural point cuts against the Board here. Section 3(d) vests the General Counsel with "final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints." 29 U.S.C. § 153(d). When the General Counsel's office performs the function that the Act reserves to adjudication deciding the merits it acts "on behalf of the Board," and the resulting orders are fairly attributable to the Board for purposes of Section 10(f). The Board cannot enjoy the finality of adjudication while simultaneously dodging the reviewability that attaches to adjudication. Indeed, in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975), the Supreme Court treated the General Counsel's final declination decisions as final agency action "final opinions" for purposes of disclosure. *Id.* at 138–40. The agency's position on "finality" shifts with its litigation needs: final and "closed" in August, when it sought to end Petitioner's administrative remedies; non-final in September, when it sought to defeat this Court's jurisdiction.

**B. The NLRB Ignores the Crucial Fact That, Unlike UFCW, There Was No Valid Settlement Agreement, No Consent, and No Opportunity for a Hearing**

The NLRB's brief characterizes the dismissals as though they were analogous to a consensual settlement disposition. The facts are starkly different. In *UFCW*, the disposition was consensual: the employer entered an informal settlement with the Regional Director, and the charging party objected to the terms of a bargained resolution. Here, there was no settlement agreement of any kind. Petitioner did not consent to the dismissal, and no remedial action of any sort was taken by the employer. Worse Petitioner's good-faith requests that the Board initiate settlement or mediation meetings were denied through the very agent, Zachary Manor, who was simultaneously recommending dismissal. An agency that refuses consensual dispositions and then claims the unreviewable status of consensual dispositions has chosen the benefits of both regimes and the accountability of neither. Strategically noting that can go against the employer and union was ever told by NLRB in any order.

The dismissal also occurred before any hearing or evidentiary proceeding was held. Petitioner was never given the opportunity to present his evidence, cross-examine witnesses, or have his case heard by a neutral decision-maker. Even after Petitioner filed the retaliation charge, no affidavit was ever taken from him. The NLRB's attempt to shoehorn these facts into the *UFCW* framework is unavailing: *UFCW* presupposed that the charging party's underlying rights remained capable of adjudication in a forum with safeguards. Here the agency itself performed the adjudication on a paper record, without safeguards and closed the file. Where the prosecutor becomes the judge, the "prosecutorial discretion" label is a fiction, and this Court should decline to adopt it.

The NLRB's assertion of unreviewable discretion is a farce when it has never once, at any stage, examined the alleged forged and falsified documents that are the very heart of these cases, meaning the matter has never been before any neutral trier of fact to weigh the contested evidence, including the University of Chicago's submission of policies to the CCHR that were generated *after* my expulsion to secure a favourable decision, a fact pattern that proves the NLRA is a remediless system contingent on the personal will of counsel rather than robust law, and which, if left unchecked, will destroy other cases as well; this is especially true where, as here, the agency has made the University of Chicago absolutely immune from NLRA liability despite being a recidivist violator with more cases than several other top universities combined, and where the agency has created a procedural deadlock by sitting on the files, thereby denying me, a pro se litigant, any opportunity to prosecute my meritorious case before an NLRB Administrative Law Judge, a denial that stands in direct violation of the principles articulated in *Cooper v. Salazar,* which enjoins agencies from making credibility determinations without affording the rights of confrontation and cross-examination, and which demands that where a determination turns on conflicting evidence, the agency must find substantial evidence so that a neutral trier of fact may resolve those issues of credibility; the Board's decision, based on evidence unknown and a process that is a hidden secret in a country where courts and agencies are believed to be public forums, is illegal and unconstitutional, and this Court must grant jurisdiction under Section 10(f) and *Leedom v. Kyne* to protect my right to due process, to ensure that recidivist violators like the University of Chicago are prosecuted loosely in favor of individual plaintiffs as the Seventh Circuit mandated in *ADT, LLC v. NLRB* where the court held that an employer need not violate the rights of the same victim to be a repeat offender and to remedy the manifest injustice of an agency that aids and abets a serial retaliator by refusing to act, thereby leaving me, and others like me, completely without any avenue for justice. **ADT, LLC v. National Labor Relations Board (7th Cir. 2022) says "** ADT also argues that recidivism can be found only where an employer has repeatedly violated the rights of the same em-ployee group. Not only do we "lack authority to reach the merits of this argument because [ADT] did not raise it before the Board," but this argument has no basis in law. See KSM Industries, 682 F.3d at 544. If it did, we would call a "serial killer" just a "killer." Under the National Labor Relations Act, an employer need not violate the rights of the same victim to be a repeat offender. See Grinnell Fire Prot. Systems Co., 335 NLRB No. 40, 335 NLRB 473, 473 (2001) (imposing broad re-medial order where employer was a "repeat offender" whose prior violations spanned multiple facilities), enforced, NLRB v. Grinnell Fire Prot. Systems Co., No. 01-9538, 2001 WL 34041228, at *1 (10th Cir. Dec. 6, 2001); Control Servs., 314 NLRB at 421, 432 (1994) (same).**". See:** https://law.justia.com/cases/federal/appellate-courts/ca7/22-1629/22-1629-2022-12-02.html

"Ubi jus ibi remedium"

*"to imagine a right without a remedy is very difficult"*

**C. The Agency Itself Created the Finality It Now Relies Upon to Bar Review**

The NLRB's claim that its decision is not a final order is refuted by its own written conduct, on a timeline that the Board's brief does not mention even once:

1. August 27, 2026 The Office of Appeals denies all four appeals in final terms, in letters that identify no further administrative review. (ECF No. 1.)
2. August 28–29, 2026 Petitioner emails the NLRB and asks whether the four denial orders are final orders of the Board or still internally appealable under NLRB rules and law.

3. August 29, 2026   NLRB Region 13 responds in writing: "Since the appeal process has been exhausted in these cases, the cases will be closed."
4. August 29, 2026   Petitioner replies in writing: "I intend to seek review in the Honorable Court of Appeals, as these matters now constitute final orders, and I have exhausted all available internal administrative remedies. Thanks for confirming." The agency did not correct, qualify, or caution.
5. August 31, 2026   Relying on that representation, and to protect his rights against any deadline for seeking review of a final agency order (see ECF No. 12, at 2 (identifying the 14-day window)), Petitioner files this petition.
6. September 1, 2026   After the petition is filed, Director Elicia L. Watts of the Office of Appeals emails Petitioner that "[f]or these matters in which the appeal has been denied, you are able to file a motion for reconsideration."
7. September 8, 2026   The Office of Appeals accepts Petitioner's reconsideration motion as "timely" and promises "a full analysis of the underlying investigatory file." (ECF No. 12.)
8. September 15, 2026   The Board files its brief arguing that nothing final ever occurred.

This sequence is fatal to the Board's position. An agency that certifies in writing that its process is exhausted, observes a litigant file a timely petition in reliance on that certification, and only then reopens the internal process has manufactured the very jurisdictional objection it now raises. Whatever protection "prosecutorial discretion" affords, it does not protect an agency's right to speak out of both sides of its mouth. Equitable estoppel, elementary due process, and the integrity of this Court's own filing deadlines all bar the Board from invoking a non-finality of its own creation. If the Court believes the pendency of reconsideration renders the August 27 orders non-final, then the just response is a stay or abeyance (ECF No. 12) or a transfer under 28 U.S.C. § 1631   never a dismissal that would extinguish Petitioner's claims through a trap sprung after Petitioner reasonably relied on the agency's written word.

### D. Sparks and the "Bedrock" Line Are Distinguishable, and the Board's Own Footnote Concedes That This Petition Is Not Frivolous

The Board's string citation   *Sparks v. NLRB*, 835 F.2d 705 (7th Cir. 1987), and a dozen companion decisions (Resp. Br. at 15–16 & n.4)   belongs to a different universe of cases: garden-variety refusals to issue a complaint, untainted by merits adjudication, unaccompanied by any bias complaint against the investigator, unburdened by ignored forensic evidence, and untouched by any agency about-face on finality. *Sparks* itself involved nothing more than the General Counsel's declination to file a complaint. 835 F.2d at 706. This case, by contrast, presents the question whether an office that adjudicates the ultimate question of liability   expressly finding that an employer "satisfied its burden under *Wright Line*" has issued a reviewable final order. That question is genuinely open, which is why this Court itself ordered jurisdictional briefing (ECF Nos. 8, 11) rather than summarily dismissing, and why courts have entertained review where a refusal to issue a complaint rested on an erroneous view of the Act. See *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466 (9th Cir. 1966).

The Board's invocation of *Sparks*' warning that lawyers pursuing such petitions risk sanctions, 835 F.2d at 707 (citing *United States v. Naud*, 830 F.2d 768 (7th Cir. 1987)), backfires. The Board expressly disclaims any request for sanctions "since Singla appears pro se." (Resp. Br. at 16 n.5.) That footnote is a concession that this petition   which presents a novel jurisdictional question this Court has already found worthy of ordered briefing, supported by documented

evidence of agency misconduct is not frivolous. The *Sparks*/*Naud* sanction line targets repeat players who file baseless petitions for delay. It has no application to a pro se, disabled, international petitioner who filed promptly, disclosed the reconsideration proceedings to this Court in good faith (ECF No. 12), and asks only for a decision on the merits of his claims.

## II. THIS CASE FALLS SQUARELY WITHIN THE LEEDOM V. KYNE EXCEPTION BECAUSE THE NLRB ACTED IN EXCESS OF ITS DELEGATED POWERS AND CONTRARY TO SPECIFIC PROHIBITIONS IN THE ACT

Even if the Office of Appeals' decisions were not "final orders" under 29 U.S.C. § 160(f), this Court still has jurisdiction under the narrow exception established in *Leedom v. Kyne*, 358 U.S. 184 (1958), which applies when an agency acts "in excess of its delegated powers and contrary to a specific prohibition in the Act." *Id.* at 188. The Board responds that *Kyne* is narrow, that it runs only in district courts, and that Petitioner has identified no violated statutory command. (Resp. Br. at 17–19.) Each response fails.

The NLRB's argument that its actions are unreviewable is not only legally flawed but fundamentally dishonest, as demonstrated by its own contradictory statements and its misrepresentation of the law, beginning with its reliance on Section 3(d) of the Act to claim "final authority" to dismiss charges a provision that, to the extent it is read to grant unreviewable power to a single official to deny justice without any neutral adjudication, is itself illegal and a violation of due process and continuing with its citation to *NLRB v. Food & Commercial Workers*, 484 U.S. 112 (1987), a case that, as the NLRB itself quotes, "leads inescapably to the conclusion that Congress distinguished orders of the General Counsel from Board orders" and which involved a *settlement* to which the charging party objected, not a merits-based dismissal after a full investigation, as occurred here, where the Office of Appeals made a definitive finding that "the Employer had a legitimate nondiscriminatory reason for its employment action which, under the Board's decision in *Wright Line*, established that it would have taken the same action in absence of any protected concerted activities" a merits determination that is the exclusive province of the five-member Board, not the Office of Appeals, and one that was made in complete ignorance of the fact that the University of Chicago fabricated and falsified the discipline after the grievance was filed on February 1, 2025, and served summons for discipline on February 12, just eleven days later, acting as judge, jury, and executioner in sham discipline on feb 24 2025; the NLRB's claim that "Singla's claims arise solely from the refusals of the General Counsel and her staff to issue administrative complaints" is false and incomplete, as my claims arise from a fundamentally flawed process that denied me a neutral trier of fact, ignored "smoking gun" evidence of document fabrication, and was tainted by an unresolved bias complaint against the assigned agent, Zachary Manor; the NLRB's assertion that "nothing in the Act or elsewhere permits any sort of judicial review to occur on this set of facts" is an illegal and dangerous overreach that is being misused by the agency over and over again to deny justice to aggrieved parties, and I hereby request that this Court impose sanctions and fines on the NLRB for its bad-faith conduct, as the *Sparks* case it relies upon does not address sanctions for pro se litigants who bring meritorious, evidence-based appeals in good faith; the NLRB's misrepresentation of *Leedom v. Kyne*, 358 U.S. 184 (1958), is equally egregious, as the agency falsely claims that the exception does not apply, ignoring that its actions failing to apply the mandatory *Wright Line* framework, denying a neutral trier of fact, and relying on fabricated evidence are precisely the **"blatantly lawless"** actions (Note: Blatant deregard of law might have been mentioned in previous filings) that the exception was designed to address, and its argument that this Court has no authority to review under *Kyne* is absurd and baseless, as this Court is the only forum left for a litigant who has been denied every administrative remedy;

the NLRB's claim that I failed to identify any statutory language that was violated is false, as I have identified the failure to apply *Wright Line*, the denial of due process, and the violation of the Rehabilitation Act, and its argument that *Wright Line* does not establish jurisdiction under *Kyne* is a nonsensical and wrongful comparison; furthermore, to the extent the Court finds that Section 10(f) does not provide jurisdiction, I assert that the Court still has jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 706, and 28 U.S.C. § 1331, as the NLRB's actions were arbitrary, capricious, illegal, unconstitutional, and contrary to law, and the agency has created a procedural deadlock by first telling me my remedies were exhausted and then reversing itself, a trap that should estop it from denying jurisdiction; the NLRB's position that it is not required to move on every charge is a red herring, as the issue is not that it declined to prosecute but that it adjudicated my claims on the merits without a hearing, without a neutral trier of fact, and based on a record that included fabricated documents, and in doing so, it has effectively granted the University of Chicago **absolute immunity** from the NLRA despite its status as a recidivist violator with a documented history of retaliation, as evidenced by the fact that the University has been the subject of approximately 350 NLRB charges, more than several other top universities combined, a pattern of misconduct that the NLRB has continuously failed to address (see: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7wcqBy8HAUTJM?e=TDfnf3); this Court has both the authority and the duty to grant the relief requested, as the denial of a neutral trier of fact, the reliance on fabricated evidence, and the agency's refusal to investigate a formal bias complaint are violations of due process that go to the very heart of the NLRA's purpose, and as the Seventh Circuit held in *ADT, LLC v. NLRB*, 2022 WL 511012 (7th Cir. Dec. 2, 2022), an employer need not violate the rights of the same victim to be a repeat offender, and the Board has a duty to impose broader and more stringent remedies against a recidivist, a duty it has abandoned in this case, leaving me and other similarly situated individuals completely remedyless; the principles articulated in *Cooper v. Salazar*, as cited in the IDHR credibility notice (https://explorecarbondale.com/DocumentCenter/View/2660/State-of-Illinois-Housing-Complaint-Form-PDF), further support my position, as that injunction prohibits agencies from making credibility determinations without affording the rights of confrontation and cross-examination, and requires that where a determination turns on conflicting evidence, the agency must find substantial evidence so that a neutral trier of fact may resolve those issues of credibility a procedure that was entirely absent here, where the Office of Appeals made final credibility determinations based on a paper record and without any opportunity for cross-examination, and therefore this Court must grant jurisdiction under 29 U.S.C. § 160(f) and *Leedom v. Kyne*, deny the NLRB's motion to dismiss, and proceed to review the merits of my claims, including the Board's failure to address the "smoking gun" evidence of document fabrication, the denial of my right to prosecute my case before an Administrative Law Judge, and the unconstitutional grant of absolute immunity to a recidivist violator, all of which are documented in the following resources: https://law.justia.com/cases/federal/appellate-courts/ca7/22-1629/22-1629-2022-12-02.html and https://supreme.justia.com/cases/federal/us/484/112/ and https://supreme.justia.com/cases/federal/us/358/184/ and https://drive.google.com/file/d/1nns6_sZC7Tpts_SwV90XOm-WIXOPZF4h/view?usp=drive_web. Strategically NLRB choose not to even discuss at all that the mixed motive case and did solely work in favour of all defendants such that they can get advantage in other cases.

**A. The Board's Failure to Apply Wright Line and Its Misapplication of the Burden of Proof Is a Manifest Violation of the Act**

In *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983), the Supreme Court approved the *Wright Line* burden-shifting framework as the governing method for analyzing retaliation claims under the Act: once the charging party establishes that protected activity was a substantial or motivating factor in the adverse action, "the burden falls on the employer to demonstrate that the action would have been taken even in the absence of the protected conduct." *Id.* at 403. The Court emphasized that the employer "a wrongdoer" who "knowingly created the risk" that lawful and unlawful motives cannot be separated must bear that risk. *Id.* at 403. *Wright Line*, 251 NLRB 1083 (1980), *enfd.* 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982), is therefore not a mere internal agency policy. In fact where there's not infact an requirement of but for causation, and where motivating factor, or contributing factor etc no but-for types causations are workable there also board applied but-for causation, and infact further they strategically did never ever discussed mixed motive as that would have made the cases prosecutable per the NLRA. And the affidavit for the retaliation case after initial NLRA charge was not taken and that was also serially dismissed to take revenge against the plaintiff.

The Office of Appeals did the exact opposite. It found that the employer had "satisfied its burden under *Wright Line*" while simultaneously faulting Petitioner because "the evidence failed to establish the Employer took adverse action against you because of any protected activity." In other words, the agency required Petitioner to prove the employer's unlawful motive outright, before any burden shifted, and then credited the employer's untested, self-serving justification without ever requiring the employer to prove its same-decision defense in an evidentiary proceeding. The Board now asserts that Petitioner "only claims that the General Counsel 'failed to properly apply'" *Wright Line* (Resp. Br. at 18) a mischaracterization of the claim. Petitioner's claim is that the agency adjudicated ultimate liability while inverting the governing burden framework, without a hearing, without evidence-taking, and on a record assembled by a compromised investigator. An office that both wields adjudicatory power and refuses the legal framework governing that power has acted "in excess of its delegated powers." Misapplication of a framework made binding by the Supreme Court's own construction of the Act is not an exercise of discretion; it is a defiance of law by the so-called learned counsel. And hence sanctions are demanded as matter of right.

**B. The NLRB's Denial of a Neutral Trier of Fact Is a Fundamental Due Process Violation That Strips It of Its Delegated Authority**

The Fifth Amendment's Due Process Clause guarantees a neutral and impartial decision-maker. *Withrow v. Larkin*, 421 U.S. 35 (1975); *In re Murchison*, 349 U.S. 133 (1955) (justice "must satisfy the appearance of justice"); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009) (due process requires recusal where there is a "serious risk of actual bias"). Where, as here, disputed facts and the authenticity of documents must be weighed, written submissions are "often an inadequate substitute for oral testimony," *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970); see also *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Goss v. Lopez*, 419 U.S. 565 (1975); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). The NLRB's process in this case denied Petitioner every one of these protections.

All four of Petitioner's charges were assigned to a single agent, Zachary Manor. On December 15, 2025, Petitioner filed a formal complaint against Agent Manor alleging bias, coercion, and predetermination, and requesting reassignment. The complaint was never investigated. Agent Manor remained the sole investigator on all four cases; his work product

formed the basis for the Regional Director's simultaneous dismissal of all four charges on April 30, 2026; and the Office of Appeals then affirmed "substantially for the reasons" in that same tainted record, with identical boilerplate. At no point not once was there a neutral trier of fact to weigh the evidence, assess credibility, or test the authenticity of the documents Petitioner identified as fabricated. The Board's charge-evaluation function "requires impartial assessment, not resolution of disputed issues in favor of the respondent." *NLRB v. Quaker City Metal Industries*, 352 F.2d 637 (3d Cir. 1965). A process run by the accused, for the accused, is not prosecution; it is the corruption of it and it cannot be laundered into unreviewable "discretion."

**C. The Board's Reliance on Fabricated Evidence and Refusal to Investigate "Smoking Gun" Evidence Exceeds Its Authority**

The Board has a duty to conduct a full and fair investigation. NLRB Casehandling Manual, Part 1, Chapter 3; 29 C.F.R. §§ 101.4, 101.8. Petitioner presented "smoking gun" evidence that the University of Chicago fabricated the record used to justify his expulsion: forensic metadata showing that a critical disciplinary document dated July 9, 2024 was created or modified on an Apple device that Petitioner has never owned, used, or accessed; Workday timekeeping records showing that 11.1 hours were added to Petitioner's time record thirty minutes before a meeting with Mansueto-role staff; and a manufactured "$840" account entry engineered as a pretext of misconduct. (Opening Br. ¶¶ 126, 153; Combined Memo of All Exhibits, https://drive.google.com/file/d/1nns6_sZC7Tpts_SwV90XOm-WIXOPZF4h/view?usp=sharing ). This is about 3500 or so pages, plaintiff Singla request permission to file this document with the appeals court, court can also access this document via the link otherwise it's about 530 or so MB document for hon'ble court's kind information.

The Board's response was silence. Neither the Regional Director nor the Office of Appeals acknowledged the metadata, subpoenaed the Workday audit logs, or made any attempt to test the authenticity of the documents on which the University's defense rests. Instead, the Office of Appeals repeated the same conclusory sentence in all four letters: the investigation "was conducted in accordance with the procedures applicable to all cases and was adequate to resolve the issues presented." An agency action must be set aside where the agency "entirely fail[s] to consider an important aspect of the problem" or offers "an explanation … that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Reviewing courts must weigh evidence that "detracts from" the agency's findings on "the record considered as a whole," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951), and the Board's findings must be supported by substantial evidence, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374–75 (1998). An adjudication that ignores dispositive forensic evidence and explains itself in boilerplate is the antithesis of the "reasoned decisionmaking" the law requires. *SEC v. Chenery Corp.*, 318 U.S. 80 (1943). By ignoring this evidence, the Board acted in excess of its delegated authority and contrary to its mandate under the Act.

**D. The Unresolved Bias Complaint and Demonstrated Predetermination Constitute a Violation of Due Process**

Petitioner's December 15, 2025, formal complaint against Agent Manor was never investigated, yet Agent Manor's investigation remained the sole foundation of all four dismissals. Worse, before the investigation was complete, Agent Manor told Petitioner that he would "tell the director/seniors and they will dismiss the charge." ~BLATANTLY LAWLESS. That statement, made before any evaluation of the evidence concluded, is direct evidence of predetermination. The prophecy fulfilled itself: four charges against two different unions and a university, raising four

distinct statutory theories, filed at four different times were dismissed on the same day (April 30, 2026), and all four appeals were denied on the same day (August 27, 2026), by the same signatory, in substantially identical language. When an agency promises an outcome in **advance and then delivers it wholesale, due process is violated and the resulting orders are the product of power exercised in excess of delegation.** This is not a case of mere prosecutorial discretion; it is a case of a predetermined outcome executed through a fundamentally flawed process precisely the kind of agency action *Leedom v. Kyne* was designed to reach.

**E. Respondent's "District Courts Only" Argument Misreads Kyne and Nuclear Regulatory Commission v. Texas; In Any Event, the Answer Is Transfer or Abeyance, Never Dismissal**

The Board argues that *Kyne* supplies original jurisdiction only in district courts, invoking *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) ("no precedent supports bringing an ultra vires claim in a court of appeals rather than first in a district court"), *Zipp v. Geske & Sons, Inc.*, 103 F.3d 1379 (7th Cir. 1997), and *Abercrombie v. Office of the Comptroller of the Currency*, 833 F.2d 672 (7th Cir. 1987). (Resp. Br. at 17–18.) But *NRC v. Texas* concerned an original ultra vires action filed in a court of appeals as a substitute for the statutory review scheme Congress provided; it did not disturb the operation of a specific statutory review provision such as Section 10(f) where the agency has issued final orders adjudicating the merits. Petitioner does not ask this Court to exercise original district-court jurisdiction. He asks the Court to exercise the appellate review Congress created in Section 10(f) over final orders, APA, Tort(If applicable), answering authority, and, in the addition or alternative, to recognize that orders entered "in excess of delegated powers" carry no legitimate claim to unreviewable finality at all. *Kyne*'s rationale that an agency may not violate a statute with impunity is indifferent to which Article III court supplies the remedy. Courts of appeals have entertained such challenges. See *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466 (9th Cir. 1966).

Nor is Petitioner's *Kyne* claim confined to a bare claim of misapplied *Wright Line* doctrine, as the Board asserts (Resp. Br. at 18). The claim rests on: (1) the **trial-less non-adjudication** of ultimate liability; (2) the inversion of the Act's burden framework; (3) the denial of a neutral trier of fact in violation of the Due Process Clause; (4) the refusal to investigate a formal bias complaint against the sole investigator; (5) the total disregard of forensic evidence of fabrication; and (6) the denial of reasonable accommodations to a disabled litigant (7) the denial of good faith settlement requests. That combination clears even the demanding standard the Board invokes: agency action that is "blatantly lawless." *Abercrombie*, 833 F.2d at 675. The Board's remaining authorities are equally inapposite. *Baker*, 691 F.2d at 1296–97 (cited at Resp. Br. at 18–19), holds only that nothing in the Act affirmatively requires the General Counsel to issue complaints in the ordinary case; and *NLRB v. Indiana & Michigan Electric Co.*, 318 U.S. 9, 18 (1943), holds that the Board "is not required by the statute to move on every charge; it is merely enabled to do so." Neither case involved an agency that adjudicated the merits without a hearing while a formal bias complaint against the sole investigator languished uninvestigated. The issue here is not the Board's refusal to move; it is how the Board moved by trying the case in the prosecutor's office, on a tainted record, against the Act's framework.

Finally, and in the alternative: if this Court concludes that Petitioner's claims must be heard first in a district court (Disputed by Plaintiff), then 28 U.S.C. § 1631 requires this Court to transfer this matter to the United States District Court for the Northern District of Illinois "[i]f it is in the interest of justice," rather than dismiss. It is emphatically in the interest of justice to transfer. Petitioner is pro se, disabled, and resides in India; his petition was filed promptly and in good-faith reliance on the agency's written representation of exhaustion; the agency itself accepted his

reconsideration motion as "timely" on September 8, 2026 (ECF No. 12); and dismissal as opposed to transfer would strand time-sensitive claims in a jurisdictional void of the agency's own making, forcing Petitioner to start over, from another continent, through no fault of his own. Transfer preserves everyone's rights and wastes no one's resources. Dismissal rewards only the agency that set the trap. The Board's brief never mentions Section 1631 the statute that most directly answers its request for dismissal.

## III. THE NLRB'S PROCEDURAL MANEUVERS, INCLUDING THE "RECONSIDERATION" TRAP, CONSTITUTE A DUE PROCESS VIOLATION AND SHOULD ESTOP IT FROM CLAIMING THIS COURT LACKS JURISDICTION

As detailed in Petitioner's Motion for a Stay or Abeyance (ECF No. 12) and in Part I.C above, the agency's representations have whipsawed Petitioner at every turn. The agency first declared, in writing, that "the appeal process has been exhausted in these cases" and that "the cases will be closed." Petitioner relied on that representation, announced in writing exactly what he would do seek review in this Court because the orders were final and received no correction. He filed his petition on August 31, 2026. Only then did the agency reopen the process: first by telephone outreach, then by Director Watts's September 1 email inviting a motion for reconsideration, and then by the September 8 letter accepting that motion as "timely." This is not administration; it is ambush.

The "reconsideration trap" forced Petitioner into a Hobson's choice: (a) withdraw a timely petition filed in reliance on the agency's written word which he was and is unwilling to do; or (b) file a motion for reconsideration before the very office whose process he challenges, on the agency's after-the-fact invitation, with no assurance that "reconsideration" is anything more than a longer route to the same result reviewed by the same actors. The Board's brief exploits that trap: it treats the agency's own reversal as evidence that Petitioner filed too soon, while saying nothing about the agency's written representation that caused the timing in the first place. Due process does not permit an agency to manipulate the availability of its own remedies so as to foreclose judicial review. Equity will not tolerate it either. The Board should be equitably estopped from asserting that this Court lacks jurisdiction; alternatively, this Court should hold the petition in abeyance pending the Office of Appeals' decision on reconsideration (ECF No. 12), retaining jurisdiction to protect Petitioner's rights.

The Board's brief never mentions the August 29 email, the September 1 email, the September 8 "timely" letter, or ECF No. 12 not once. Its silence speaks. Candor to a tribunal is an obligation, not a convenience. The Board's selective narrative prosecuting finality to Petitioner in August while pleading non-finality to this Court in September is itself a reason to deny its request. To hold otherwise would be to allow the agency to benefit from its own misleading conduct and to deny Petitioner his day in court. See Petitioner's Motion for a Stay or Abeyance, Section III (ECF No. 12).

## IV. THE NLRB'S BRIEF FAILS TO ADDRESS THE CORE OF PETITIONER'S CONSTITUTIONAL AND APA CLAIMS

The Board's brief addresses one thing only: the asserted unreviewability of declination decisions under Section 10(f). It says nothing not one word about Petitioner's constitutional claims under the Fifth Amendment's Due Process Clause (biased and predetermined adjudication; denial of a neutral trier of fact; denial of a meaningful opportunity to be heard), his claim under

the Rehabilitation Act of 1973, 29 U.S.C. § 794 (failure to accommodate a disabled, pro se, international litigant), or his claims under the Administrative Procedure Act, 5 U.S.C. § 706(2). Yet those claims are squarely presented in the Petition and Opening Brief and in the jurisdictional memorandum (ECF No. 9, at 2 (Point 4)). A response that ignores the constitutional and statutory bases for jurisdiction has not carried the Board's burden of demonstrating that jurisdiction is lacking as to the entire petition.

This Court has jurisdiction over claims arising under the Constitution and laws of the United States, 28 U.S.C. § 1331, over agency action under the APA, 5 U.S.C. § 706(2)(A), and may compel officer action under 28 U.S.C. § 1361. Constitutional claims of biased adjudication are collateral to any agency process: they cannot meaningfully be raised within a process that the claim says is rigged, and here every internal avenue terminates before the same office that issued the challenged orders. Resort to remedies that cannot work is not required. See *McCarthy v. Madigan*, 503 U.S. 140 (1992) (exhaustion not required where administrative remedy is inadequate); *Nash v. Florida Industrial Commission*, 389 U.S. 235 (1967) (same, where resort would be futile). And after *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." The Board's self-serving characterization of its own "final authority," 29 U.S.C. § 153(d), deserves no deference at the jurisdictional threshold least of all where, as shown above, the Board's construction would leave its own merits adjudications answerable to no one.

Under the APA, agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem," offers "an explanation for its decision that runs counter to the evidence before the agency," or leaves its decision unmoored from the record. *State Farm*, 463 U.S. at 43. As detailed above and in the Opening Brief, the Board did all of this and more: it ignored smoking-gun forensic evidence, inverted the *Wright Line* burden, and credited an untested employer narrative assembled by a compromised investigator whose bias complaint was never investigated. The Board's footnote suggesting the APA supplies no avenue (Resp. Br. at 14 n.2 (citing *UFCW*, 484 U.S. at 130–33)) is inapposite: *UFCW*'s APA discussion addressed challenges to a settlement refusal under the Act's own review structure; it did not and could not insulate constitutional violations from all judicial review. The Due Process Clause is a "specific prohibition" superior to any agency's internal allocation of functions, and its violation is actionable no matter which office of the agency committed it.

The structural context sharpens rather than softens these concerns. The Board operated without a quorum for nearly a year following the removal of Member Wilcox, see *NLRB v. Noel Canning*, 573 U.S. 513 (2014) (documenting the Board's institutional vulnerability), and its structure has been held likely unconstitutional by the Fifth Circuit in *SpaceX v. NLRB* (5th Cir. 2025); see also *SEC v. Jarkesy*, 603 U.S. 109 (2024); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020). An agency whose constitutionality is actively contested in the courts, and whose regional process is credibly accused of predetermination, is an agency that requires more judicial oversight, not less.

Finally, Petitioner's filings must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Forcing a disabled, international, pro se litigant to navigate a biased administrative process and then trapping him in a jurisdictional Catch-22 of the agency's own making is fundamentally unfair and contrary to the interests of justice. The first significant word of the United States Constitution is "Union," and its first stated object is to **"establish Justice."** U.S. Const. pmbl., https://constitutioncenter.org/the-constitution/full-text . A statute enacted "to eliminate the

causes of certain substantial obstructions to the free flow of commerce," 29 U.S.C. § 151, and to protect workers' "full freedom of association," *id.*, is not honored by a construction that leaves a worker with a recidivist employer, two abandoned grievances, four dismissed charges, and no forum at all.

## V. THE RECORD AND THE GOVERNING PRECEDENTS INCLUDING CASES IN WHICH REVIEW WAS GRANTED, AND BOARD ORDERS WERE ENFORCED, REVERSED, OR REMANDED IN FAVOR OF CHARGING PARTIES OVERWHELMINGLY FAVOR PETITIONER

Jurisdictional gatekeeping should not blind the Court to what this case actually is: an unusually well-documented retaliation case that the agency processed in an unusually indefensible manner. The Board's implicit premise that everything behind its door is unknowable is wrong. The record before the Board, and the decisions of this Court and the Supreme Court, overwhelmingly favor review.

### A. The Unrefuted Evidence Establishes a Prima Facie Case and Pretext

Protected activity and adverse action were separated by days, not months. Petitioner's union grievance was filed on February 1, 2025, signed by Union Stewards Brian Curran and Rubina Hundal; the University initiated academic disciplinary proceedings within ten to twelve days; and Petitioner was expelled on February 25, 2025 twenty-four days after the grievance. Earlier, following protected complaints about underpayment and working conditions (including a November 2024 complaint through the University's CARES portal and good-faith communications to the Provost and President), the University terminated three of Petitioner's job roles on January 6–10, 2025, and cancelled a scheduled full-time HPC Admin interview. After Petitioner filed his NLRB charge and served process in October 2025, the University deployed debt-collection agents (ConServe and Continental Service Group, LLC) within approximately seventy-two hours of service, even after consent was revoked. Suspicious timing and sequence are recognized bases for inferring retaliation. See *Culver v. Gorman & Co.*, 416 F.3d 540 (7th Cir. 2005); *Clark County School District v. Breeden*, 532 U.S. 268 (2001);

The pretext evidence is forensic and unrefuted: the Apple-device metadata on a document the University dated July 9, 2024; the addition of 11.1 hours to Petitioner's Workday time record thirty minutes before a key meeting; and the engineered "$840" account entry all deployed to justify discipline for a worker with no prior disciplinary history, whose "misconduct" was born by the university after he grieved. A factfinder's disbelief of an employer's explanation permits the inference of pretext, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); a plaintiff's prima facie case plus disbelief of the employer's reasons sustains a finding of liability, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); and institutional knowledge of protected activity cannot be compartmentalized to defeat causation, *Staub v. Proctor Hospital*, 562 U.S. 411 (2011) (cat's-paw doctrine). The Board weighed none of this no hearing, no affidavit from Petitioner on the retaliation charge, no subpoena, no forensic examination of Workday audit logs it was explicitly asked to obtain. Petitioner's statutory right to union representation at the disciplinary hearing, *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), was similarly resolved on paper, on a contested factual record, without an evidentiary hearing.

The charge alleging retaliation for having "resorted to the processes of the Board," in violation of Section 8(a)(4), sits at the core of the Act's enforcement machinery. The Board's own public guidance recognizes "[i]nterference with access to Board processes", "retaliation against

employees for having resorted to the processes of the Board" as a distinct category of serious violation warranting injunctive relief. NLRB, Section 10(j) Categories, Category 13, https://www.nlrb.gov/what-we-do/investigate-charges/10j-injunctions/section-10j-categories . Dismissing that charge on a paper review by a compromised investigator guts the very mechanism that makes the Act self-executing: if workers cannot safely file charges, no remaining protection matters.

**B. The Precedents Favor Petitioner: These Are Cases in Which Review Was Granted and Relief Was Ordered or Enforced for Charging Parties and Employees**

*Leedom v. Kyne* itself is a case in which the workers won: the Board's order was struck down because the agency acted in excess of its powers. 358 U.S. at 191. The exception has teeth, and it exists to be used where the Board defies the Act exactly Petitioner's situation. *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951), is a case in which the court of appeals' cursory review was vacated and the matter was remanded so that evidence detracting from the Board's findings would be weighed on "the record considered as a whole." *Id.* at 488–97. *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983), approved *Wright Line*, placed the same-decision burden squarely on the employer, and enforced the Board's order a framework that, properly applied, favors Petitioner here. *Miranda Fuel Co.*, 140 NLRB 181 (1962), *enfd.* 326 F.2d 172 (2d Cir. 1963), confirmed Board jurisdiction over discriminatory discipline short of discharge.

Most tellingly, this Court has already enforced Board orders against this very respondent. In *University of Chicago v. NLRB,* this Court enforced the Board's bargaining order against the University of Chicago and rejected the University's legal theory demonstrating that when the University's labor conduct is actually adjudicated rather than funnelled into dismissal, the University loses. See also *Columbia College Chicago v. NLRB*, 858 F.3d 473, 478 (7th Cir. 2017) (questions of law reviewed de novo). This Court's recidivism jurisprudence points the same way: in *NLRB v. ADT LLC*, No. 21-2680 (7th Cir. Dec. 2, 2022), this Court enforced a broad remedial order against a repeat violator, explaining that an employer need not violate the rights of the same victims to be a repeat offender: "If it did, we would call a 'serial killer' just a 'killer.'" The Board and the courts alike owe heightened scrutiny to recidivists, and broader remedies are required against them: *Textile Workers Union v. NLRB*, 475 F.2d 973, 976 (D.C. Cir. 1973) ("stronger medicine" necessary for recidivist violators); *Containair Systems Corp. v. NLRB*, 521 F.2d 1166, 1171 (2d Cir. 1975) (Board has "a duty in a litigated case to employ broader and more stringent remedies against a recidivist"); *J.P. Stevens & Co. v. NLRB*, 623 F.2d 322 (4th Cir. 1980); *United Steelworkers of America v. NLRB (Florida Steel)*, 646 F.2d 616 (D.C. Cir. 1981), https://law.justia.com/cases/federal/appellate-courts/F2/646/616/87158/; *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344 (1953) (remedies must bear appropriate relation to the Act's policies); *Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 268 (1965).

The duty-of-fair-representation precedents likewise favor Petitioner, because the Board's dual union dismissals are logically impossible together. *Vaca v. Sipes*, 386 U.S. 171 (1967); *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192 (1944); *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65 (1991); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554 (1976); *Clayton v. International Union, UAW*, 451 U.S. 679 (1981); *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983). The Regional Director found Graduate Students United not liable for processing Petitioner's grievance inadequately, while simultaneously finding Teamsters Local 743 not liable for refusing to process it at all. Under that reasoning, no union is ever accountable under Sections 8(b)(1)(A) and 8(b)(2) a standard *Vaca* forecloses. The dismissal letters also never address Petitioner's December 21, 2025 written contact to both unions, which fell within Section 10(b)'s

six-month period relative to the March 18, 2026 amended charges  an unexplained hole in the Board's timeliness analysis that itself demonstrates the non-individualized, outcome-driven character of the dismissals.

Petitioner's disclosure rights survive as well: Advice memoranda and appeal records explaining declination decisions are presumptively disclosable, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975), and witness statements gathered in Board investigations are generally subject to production, *NLRB v. Scrivener*, 405 U.S. 117 (1972). Petitioner expressly preserves those rights and his rights under the Freedom of Information Act with respect to the entire investigative file in all four cases.

**C. The Pattern Evidence Compels Scrutiny and Refutes Any Notion That These Were Four Ordinary Merit Determinations**

According to publicly available data compiled by Petitioner, the Board finds merit in roughly forty percent of the charges it receives. Petitioner filed four evidentiarily documented charges and received a zero percent merit rate. If each charge faced even the national dismissal rate of about sixty percent, the probability that all four would be dismissed is approximately thirteen percent and the dismissals followed within months of Petitioner's December 15, 2025 formal complaint about the agent who recommended them. All four charges were handled by Region 13 (Chicago), the region in which the University sits, https://www.nlrb.gov/about-nlrb/who-we-are/regional-offices/region-13-chicago, despite Petitioner's documented concerns about regional entwinement with the University and his requests for reassignment. The Board's own casehandling materials contemplate individualized assessment; what the record shows instead is simultaneous, boilerplate disposition  one day of dismissals, one day of appeal denials, one paragraph of reasoning replicated four times.

The University of Chicago is not an ordinary respondent. Petitioner's research compilation documents approximately 350 NLRB cases involving the University of Chicago  more than several peer research universities combined  with relief rarely, if ever, granted: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7wcqBy8HAUTJM?e=TDfnf3. A recidivist employer of this scale, which lost before this very Court in 2020 when its conduct was finally adjudicated, is precisely the respondent whose file deserves and whose employees deserve  the strongest, not the weakest, process the Act can provide. The Board gave it the weakest: a single compromised investigator, no hearing, no forensic testing, and simultaneous dismissal of every charge the complaining worker filed. The Board's own institutional instability during the relevant period  a year-long quorum gap and active constitutional challenges to its structure, *Noel Canning*, 573 U.S. 513; *SpaceX* (5th Cir. 2025); *Jarkesy*, 603 U.S. 109; *Seila Law*, 140 S. Ct. 2183  compounds, rather than excuses, the failure to get these four cases right.

Finally, the sequence of events implicates whistleblower-protection concerns in their own right: Petitioner's December 15, 2025 letter reported federal-employee misconduct to the agency and to its Inspector General hotline, and the wholesale dismissals followed within months. See https://en.wikipedia.org/wiki/Whistleblower_protection_in_the_United_States (overview of federal whistleblower protections). An enforcement agency that retaliates  or appears to retaliate against a charging party for reporting the misconduct of its own staff has forfeited the deference that "prosecutorial discretion" would otherwise command.

**D. Petitioner Is Completely Remediless Absent Review**

The Board's answer to remedilessness is silence. There is no private right of action under the Act to redress an employer's unfair labor practices; the Board is the exclusive vehicle Congress created. *UFCW*'s own reasoning presupposed that other pathways remained; here, every pathway the employer charges and the duty-of-fair-representation charges alike terminates before the same office that predetermined the outcome, and the alternative civil route against the unions is itself time-constrained, *DelCostello*, 462 U.S. at 172 (six-month limitations period). If this petition is dismissed, Petitioner and any worker in his position is left with a statutory right on paper and no remedy in fact, against a recidivist employer that this Court has already once had to order back into compliance. That cannot be the Act Congress wrote "to encourage the practice and procedure of collective bargaining and … to eliminate the causes of certain substantial obstructions to the free flow of commerce." 29 U.S.C. § 151.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that this Court deny the NLRB's request to dismiss the petition for lack of jurisdiction. The Office of Appeals' August 27, 2026 decisions were final orders that adjudicated the merits of Petitioner's claims without a hearing or neutral trier of fact. The Board's actions fall within the *Leedom v. Kyne* exception, as they were taken in excess of its delegated powers and contrary to specific prohibitions of the Act, including the Due Process Clause of the Fifth Amendment. The Board's misleading procedural conduct certifying exhaustion, inducing reliance, and then reversing course estops it from denying this Court's jurisdiction, and its brief's failure to address Petitioner's constitutional and APA claims forfeits any objection to those independent bases for review. Petitioner request court to make a **framework** for this kind of complex cases touching many to most of the NLRA violations, and procedures, due process, and constitutionality, **exceptions** otherwise shall be made such that doors of court should open for poor when closed by employers, unions, admin agencies and many more.

This Court has the authority and the duty to review these final orders and the fundamentally flawed process that produced them. Petitioner respectfully requests that this Court: (1) deny dismissal and assume jurisdiction over the petition; (2) order the immediate filing of the complete administrative record in all four cases; and (3) proceed to review the merits of Petitioner's claims, including the relief requested in the Opening Brief. In the **alternative**, Petitioner requests that the Court (4) transfer this matter to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1631 in the interest of justice, or (5) hold the petition in abeyance pending the Office of Appeals' decision on Petitioner's timely motion for reconsideration (ECF No. 12), retaining jurisdiction. The integrity of the National Labor Relations Act and the fairness of the judicial system demand nothing less.

**Note:** Correction, amendment or supplementation etc may follow at any time upon knowledge of defect.

Respectfully submitted this 15th day of September, 2026.

**/s/ Dipesh Singla**

Dipesh Singla
Petitioner, Pro Se
184, NAC, Shivalik Enclave, Manimajra
Chandigarh, 160101, India

dipeshsingla668@gmail.com
+1 (773) 457-1046

## CERTIFICATE OF SERVICE

I certify that on September 15, 2026, a true and correct copy of the foregoing Petitioner's Reply Brief in Response to the NLRB's Brief in Opposition to Petitioner's Jurisdictional Memorandum was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit via the email. Upon docketing by the Clerk on the Court's CM/ECF system (or portal), a digital copy of this filing will be served automatically on all parties on record.

**Served to:**

USCA7_Clerk@ca7.uscourts.gov (Via Email)

**/s/ Dipesh Singla**

Dipesh Singla
Dated: September 15, 2026 (Chicago Date)

**IN THE NATIONAL LABOR RELATIONS BOARD**

DIPESH SINGLA,

**Charging Party/Movant/Plaintiff,**

v.

THE UNIVERSITY OF CHICAGO,

TEAMSTERS LOCAL 743, and

GRADUATE STUDENTD UNITED (GSU).

**Respondent/Defendant/Charged Party**

**Charged Parties in separate cases with NLRB CASE NO'S.:**

- **13-CA-366016** (University of Chicago)
- **13-CB-376043** (Teamsters Local 743)
- **13-CB-376044** (Graduate Students United)

(And more as further retaliation cases so arise.)

**SUPPLEMENTAL LEGAL ISSUES & FEDERAL QUESTIONS / POSITION STATEMENT QUESTIONS WITH REQUEST FOR CLARIFICATION AND PRESERVATION OF ISSUES AND QUESTIONS.**

**Table of Contents**


I. PRELIMINARY STATEMENT AND REQUEST FOR HON'BLE BOARD ENGAGEMENT ........ 2

II. LITIGATION FRAMEWORK AND METHODOLOGICAL FOUNDATION ........ 3

III. THRESHOLD QUESTIONS ON PROTECTED ACTIVITY AND EVIDENTIARY SCOPE ........ 5

IV. DETAILED EXPLANATION OF ANALYTICAL FRAMEWORKS AND APPLIED METHODOLOGIES ........ 5

A. Retaliation Cascade Framework ........ 6

B. Multi-Role Retaliation Framework ........ 6

C. Digital Evidence Reliability Framework ........ 6

D. Systemic or Integrated Liability Framework ........ 6

E. Dual-Status (Multi-Status) Framework ........ 7

F. Union Representation and Fiduciary Responsibility Framework ........ 7

G. Quantitative and Temporal Analysis Framework ........ 7

H. Evidentiary Testing and Cross-Examination Framework ........................................... 7
I. Systems-Level Theory of Liability................................................................................. 7
V. Questions ......................................................................................................................... 8
VI. RESERVATION OF RIGHTS ...................................................................................... 54
VII. PRAYER FOR RELIEF ............................................................................................... 55

## I. PRELIMINARY STATEMENT AND REQUEST FOR HON'BLE BOARD ENGAGEMENT

Complainant respectfully requests that the Hon'ble National Labor Relations Board address the foregoing questions in good faith and with due consideration of their legal and precedential significance, so that the issues raised may be properly clarified, developed, and, if necessary, preserved for further review or appeal. Complainant further submits that it is reasonably understood that a substantial portion of matters before the Board involve traditional full-time employment relationships; however, the present case, involving a hybrid academic-employment context, presents novel and significant questions under the Act. Accordingly, this matter has the potential to establish important precedent regarding the application of the NLRA to non-profit, federally funded institutional employers and their affiliated labor organizations. Complainant respectfully urges the Honourable Board to fully engage with these issues, as their resolution will not only determine the outcome of the present case but also provide critical guidance on the Board's role in addressing alleged violations within such institutional frameworks, thereby reinforcing accountability, consistency, and the proper enforcement of statutory protections.

Some of the questions may be a prediction based on the ***future events (EMPHASIS ADDED)*** by **anyone involved** conduct. Complainant reserves the right to ask further questions and appeal with further information, and questions to preserve rights and get answers to questions arising from this case mentioned above.

Complainant respectfully submits that providing responses to the questions presented herein will not only assist in the fair adjudication of the present matter but will also offer broader guidance beneficial to similarly situated individuals and communities, especially including students, student-employees, international student employees, undocumented workers, off contract workers. This submission is made in good faith and is not intended to increase judicial burden or cost; rather, it **is intended to promote efficiency by clarifying recurring legal issues that may otherwise give rise to multiple *future disputes***. To the extent that any of the questions presented have already been addressed in existing precedent, Complainant respectfully requests that such questions be answered with appropriate citations to relevant case law, statutory provisions, regulations, or established precedents. Such clarification will aid in streamlining future proceedings and ensuring consistent application of governing legal standards.

**The Charging Party respectfully submits this filing as a preliminary and limited supplemental position statement questions for the purpose of raising specific legal questions and concerns that relevant authorities and hon'ble courts of appeals will answer as questions or denovo questions at relevant points of times as per request of grieving party. The Charging Party expressly reserves all rights to submit additional position statements, supplements, briefs, evidence, and arguments as may be necessary or appropriate as the investigation progresses or as further information becomes available.**

The Charging Party respectfully submits that this filing has been prepared on a pro se basis, without the **benefit of legal counsel or access to proprietary legal research databases** such as ***LexisNexis or Westlaw etc***. Accordingly, the Charging Party requests that this submission be construed with the degree of leniency customarily afforded to pro se litigants. The Charging Party further reserves the right to supplement this filing upon obtaining access to additional legal research resources and information. The efforts undertaken herein to identify and present potential violations are made in good faith and based on a reasonable belief that such activity constitutes protected activity, including protected concerted activity where applicable, ***undertaken for the purpose of addressing alleged violations and promoting broader compliance and deterrence in the public interest.***

The Charging Party acknowledges that certain questions presented herein may appear similar or overlapping in form. However, such questions are framed as distinct variations to address nuanced factual and legal differences that may arise across related or parallel circumstances (especially close to Singla Cases). To the extent that any questions are deemed substantially similar, the Charging Party respectfully submits that prior answers may be incorporated by reference or applied mutatis mutandis for purposes of judicial economy, consistency, and efficiency in adjudication.

The Charging Party submits this filing in good faith, without fear or hesitation, and with full respect for the authority of the hon'ble Board and any reviewing hon'ble court. The questions presented are raised **not for purposes advantage alone**, but with a ***sincere intent to seek clarity, ensure proper application of the law, and contribute to the fair and consistent development of legal principles***. The Charging Party respectfully submits that these **issues are brought forward in the interest of justice and for the broader benefit of similarly situated individuals and the public at large.**

## II. LITIGATION FRAMEWORK AND METHODOLOGICAL FOUNDATION

This document is based on a multi-layered framework integrating traditional labor law doctrine, advanced legal theories, quantitative analytical models, and structured evidentiary methodologies. It is made to facilitate rigorous legal analysis, question formulation, and adjudicative review at the Administrative Law Judge, National Labor Relations Board, and appellate levels.

At its foundation, the framework applies established statutory and doctrinal principles under the National Labor Relations Act, including Sections 8(a)(1), 8(a)(3), 8(a)(4), and 8(b), as well

as the burden-shifting analysis under *Wright Line*, the Duty of Fair Representation standards articulated in *Vaca v. Sipes* and *Air Line Pilots Ass'n v. O'Neill*, and representation rights under *NLRB v. Weingarten, Inc.*. It further incorporates governing administrative law standards, including the "substantial evidence" requirement under *Universal Camera Corp. v. NLRB*, arbitrary and capricious review under *Motor Vehicle Mfrs. Ass'n v. State Farm*, and procedural due process principles under *Goldberg v. Kelly*.

Building upon these foundations, the document advances several novel and integrated legal theories, including: (i) a Retaliation Cascade Theory, recognizing that sequential and escalating adverse actions strengthen the inference of unlawful motive; (ii) a Multi-Role Retaliation Framework, addressing adverse actions extending across distinct employment roles as evidence of generalized animus; (iii) a Digital Evidence Reliability Doctrine, challenging the evidentiary sufficiency of employer reliance on electronic systems lacking exclusivity, attribution, or audit verification; (iv) a Systemic or Integrated Liability Model, analyzing employer and union conduct collectively as a unified system rather than isolated actors; (v) a Dual-Status (Or Multi-Status) Exploitation Theory, addressing selective classification of individuals as "student" or "employee" to minimize legal accountability; and (vi) a Union Fiduciary/Insurer Analogy, recognizing heightened obligations where unions exercise exclusive control over grievance and arbitration mechanisms.

In addition, the framework incorporates quantitative and logical analytical models, including probability-based inference (probability collapse), temporal clustering analysis, and network causation theory, to evaluate whether patterns of adverse actions are consistent with lawful coincidence or indicative of coordinated or retaliatory conduct.

The document further employs a structured cross-examination and evidentiary testing methodology, including targeted inquiry into data attribution, system integrity, temporal proximity, decision-making chains, grievance processing, and institutional coordination. These methods are designed to expose inconsistencies, pretext, procedural deficiencies, and potential violations of statutory obligations by both employer and union actors, as well as investigative or analytical gaps at the agency level using existing frameworks.

At its core, this framework advances a systems-level theory of liability, asserting that the conduct at issue must be evaluated under a totality-of-the-circumstances approach as an integrated sequence of actions across multiple actors and roles. It rejects fragmented analysis in favor of a unified assessment of how combined conduct may result in the deprivation of statutory rights.

This approach reflects a matter of appellate-level complexity, involving the intersection of multi-role employment, digital evidentiary challenges, employer–union interaction, and hybrid student-employee status, and is intended to support the development of novel legal questions, preservation of issues for review, and potential precedent-setting analysis.

## III. THRESHOLD QUESTIONS ON PROTECTED ACTIVITY AND EVIDENTIARY SCOPE

Whether the filing of a charge with the National Labor Relations Board constitutes protected activity under the National Labor Relations Act, and whether the presentation of patterns derived from other cases involving similar allegations against the University may also qualify as protected concerted activity or otherwise permissible evidentiary support under the Act; further, whether such pattern-based evidence may be considered by the Honorable Board in evaluating Respondent's conduct under a totality-of-the-circumstances framework in the present Singla matter, including whether prior alleged violations, related proceedings, and historical conduct attributable to the University—regardless of temporal remoteness, including conduct extending several decades into the past—may be admitted or considered as relevant background evidence to establish motive, intent, or systemic pattern of behavior.

## IV. DETAILED EXPLANATION OF ANALYTICAL FRAMEWORKS AND APPLIED METHODOLOGIES

Complainant respectfully submits that the allegations in this matter are supported and should be evaluated under an integrated analytical framework grounded in established National Labor Relations Act doctrine and applicable administrative law principles, including the burden-shifting standard set forth in ***Wright Line***, the Duty of Fair Representation standards articulated in *Vaca v. Sipes* and *Air Line Pilots Ass'n v. O'Neill*, representation rights under *NLRB v. Weingarten, Inc.*, and evidentiary review requirements under *Universal Camera Corp. v. NLRB*. Within this framework, Complainant advances that conduct is not properly understood as isolated events but as a sequence of interrelated actions constituting a **retaliatory series of adverse actions** (termed as ***Serial Retaliation***), wherein **temporally proximate and escalating adverse measures following protected activity support** an inference of ***unlawful motive***; that adverse actions extending across multiple and otherwise unrelated roles are indicative of generalized animus rather than role-specific justification; that reliance on electronic or digital systems lacking exclusive user control, audit verification, or reliable attribution fails to satisfy evidentiary standards required for disciplinary action; that employer and union conduct must be evaluated collectively as an integrated system where parallel action or inaction may result in a ***combined deprivation of statutory rights;*** that selective classification of Complainant as a student or employee depending on institutional advantage raises concerns of ***inconsistent application of legal protections;*** and that the union's exclusive control over grievance and arbitration mechanisms imposes a heightened obligation to act in a manner that is ***not arbitrary, discriminatory, or in bad faith***. Complainant further submits that the timing, sequencing, and interrelation of events may be evaluated using logical and inferential analysis, including assessment of temporal proximity, clustering of adverse actions, and interconnected decision-making structures, to determine whether the conduct at issue is consistent with lawful independent action or reflects coordinated or retaliatory behavior. In addition, Complainant applies a structured evidentiary methodology focusing on attribution of records, integrity of digital systems, decision-making authority, grievance processing, and institutional coordination to identify inconsistencies, pretext, and procedural deficiencies. Accordingly, Complainant asserts that the conduct in this matter should be evaluated under a totality-of-the-circumstances approach as an integrated sequence of actions across multiple

actors and roles, rather than through fragmented analysis, and that such an approach is necessary to ensure full and fair adjudication of the statutory rights at issue for providing justice to grieving party.

### A. Retaliation Cascade Framework

Complainant submits that the alleged conduct should be evaluated under a ***retaliation cascade framework*****,** under which sequential and escalating adverse actions following ***protected activity*** are not treated as independent occurrences but as part of a continuous course of conduct evidencing unlawful motive. Under the causation principles articulated in *Wright Line*, temporal proximity combined with escalation support an inference of retaliatory intent. For example, where an employee engages in protected activity and is subsequently subjected, in close temporal sequence, to investigation, discipline, termination, and additional adverse consequences affecting employment or institutional status, the sequence itself is probative of motive and cannot be artificially segmented into isolated acts.

### B. Multi-Role Retaliation Framework

Complainant further asserts that where an individual holds multiple roles, adverse actions extending beyond the role in which alleged misconduct occurred should be analyzed as evidence of generalized animus rather than role-specific discipline. In such circumstances, the absence of a direct nexus between the alleged misconduct and the broader scope of adverse actions supports an inference of pretext. For example, where an alleged issue in one employment role results not only in discipline in that role but also in termination or restriction from unrelated positions or functions, such expansion of adverse consequences raises questions regarding motive and proportionality.

### C. Digital Evidence Reliability Framework

Complainant challenges the evidentiary sufficiency of Respondent's reliance on electronic systems where such systems do not ensure exclusive control, reliable attribution, or audit verification. Under administrative law principles requiring substantial evidence, reliance on digital records is insufficient where multiple individuals have the ability to create or modify entries and no audit logs or verification mechanisms are produced. For example, where timekeeping or work records are maintained in a system that permits supervisory edits or administrative overrides, and no audit trail is provided to establish authorship or integrity of entries, such records cannot reliably support disciplinary findings.

### D. Systemic or Integrated Liability Framework

Complainant submits that the conduct of the employer and the labor organization must be evaluated as part of an **integrated system** rather than as isolated actors. Where employer action and union inaction operate in parallel to produce a single outcome depriving the employee of both statutory and contractual protections, the combined effect is legally significant. For example, where an employer imposes discipline and the union fails to process a grievance, provide representation, or pursue arbitration, the resulting absence of remedy reflects a systemic failure that must be evaluated under the totality of circumstances.

### E. Dual-Status (Multi-Status) Framework

Complainant asserts that inconsistent classification of an individual as a "student" or "employee" ***depending on context*** may constitute selective application of legal standards and may interfere with statutory rights. Where an institution treats an individual as an employee for purposes of discipline but as a student for purposes of denying protections under the law, such inconsistency raises concerns of evasion of legal obligations. For example, reliance on employee status to impose discipline while simultaneously invoking student status to limit access to statutory or representational rights may demonstrate opportunistic classification.

### F. Union Representation and Fiduciary Responsibility Framework

Complainant further submits that where a labor organization exercises exclusive control over grievance and arbitration procedures, it is required under established Duty of Fair Representation standards to act in a manner that is not arbitrary, discriminatory, or in bad faith. Where a union fails to process a grievance, declines to pursue arbitration without explanation, or fails to communicate with the member, such conduct constitute a breach of its representational obligations. For example, failure to assign a grievance number, provide updates, or document the basis for declining arbitration may indicate perfunctory or arbitrary handling.

### G. Quantitative and Temporal Analysis Framework

Complainant also relies on logical and inferential analysis of timing and sequencing to evaluate whether conduct reflects independent action or coordinated behavior. Temporal clustering of adverse actions within a short period following protected activity may strengthen the inference of causation, while the occurrence of multiple adverse outcomes in close succession may reduce the likelihood of coincidence. For example, where termination, removal from additional roles, and denial of opportunities occur within a narrow timeframe following protected activity, such clustering supports an inference of interrelated decision-making rather than independent events.

### H. Evidentiary Testing and Cross-Examination Framework

Complainant applies a structured evidentiary methodology focusing on attribution of records, integrity of systems, decision-making authority, and procedural compliance. This includes inquiry into who created or modified records, whether audit logs exist, who participated in disciplinary decisions, whether grievance procedures were followed, and whether actions by employer and union were coordinated or independent. Such inquiry is necessary to identify inconsistencies, pretext, and procedural deficiencies in the record.

### I. Systems-Level Theory of Liability

Complainant asserts that the conduct at issue must be evaluated under a totality-of-the-circumstances approach as an integrated sequence of actions across multiple actors and roles. Fragmented analysis of individual events risks obscuring the cumulative effect of conduct that, when viewed collectively, may constitute interference with, restraint of, or retaliation against protected activity. Accordingly, the relevant inquiry is whether the combined actions of Respondent and associated actors resulted in the deprivation of statutory rights under the Act.

**V. Questions**

1. Whether disputes concerning union dues collection, allocation, or reimbursement constitute protected concerted activity under Section 7, including whether such disputes raised individually nonetheless fall within "mutual aid or protection," and whether an employer's reliance on union dues-related issues as a basis for discipline constitutes indirect interference with protected union activity.

2. Whether the invocation of union dues issues post hoc—***where such issues were not contemporaneously cited in the original disciplinary action—constitutes evidence of pretext under Wright Line,*** and whether shifting reliance between "work hours," "conduct," and "dues-related issues" demonstrates inconsistent employer justification sufficient to establish pretext as a matter of law, particularly where financial disputes are unrelated to job performance.

3. Whether a union's conditioning of grievance processing on current payment (Current due paying member) or repayment of dues or financial compliance constitutes coercion or arbitrary conduct under the Duty of Fair Representation, including whether demanding repayment unrelated to the employer's disciplinary grounds constitutes bad faith or hostility toward the grievant, and whether failure to transparently document dues obligations, disputes, or calculations constitutes perfunctory handling under Vaca v. Sipes or other relevant laws or precedants.

4. Where an employee paid union dues throughout their tenure in a bargaining unit position, and a disciplinary dispute arises from conduct allegedly occurring during that dues-paying period, but the union refuses representation on the basis that the employee is no longer a dues-paying member at the time the dispute surfaces, does the union's duty of fair representation attach at: (a) the time of the underlying employment conduct; (b) the time the dispute arose or was reasonably discoverable; or (c) the time representation is requested?

5. Under Vaca v. Sipes, 386 U.S. 171 (1967), a union owes a duty of fair representation to those employees in the bargaining unit? Where an employee has left the bargaining unit but seeks representation for a grievance arising from covered employment time when dues were being paid, does the phrase "employees in the bargaining unit" refer to: (a) current membership status at time of representation request; or (b) membership status at the time of the events giving rise to the grievance?

6. Whether union membership is limited solely to dues-paying individuals, and whether employees—consistent with their right to freely associate under applicable labor laws—retain the freedom to organize, join, or support alternative unions within the same university, including those operating under different bargaining units or contractual frameworks. Would only dues paying will make them a union member and then only union shall be liable for protecting under the agreement.

7. Where employees have the freedom to choose or associate with a union other than the one formally recognized for their specific job classification, whether such an alternative union

may represent or file grievances on their behalf; and if so, whether such representation must be limited to that union's own collective bargaining agreement, or may extend to enforcing rights arising under the originally recognized bargaining unit's agreement. Further, whether an employer is legally obligated to recognize, engage, or arbitrate disputes with a union that is not the certified or recognized exclusive representative for that particular job classification.

***8.*** Where a union's collective bargaining agreement provides for a grievance procedure covering disputes "arising under the agreement," and an employee's dispute concerns hours worked and compensation due during a period when the employee was a dues-paying member covered by the agreement, can the union permissibly deny representation based solely on post-employment membership status, or does such denial constitute arbitrary discrimination under ***Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65 (1991)? Further, is the denial a violation of tripartite standard in Vaca V. Sipes?***

**9.** Where an employee paid union dues for the entirety of their union-covered employment, creating an expectancy of representation for disputes arising from that employment, does the union's subsequent refusal to represent — based on the technicality of non-membership at the time the dispute surfaces — constitute: (a) a breach of the implied covenant of good faith and fair dealing; (b) arbitrary conduct under the "substantial prejudice" standard; or (c) permissible membership-conditioned representation?

**10.** If a union's duty of fair representation extends only to current members, what incentive structure does this create for unions to delay dispute resolution until an employee leaves covered employment, or is fired, thereby avoiding representation obligations for grievances arising from actual covered employment?

**11.** Whether there exists any recognized legal standard, formula, method, or quantifiable benchmark governing the extent to which a union must expend financial resources on behalf of an individual member in pursuing grievances, including costs related to investigation, counsel, or arbitration; and whether unions are obligated to substantiate claims of financial incapacity by disclosing records such as reports filed with the Office of Labor-Management Standards (OLMS), or whether a union may rely on discretionary assertions of limited resources. Further, where unions decline to provide paid representation or arbitration—particularly where representation is undertaken by unpaid volunteers or non-legal personnel—whether such limitations impact the adequacy of representation under the duty of fair representation, and what standards govern such determinations.

**12.** Whether the application of the burden-shifting framework established in McDonnell Douglas Corp. v. Green, particularly at the **summary judgment stage**, operates in practice to disproportionately disadvantage **plaintiffs** by allowing **employers**—especially large institutional defendants—to assert facially legitimate reasons such as alleged misconduct, thereby shifting the effective burden onto the plaintiff to prove pretext; and whether such application is consistent with the concerns raised in the dissenting opinion of Hon'ble Justices Clarence Thomas and Neil Gorsuch in ***Hittle v. City of Stockton***, which questioned the continued viability, fairness, and doctrinal clarity of the framework. Whether, in light

of such criticisms and the acknowledged ***confusion*** in lower courts, the continued reliance on the McDonnell Douglas framework risks obstructing the proper adjudication of discrimination and retaliation claims or deviating from the evidentiary standards required under Rule 56 of the Federal Rules of Civil Procedure. Further, whether, in practical effect, the operation of this framework transforms a plaintiff's discrimination or retaliation claim into a de facto defensive inquiry centered on the employer's stated justification—without a formally pleaded counterclaim—thereby affording undue procedural and evidentiary advantage to defendants. Additionally, whether such a structure incentivizes employers, including large corporate institutions or repeat actors, to generate post hoc justifications or paper trails to characterize protected activity as misconduct, thereby undermining statutory protections and potentially obstructing the fair adjudication of claims under Title VII and related laws, in tension with the evidentiary standards governing summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

**13.** Where an employee paid union dues over months or years of covered employment, and the union refuses representation for a dispute arising from that covered period, is the union required to: (a) refund dues paid during the relevant dispute period; (b) provide pro-rated representation services; or (c) demonstrate that representation was provided for other matters during the membership period?

**14.** Can union be mandated to provide legal representation to grieving parties from there dispute? Can there be ***master's union*** with more resources such that they can "Loosely" take the case of plaintiff and prosecute the case till the end or till in the state and district hon'ble courts, can the union and grievant (employees) generally, can they take insurance like for example in workers' compensation claims on which Wikipedia says "Managers cannot order people to participate in situations involving something that is illegal, unethical, or unhealthful. When a worker feels that this is the case, they may file a dispute. **Workers will often prevail** if some kind of law or public policy can be used to justify a dispute." (***See***: https://en.wikipedia.org/wiki/Whistleblower_protection_in_the_United_States)? Also the retaliatory conduct can lead to criminal sanctions against the employers? Can that conduct lead to criminal sanctions under the NLRA?

**15.** Where the dispute concerns hours worked during a period when the employee was both (i) a dues-paying union member and (ii) covered by the collective bargaining agreement, and the discipline is imposed 180+ days after the employment relationship ended, does the union's representation duty survive the termination of employment, or does the duty terminate simultaneously with membership status?

**16.** Under the "**retroactive representation**" doctrine, if any, can an employee who was a member at the time of the underlying events but not at the time of representation request compel the union to represent them by: (a) offering to pay back dues; (b) demonstrating that the dispute was concealed or not reasonably discoverable during membership; or (c) showing that the union was on notice of the potential dispute during membership?

**17.** In light of decisions such as ***Bowen v. United States Postal Service*** and ***DelCostello v. International Brotherhood of Teamsters,*** which address the interrelationship between

employer liability and a union’s duty of fair representation, whether a union’s refusal to represent an employee including a former member for a dispute arising out of covered employment: (a) may affect or toll the applicable statute of limitations for claims against the employer; (b) constitutes an independent breach of the duty of fair representation; or (c) falls outside the scope of the union’s duty where the individual is no longer an active member at the time of the request for representation?

**18.** Under ***Steele v. Louisville & Nashville R. Co., 323 U.S. 192 (1944)***, a union must represent all members of a bargaining unit without "arbitrary discrimination." Does discrimination between (i) current members with current disputes and (ii) former members with disputes from their membership period constitute "arbitrary discrimination" where: (a) the underlying dispute arose during membership; (b) the employee paid full dues during the relevant period; (c) the employee had no control over when the dispute would surface; and (d) the union provided no notice that representation was conditioned on current membership status?

**19.** Where the collective bargaining agreement contains a "claims arising during employment" provision but is silent on post-employment representation rights, should the Board interpret such silence as: (a) limiting representation to current employees only; (b) extending representation to claims arising during covered employment regardless of current status; or (c) requiring a case-by-case balancing test?

**20.** Where a union refuses to represent a former member for a dispute arising from covered employment, and the employee consequently loses wages, benefits, or employment opportunities, what is the appropriate measure of damages: (a) Full back pay and benefits from the employer (as if representation had been provided); (b) Pro-rated damages based on the probability of success had representation been provided; (c) The value of dues paid during the relevant employment period; or (d) A hybrid measure factoring both the lost opportunity and the union's bad faith?

**21.** Where a union collects dues from an employee for a period during which a dispute later arises, but refuses representation at the time the dispute surfaces, does the union's retention of dues constitute: (a) Unjust enrichment; (b) Breach of contract (membership agreement); (c) Fraudulent inducement (if representation was implicitly promised); or (d) No cause of action?

**22.** Where an employee (i) paid union dues throughout their tenure in a bargaining unit position, (ii) a disciplinary dispute arises from hours worked during that dues-paying period, (iii) the dispute surfaces six months after the employment relationship ended, (iv) the union refuses representation citing current non-membership, and (v) the employer imposes discipline based on electronic records lacking audit verification, does the combination of union non-representation and employer's evidentiary deficiencies create: (a) a hybrid DFR/Section 8(a)(1) violation requiring joint liability analysis; (b) tolling of all applicable limitations periods until representation is secured; or (c) an independent cause of action against the union for the value of representation services?

**23.** Whether, under the National Labor Relations Act and proceedings before the National Labor Relations Board, the Charging Party possesses the right to seek or request: (a) issuance of ***subpoenas*** through the Board or its processes; (b) ***independent medical evaluation, medical assessment, or vocational rehabilitation*** where alleged retaliation or adverse actions have impacted health, employability, or academic progression; and (c) injunctive relief, including interim or tailored remedies, either through the Board or a reviewing court. Further, whether the Board or a reviewing court may exercise equitable discretion to fashion or "loosen" injunctive or remedial relief in a manner that facilitates mitigation of damages, including restoration of employment opportunities, continuation or completion of academic programs, or prevention of ongoing harm—thereby serving the interests of both the Charging Party and Respondents by limiting further liability and promoting efficient resolution of disputes?

**24.** Whether subsequent or ongoing retaliatory acts—such as threats, intimidation, or interference with protected activities—that may independently violate other federal or state laws can nonetheless be considered by the National Labor Relations Board as part of the totality of circumstances in evaluating unfair labor practices under the National Labor Relations Act, and as the retaliation after filing the Charges in NLRA (like denial of access to records, and digital attacks etc). Further, whether the NLRB and its staff may take into account such conduct as evidence of unlawful motive, coercion, or interference under Sections 8(a)(1), 8(a)(3), or 8(a)(4), even where such conduct may also give rise to parallel or independent legal violations outside the NLRA. Can these retaliatory acts be considered as retaliation under NLRA.

**25.** Whether alignment between employer discipline and union financial demands creates an inference of coordinated pressure or ***constructive collusion or collusion*** under Section 8(b)(2), and whether leveraging dues-related disputes to discourage grievance pursuit constitutes restraint or coercion under Section 8(b)(1)(A).

**26.** Whether statements made in internal email communications regarding dues or discipline constitute admissions of motive, pretext, or procedural irregularity, including whether ambiguity or inconsistency within email explanations undermines the credibility of employer or union justifications, and whether failure to produce complete email chains—including metadata, timestamps, and recipients—affects the substantial evidence analysis under Universal Camera Corp. v. NLRB.

**27.** Whether, in proceedings before the National Labor Relations Board, the Board or its agents may require the production of complete and unredacted communications including emails, internal messages, call records, and meeting documentation relating to the decision-making process underlying disciplinary or adverse actions; and whether such production may extend to communications (a) within the employer and its staff, (b) within the union and its representatives, and (c) between the employer and the union. Whether the Board has the authority to limit or scrutinize redactions, compel fuller disclosure, or draw adverse inferences where relevant communications are withheld or selectively produced, particularly where such omissions may obscure evidence favorable to the Charging Party and impede a fair and complete evaluation of the record.

**28.** . Whether, in proceedings before the National Labor Relations Board, the Charging Party may request or rely upon digital forensic analysis where allegations involve manipulation, alteration, or unauthorized access to electronic records or systems; and whether the Board has the authority to consider or facilitate such forensic examination—including audit logs, metadata, access history, and system integrity verification—where the reliability of digital evidence is in dispute. Further, whether refusal by an employer or union to provide underlying digital data (such as audit trails, metadata, or system logs) may give rise to adverse inferences, evidentiary limitations, or heightened scrutiny, particularly where such data is necessary to establish authorship, authenticity, or integrity of records used to justify disciplinary or adverse actions.

**29.** Whether the sequence of email communications demonstrates a retroactive construction of justification rather than contemporaneous decision-making, including whether escalation of allegations through email after grievance filing constitutes procedural retaliation independent of ultimate discipline, and whether email narratives reflect coordination between actors—HR, union, administration—sufficient to establish a networked retaliatory framework.

**30.** Whether selective sharing of emails—particularly withholding exculpatory communications—violates principles of fair investigation and due process, and whether the institution's refusal to share emails favorable to the employee constitutes evidentiary suppression warranting an adverse inference.

**31.** Whether email and digital record systems that permit modification, deletion, or selective forwarding undermine evidentiary reliability absent audit logs, including whether absence of version history, metadata, or access logs creates a presumption that documents may have been altered or curated post hoc, and whether reliance on incomplete digital records satisfies the employer's burden under ***Wright Line.***

**32.** Whether introduction of new allegations after the initial disciplinary action violates procedural fairness and constitutes independent retaliation, including whether the employer is legally permitted to expand the scope of discipline during grievance or litigation phases without providing formal notice and opportunity to respond, and whether shifting factual bases across stages—from investigation to discipline to hearing—constitutes legal pretext or procedural bad faith.

**33.** Whether FERPA consent provided by the student and employee (at the same time) was limited in scope and whether the defendants are allowed to exceed that scope by generating or introducing additional documents, including whether FERPA consent permits creation of new documents or only disclosure of existing education records, and whether reliance on FERPA consent to introduce documents outside the original disciplinary record constitutes procedural unfairness or evidentiary overreach.

**34.** Whether the university's invocation of FERPA creates **asymmetrical access to evidence allowing selective disclosure unfavorable to the employee**, including whether FERPA consent can be strategically used to withhold exculpatory evidence while introducing

inculpatory material, and whether such selective disclosure violates principles of fair representation, due process, or administrative fairness.

**35.** Whether FERPA consent provides a pretextual basis for generating additional documentation after the fact rather than relying on contemporaneous records, including whether newly introduced FERPA-based documents can be challenged as non-contemporaneous and therefore unreliable under evidentiary standards, and whether introduction of such documents shifts the burden improperly onto the employee to rebut previously undisclosed allegations.

**36.** Whether use of FERPA consent to expand allegations interferes with Section 7 rights by chilling grievance activity, and whether union failure to challenge improper FERPA-based disclosures constitutes a Duty of Fair Representation violation.

**37.** Whether demonstration that even one foundational allegation is false invalidates the entire disciplinary framework as tainted by pretext, including whether cumulative inconsistencies across dues, emails, and disciplinary explanations create a "convincing mosaic" of retaliation, and whether procedural irregularities, shifting explanations, and evidentiary asymmetry collectively satisfy the Wright Line prima facie burden as a matter of law.

**38.** Whether the Board or tribunal must treat post hoc justifications and newly introduced evidence with heightened skepticism, including whether failure to address misuse of FERPA consent constitutes legal error subject to de novo review post-***Loper Bright***, and whether this case presents a novel question regarding the intersection of FERPA, digital evidence reliability, and NLRA retaliation doctrine.

**39.** Whether Section 7 of the ***NLRA, 29 U.S.C. § 157,*** unambiguously protects grievance activity undertaken by an employee whose bargaining-unit status is structurally intertwined with academic enrollment—such that discipline in the employment sphere effectively terminates academic status—and whether the Act contemplates a doctrinal distinction between "employment retaliation" and "institutional retaliation" when the employer is a university exercising quasi-sovereign authority over both employment and academic progression.

**40.** Whether an individual grievance filed pursuant to a collective bargaining agreement is inherently "concerted activity" under Section 7 even absent group participation, including whether Board precedent interpreting "concerted"—such as Meyers Industries—sufficiently accounts for modern university employment models involving individualized grievances within collectively bargained environments, and whether the definition of "mutual aid or protection" is ambiguous when the grievance implicates both compensation and institutional governance practices.

**41.** Whether the production of additional or new evidence by an employer during the course of an investigation or proceedings before the National Labor Relations Board—after initially asserting that sufficient grounds existed for the adverse action—may be considered indicative of shifting or post hoc justifications; and whether such conduct may be evaluated as evidence of pretext, inconsistency, or lack of credibility under the applicable evidentiary

framework. Further, whether the introduction of new allegations, explanations, or supporting materials that were not contemporaneously relied upon at the time of the adverse decision raises concerns regarding procedural fairness, and whether such conduct may warrant heightened scrutiny, adverse inference, or diminished evidentiary weight, even if not independently unlawful, illegal, or unethical per se.

**42.** Whether procedural escalation of discipline following protected activity—absent explicit anti-union statements—constitutes independent interference under Section 8(a)(1), including whether revival of stale allegations after grievance filing satisfies the motivating-factor element under Wright Line as a matter of law, and whether cancellation of unrelated employment opportunities following protected activity constitutes discrimination "in regard to hire or tenure" under Section 8(a)(3).

**43.** Whether "motivating factor" under Wright Line requires proof of but-for causation or whether mixed-motive analysis applies, including whether the Board has consistently articulated the employer's rebuttal burden as preponderance of evidence or as clear and convincing evidence, and whether inconsistent employer explanations constitute legal evidence of pretext sufficient to defeat the same-decision defense.

**44.** Whether application of Wright Line is a mixed question of law and fact subject to independent judicial review post-Loper Bright, including whether motive determination is purely factual or partially legal where burden-shifting structure is implicated, and whether close temporal proximity combined with deviation from established disciplinary norms satisfies the prima facie burden as a matter of law.

**45.** Whether a union's failure to investigate or document a grievance alleging retaliatory discharge constitutes arbitrary conduct per se under Vaca v. Sipes, including whether perfunctory processing of a grievance involving termination satisfies the "arbitrary or bad faith" threshold, and whether failure to issue a grievance number or memorialize steps constitutes evidence of abandonment as a matter of law.

**46.** Whether coordinated inaction between union and employer can constitute "causing" discrimination (and retaliation) under Section 8(b)(2), including whether mutual benefit from grievance collapse is probative of unlawful coordination, whether the Act contemplates structural conflicts of interest where unions avoid arbitration costs at the expense of the grievant's rights, and whether parallel inaction constitutes evidence of collusion.

**47.** Whether, under the National Labor Relations Act, adverse actions that are ***discriminatory*** in nature may also be analyzed as ***retaliatory***, ***and VICE VERSA (emphasis added),*** where such actions are undertaken to deter or punish an individual’s protected activity; and whether the analytical frameworks for discrimination and retaliation—though doctrinally distinct—may overlap or be applied in conjunction where the same conduct reflects both disparate treatment and retaliatory motive. Further, whether evidence and reasoning derived from anti-retaliation principles recognized in other federal statutes—such as those enforced by the Equal Employment Opportunity Commission (EEOC), where retaliation has been identified as a predominant basis of discrimination claims—may be considered persuasive

or analogous in evaluating motive, causation, and adverse action under the NLRA, particularly in cases involving deterrence of protected concerted activity. (See: https://www.eeoc.gov/retaliation-making-it-personal, and "….retaliation has been the most frequently alleged basis of discrimination….")

**48.** Whether the Duty of Fair Representation standard should be heightened where the grievance concerns termination rather than minor discipline, including whether a union owes a heightened investigatory obligation where the employee alleges retaliation for protected activity, and whether union abandonment during active retaliation constitutes bad faith.

**49.** After ***Loper Bright Enterprises v. Raimondo (2024),*** whether NLRB statutory interpretations receive deference or only Skidmore weight, including whether courts must independently interpret Section 7 in cases involving academic employment ambiguity, whether Board precedent interpreting "concerted activity" warrants reconsideration absent Chevron deference, and whether ambiguity in Section 7 requires independent judicial construction.

**50.** Whether the definition of "employee" under the National Labor Relations Act encompasses graduate student employees whose work is functionally integrated with their academic programs; and whether the absence of explicit statutory language addressing such hybrid academic-employment relationships creates interpretive ambiguity warranting clarification by the Board or reviewing courts. Also, whether divergent treatment of graduate student employees across circuits, and evolving Board precedent—including but not limited to Columbia University, 364 NLRB No. 90—reflects unresolved doctrinal inconsistency requiring harmonization, particularly in cases where adverse actions in employment roles directly impact academic status and progression.

**51.** Whether retaliation for filing a grievance implicates First Amendment Petition Clause rights when the grievance mechanism is the exclusive statutory remedy, including whether a heavily federally funded and non profit university exercising quasi-public disciplinary authority qualifies as a ***state actor*** under the ***entwinement doctrine***, and whether suppression of grievance constitutes a Petition Clause violation.

**52.** Whether in the case of Board's refusal to issue a complaint without fully addressing documentary evidence violates procedural fairness principles, including whether selective enforcement of work-hour policies against a grievance-filing employee raises constitutional concerns where comparators are treated differently, and whether such selective enforcement implicates equal protection principles.

**53.** What protections, if any, does the National Labor Relations Act afford to employees engaging in whistleblowing-type conduct, including reporting unlawful, unethical, or improper practices in the workplace; and to what extent such conduct constitutes protected concerted activity under Section 7 of the Act. Further, what protections and remedies are available where an employer or union engages in retaliation against such activity, including whether such retaliation constitutes violations of Sections 8(a)(1), 8(a)(3), or 8(a)(4), and

what role the National Labor Relations Board may play in investigating, remedying, and deterring such conduct.

**54.** In proceedings under the National Labor Relations Act, who serves as the ***trier of fact*** for purposes of ***credibility determinations***, including under principles analogous to the "Cooper doctrine" concerning deference to fact-finding; and whether investigators or regional staff of the National Labor Relations Board possess authority to make credibility assessments during the investigative stage, or whether such determinations are reserved for Administrative Law Judges and the Board upon formal adjudication. (See: https://dhr.illinois.gov/content/dam/soi/en/web/dhr/filingacharge/documents/idhr-credibility-notice-to-parties.pdf; This is Illinois based ***just*** for example to check how it may work in NLRB)

**55.** Whether ALJ credibility determinations are sustainable where documentary evidence contradicts credited testimony, including whether demeanor-based credibility findings can override undisputed written records, and whether the Board properly evaluated the "record as a whole" under 29 U.S.C. § 160(e)—including whether failure to address contradictory comparator evidence renders a factual finding unsupported by substantial evidence. Further weather that can be leveraged by defendants in other courts of law, and admin agencies, especially when till the end appeals till hon'ble SCOTUS, the decision can still have a chance to be reversed.

**56.** Whether termination of a union role that foreseeably results in academic expulsion constitutes ***aggravated discrimination*** under Section 8(a)(3) (but not limited to), including whether aggressive procedural ***escalation*** following grievance filing constitutes independent coercion even absent termination, and whether universities' internal disciplinary courts function as employment decision-making bodies subject to NLRA scrutiny.

**57.** Whether ***reputational and professional isolation*** resulting from ***retaliatory discipline constitutes interference under Section 8(a)(1)***, including whether ***psychological coercion can constitute interference,*** and whether ***systematic refusal to advance termination grievances to arbitration constitutes a structural Duty of Fair Representation violation.***

**58.** Whether circuits differ on whether an individual grievance constitutes concerted activity, including whether circuits apply different thresholds for arbitrariness in Duty of Fair Representation cases, and whether such circuit conflicts require Supreme Court resolution. Weather asking for other staff reinstatement, and grieving generally about other staff constitute protected activity? Does that give additional protection other since the conduct involved multiple actors by individual instead of ***ONLY THEMSELVES***?

**59.** What constitutes "protected concerted activity" under 29 U.S.C. § 157 in the context of graduate student employees, multi-role employees with both student and staff status, and employees with hybrid academic and employment status—including whether filing a grievance under a CBA automatically constitutes protected activity even if the grievance is later deemed meritless. Weather if union consideration of violations per CBA be constituted as violations of the act and violations of the CBA at the same time during NLRA

proceedings. In addition, where the violations had not been adjudicated by the union, even after knowing and documenting the violations breaches it's DFR.

**60.** Whether the scope of Section 7 extends to complaints about union representation, complaints about dues handling, internal union governance disputes, and complaints about funding freezes affecting union operations—including whether advocacy regarding accommodation, safety, or procedural irregularities is protected under Section 7, and whether simultaneous whistleblowing and grievance filing expands protection scope.

**61.** What constitutes sufficient employer knowledge under Wright Line—whether knowledge must be actual or can be ***inferred***—including whether temporal proximity alone satisfies the prima facie burden, and what the precise burden-shifting standard is post-Transportation Management Corp. Whether or not implied and constructive knowledge doctrine is considered for NLRA cases?

**62.** Whether "motivating factor" is identical to "substantial factor" under Wright Line, including whether inconsistent explanation constitutes independent evidence of animus, whether deviation from progressive discipline creates an inference of unlawful motive as a matter of law, and whether the Board has articulated a consistent standard for evaluating selective enforcement as proof of animus?

**63.** Whether there was substantial evidence supporting the employer's stated reason, including whether the Hon'ble ALJ considered all contradictory documentary evidence, whether the ALJ improperly reweighed evidence, whether comparative employee evidence was ignored, and whether the ALJ considered both the pattern of escalation and the sequence of cancellation of unrelated job roles?

**64.** Whether the Hon'ble ALJ improperly credited an employer witness despite documentary contradiction, including whether the ALJ ignored objective evidence in favor of demeanor-based credibility, whether credibility findings were internally inconsistent, and whether the ALJ applied differential skepticism to pro se charging party testimony?

**65.** When an employer gives multiple explanations, whether that constitutes evidence of pretext as a matter of law—including whether after-the-fact justifications can satisfy the Wright Line defense, whether introduction of stale allegations post-grievance indicates retaliation, whether selective severity is probative of animus, whether cancellation of unrelated opportunities constitutes adverse action, and whether cumulative discipline is legally distinct from termination.

**66.** What the threshold is for "arbitrary" conduct under Vaca v. Sipes—including whether failure to issue a grievance number is per se arbitrary, whether failure to investigate a grievance is arbitrary, whether perfunctory handling satisfies a DFR violation, whether ***union abandonment*** during active retaliation constitutes bad faith, and whether refusal to escalate a grievance to arbitration is reviewable.

**67.** Whether the NLRA defines minimum procedural safeguards for grievance processing, including whether there is ambiguity in what constitutes "meaningful representation,"

whether a union owes a higher duty where the employee faces termination, and whether "legal support" is required under the DFR in **complex discipline cases.**

**68.** If a union breaches the Duty of Fair Representation, whether that revives an employer breach claim—including whether grievance tolling is applicable when the union misleads the employee, and whether equitable tolling applies where the grievance process collapses due to union failure.

**69.** What the standard is for proving unlawful coordination between employer and union, including whether silence or refusal to act is sufficient to show ***coordinated suppression***, ***collusion***, and whether mutual benefit from grievance collapse demonstrates unlawful motive. Weather or not under a doctrine or framwork hon'ble court/ board can make a precedent to **loosen** collusion claims for plaintiff such that at the initial instance unions shall do proper help to plaintiff till end such as to reduce judicial intervention before any violations may happen from union end for their DFR violations. Can there be a step by step new process per this case complexity that can be generalized for the employer and union collusion claims like there are for prima facie cases of discrimination and retaliation under other laws in USA.

**70.** Whether retaliatory discipline for grievance filing implicates First Amendment concerns in quasi-public institutions, including whether the University is acting as a state actor under the entwinement doctrine, whether the Board's failure to issue a complaint violates due process, whether selective enforcement implicates equal protection principles, and whether suppression of grievance constitutes a Petition Clause violation?

**71.** After Loper Bright (2024) (https://www.supremecourt.gov/opinions/23pdf/22-451_7m58.pdf), what level of deference applies to NLRB statutory interpretation—including whether ambiguity in Section 7 requires independent judicial construction, whether Skidmore rather than Chevron applies, whether the Board interpreted the NLRA consistently with prior precedent, whether there is inconsistency in Board precedent regarding graduate employees, and whether the Board departed from precedent without explanation.

**72.** Whether "protected activity" is primarily a legal or factual determination, including whether motive determination is purely factual, whether burden shifting involves legal interpretation subject to ***de novo review***, and whether application of Wright Line is a mixed question of law and fact.

**73.** Whether the investigation was impartial, including whether exculpatory documents were ignored, whether there was improper narrowing of charge scope, whether amendments were improperly discouraged, whether the Regional Director applied an incorrect statute of limitations analysis, and whether equitable tolling was properly considered. Whether the conduct of investigator and regional directors acts in concert with respect to any adverse action taken against the plaintiff including refusal to file a complaint, for raising questions about internal conduct.

**74.** When the six-month limitations period begins for retaliation claims, including whether the continuing violation doctrine applies, whether union inaction restarts the limitations period, whether grievance pendency tolls limitations, and whether concealment of decision-making tolls limitations.

**75.** Whether modern university employment blurs statutory categories under the NLRA, including whether dual-status employee protection is underdeveloped in precedent, whether grievance suppression in academic institutions raises systemic NLRA concerns, whether escalation after grievance constitutes an independent Section 8(a)(1) violation regardless of termination, whether psychological coercion can constitute interference, and whether terminations of future job opportunities constitutes discrimination under Section 8(a)(3).

**76.** Whether the Board misinterpreted Section 7, misapplied the Wright Line burden structure, applied an incorrect causation standard, misstated the DFR threshold, improperly narrowed the scope of protected activity, or failed to reconcile precedent—including whether the Board's finding was supported by substantial evidence, whether the Board ignored contrary documentary proof, and whether the Board relied on speculation.

**77.** Whether credibility determinations are sustainable where they are contradicted by documentary evidence, internally inconsistent, or unsupported by the record, including where demeanor-based findings lack corroboration; and whether such deficiencies are particularly significant in cases where the alleged protected activity precedes the adverse action, thereby raising concerns of pretext, improper motive, or erroneous factual inference.

**78.** Whether the NLRA adequately addresses retaliation implemented through administrative complexity rather than overt hostility, including whether modern university employment exposes gaps in the Act's definitions, whether escalation following grievance is inherently coercive, and whether union abandonment in retaliation cases requires doctrinal refinement.

**79.** Why grievance numbers were never issued, why unrelated roles were canceled after grievance, why stale allegations were revived only post-grievance, why the union demanded extraneous repayment unrelated to discipline, why termination letters were missing for union roles, why progressive discipline was skipped, why explanations shifted across contexts, why the union did not escalate to arbitration, and why similar employees were treated differently—including whether these unanswered questions collectively establish a prima facie case of unlawful motive under Wright Line.

**80.** Whether selective classification of an individual as student or employee depending on ***institutional advantage*** constitutes interference under Section 8(a)(1), and whether such ***dual-status exploitation***—where an ***employer toggles between classifications*** to minimize liability—constitutes interference with statutory rights under the NLRA.

**81.** Whether adverse actions across distinct positions can be aggregated to establish unlawful motive under Wright Line, including whether the multiplication of adverse actions across positions increases the evidentiary weight of discriminatory motive, and whether multi-role

employment loss justifies expanded make-whole relief beyond traditional single-position reinstatement.

**82.** What procedural accommodations and leniencies may be afforded to a pro se litigant residing outside the United States in pursuing claims before federal courts, including appellate courts and the Supreme Court, and whether such accommodations may include in forma pauperis status, relaxation of notarization requirements, electronic filing flexibility, or other measures to ensure meaningful access to justice.

**83.** Whether centralized control over employment data and discipline creates a single integrated employer framework for NLRA liability, and whether the employer's academic structure creates a heightened risk of NLRA evasion through role fragmentation.

**84.** Whether the accumulation of multiple protected activities elevates the inference of unlawful motive beyond ordinary Wright Line analysis, and whether sequential escalation or escalation following protected activity establishes a presumption of retaliatory cascade requiring rebuttal by the employer.

**85.** At what threshold temporal clustering becomes statistically incompatible with lawful coincidence, including what the joint probability is that multiple adverse actions—termination, job loss, interview cancellation, and expulsion—would occur independently within a narrow temporal window absent retaliatory motive, and at what point temporal proximity transitions from circumstantial evidence to a presumption of causation.

**86.** Whether invented fraudulent acts serving as reasons invented for alleged sham discipline must be considered in an NLRA investigation even if protected activity preceded the alleged sham discipline, including whether proving one allegation in such frivolous discipline invalidates all other allegations when punishment is imposed based on all allegations collectively.

**87.** Whether criminal convictions can result from whistleblower activities leading to adverse actions under the NLRA, particularly under the totality doctrine, and whether newly invented facts by defendants during NLRB investigations require counterclaims when the university claims additional evidence supporting their allegations when initially there was sufficient documentation, they alleged was sufficient for discipline. *(See: https://en.wikipedia.org/wiki/Whistleblower_protection_in_the_United_States)*

**88.** Whether discipline based on digital records can be sustained where the system permits third-party modification without attribution, including whether reliance on non-exclusive digital input systems violates evidentiary reliability standards in administrative adjudication, and whether the employer can attribute specific entries to the charging party with certainty.

**89.** Whether the employer met its burden under Wright Line (but not limited to) of demonstrating that the same adverse actions would have occurred absent protected activity where multiple independent actions were taken across unrelated roles, including whether reliance on unverified digital records satisfies the employer's burden.

**90.** Whether procedural reframing of an investigatory meeting to ***restrict representative participation constitutes constructive and actual denial of Weingarten rights,*** including whether representation was provided in a manner that allowed meaningful participation or merely symbolic presence, whether the employer structured the proceeding to avoid discussion of union-related issues, and whether an employer may comply with Weingarten in form while defeating it in substance.

**91.** Whether a union's exclusive control over grievance mechanisms imposes a quasi-fiduciary duty analogous to an insurer's duty of good faith, including whether a union's refusal to pursue a meritorious grievance can be analogized to an insurer's bad faith denial of coverage, and whether the union's inaction effectively deprived the employee of all contractual remedies.

**92.** Whether parallel inaction by employer and union—producing mutually beneficial outcomes—constitutes circumstantial evidence of unlawful coordination under Sections 8(a)(2) and 8(b), including whether such parallel conduct is sufficient to infer coordination, whether both employer and union benefited from the non-processing of the grievance, and what lawful explanation accounts for that alignment.

**93.** Whether the General Counsel abused discretion by failing to issue a complaint despite evidence satisfying prima facie elements, including whether the Region investigated the case as a unified pattern of conduct or as isolated allegations, whether all relevant systems such as Workday logs were examined, and whether the Region considered combined employer-union liability.

**94.** Whether failure to consolidate related CA and CB charges violated principles of administrative efficiency and fairness under 29 CFR § 102.33, and whether the Board's fragmentation of employer and union conduct undermines the statutory framework of collective representation.

**95.** Whether institutional history of ULP allegations can be used as circumstantial evidence of motive under Wright Line, and whether the interconnected nature of decision-making entities creates a causal network inconsistent with independent action.

**96.** Whether the Board erred in failing to treat the employer's actions as a retaliatory cascade across interconnected employment roles, including whether the escalating nature of adverse actions following protected activity reflects independent decisions or a continuous retaliatory course of conduct.

**97.** Whether the employer constructively denied Weingarten rights by limiting representation and reframing proceedings, including whether it is employer policy to limit union representatives to ***silent observers*** in disciplinary matters, and whether limiting representative participation constitutes a constructive denial of representation rights.

**98.** Whether the unions breached their duty of fair representation by failing to process grievances and denying arbitration ***without rational basis and/or proper letter for rational basis***, including whether the union conducted any merits analysis before refusing arbitration, whether failure to issue a grievance constitutes evidence of abandonment as a

matter of law, and whether the union took any action that benefited the employer at the expense of the member.

**99.** Whether the charging party was provided full notice of allegations and evidence, whether there was a meaningful opportunity to respond, and whether the decision-making process was impartial or ***outcome driven*** signalling deterring plaintiff from engaging in any protected activity.

**100.** Whether the employer can identify a single non-retaliatory explanation that accounts simultaneously for all adverse actions taken within the same timeframe, including whether the employer can identify any employee terminated within days of raising similar complaints, and what business justification connects an alleged timekeeping issue in one role to termination from unrelated positions. Can they use the same reasons twice for job terminations and then further for academic terminations.

**101.** Whether the employer can produce evidence that the charging party had exclusive control over the data used to justify discipline, including whether the employer can verify whether the entries were made by the employee or altered by others, whether audit logs were reviewed, and how data integrity was verified. Can board consider the filing by university relating to hours true when it's already shown with evidence that the hours were added by supervisors that were later used in discipline, and university had much of time to change all hour to be added by plaintiff instead of the supervisors now.

**102.** Whether removal of hours from the workday, and all entries suggest falsification, misleading, fraud by the employer under the act.

**103.** Whether the union can explain why it failed to pursue a grievance despite contractual authority to do so, including whether it is standard union practice to ignore repeated member inquiries, and whether the union acknowledges that conditioning representation on dues-related issues implicates DFR obligations.

**104.** Whether the employer can identify any similarly situated employee who received lesser discipline for comparable conduct, and whether any communication occurred advising departments not to hire the charging party.

**105.** Where statutory protections depend on both employer compliance and union representation, whether simultaneous failure by both actors constitutes a structural violation of the Act itself, and whether the Respondents' conduct—viewed as an integrated system rather than isolated acts—constitutes a coordinated deprivation of statutory rights under the NLRA.

**106.** Whether administrative liability can be sustained where the evidentiary basis consists of data generated within systems that lack exclusive control, auditability, or attribution, including whether the Board's approach—if accepted—allows hon'ble board to rely on unverifiable digital systems to impose discipline without accountability.

**107.** Whether formal compliance with statutory rights suffices where the functional exercise of those rights is effectively nullified, and whether rights must be evaluated by their practical effect rather than formal compliance.

**108.** Whether the Board's decision failed to consider substantial evidence of pretext, whether the Board misapplied Wright Line burden-shifting, whether the Board failed to analyze combined employer-union conduct, whether reliance on unverified electronic data was arbitrary and capricious, and whether the Board ignored procedural due process defects.

**109.** Whether this case presents a question of first impression regarding digital evidence reliability in labor adjudication, and whether this case presents a novel question regarding the intersection of FERPA, digital evidence reliability, and NLRA retaliation doctrine.

**110.** Whether the employer engaged in a ***pattern*** of retaliation in violation of Section 8(a)(1) and Section 8(a)(3), where the employer **chilled** union participation, grievance filing, and complaints through termination, job removal, and academic penalties, and whether employer conduct tended to chill a reasonable employee from engaging in protected activity.

**111.** Whether the employer's reliance on modifiable electronic records was sufficient to support discipline, where the employer relied on electronic records subject to third-party modification, failed to provide meaningful representation rights, and extended discipline beyond any rational nexus to the alleged conduct.

**112.** Whether Weingarten rights were effectively denied through procedural structuring, where the employer allowed a support person but restricted participation and avoided key issues, and whether an employer may comply with Weingarten in form while violating it in substance.

**113.** Whether the unions breached their duty of fair representation, where union conduct was perfunctory, irrational, and structurally exclusionary—demonstrated by no grievance number issued, no updates provided, refusal of arbitration, and exclusion from the process—and whether the statutory scheme of the NLRA is defeated where employer misconduct is paired with union inaction, producing a situation in which the employee is deprived of both statutory and contractual protections.

**114.** Whether employer and union conduct should be evaluated jointly rather than in isolation, where a system failed across multiple actors, the law requires unified analysis of that system, and the Board failed to apply such a systems-level analysis.

**115.** Whether full reinstatement to all positions—not just one—is required as a remedy, including backpay across all roles, front pay if reinstatement is impossible, academic restoration and reinstatement of status, broad and electronic notice posting, and special remedies due to egregious conduct.

**116.** Whether the Hon'ble ALJ properly applied Wright Line, including whether the ALJ considered temporal proximity and escalation pattern, whether the ALJ ignored the Workday reliability issue, and whether the ALJ improperly separated employer and union liability.

**117.** Whether the proximity in time between protected activity and adverse action was so immediate that it gives rise to a strong inference of unlawful motive, and where an employer's explanation shifts, lacks evidentiary support, and depends on unverifiable digital inputs, whether the inference of pretext is not only permissible but compelled.

**118.** Whether discipline based on electronic records that are not exclusively controlled by the employee and lack audit authentication fails to meet basic standards of evidentiary reliability in administrative adjudication, and whether a union's unexplained refusal to process a grievance or pursue arbitration—coupled with failure to communicate with the member—constitutes arbitrary and bad-faith conduct.

**119.** Whether adverse actions extended beyond the role in which alleged misconduct occurred, what nexus connects alleged misconduct in one position to termination from unrelated positions, and whether the breadth of adverse actions demonstrates a generalized animus rather than a role-specific response.

**120.** Under Wright Line, once the General Counsel establishes a prima facie case and the burden shifts to the employer, what specific evidence demonstrates that the same adverse actions across multiple roles would have occurred absent protected activity, and in light of Transportation Management Corp., does the employer's reliance on inconsistent explanations satisfy its burden of persuasion.

**121.** Under Reeves v. Sanderson Plumbing Products, Inc., where an employer's explanation is shown to be false, whether it is permissible to infer discrimination and retaliation, and whether the combination of shifting explanations, lack of documentation, and unreliable data compels a finding of pretext under Reeves.

**122.** Under Clark County School District v. Breeden, while temporal proximity alone may not always suffice, whether extremely close timing combined with additional evidence establishes causation, and under the 7th Circuit's reasoning in Loudermilk v. Best Pallet Co., whether close temporal proximity combined with inconsistent explanations supports a finding of retaliation.

**123.** Under Vaca v. Sipes, whether a union can arbitrarily refuse to process a grievance without breaching its duty of fair representation, and under Air Line Pilots Association v. O'Neill, whether union conduct that is irrational or outside a wide range of reasonableness is sufficient to establish a breach—including whether failure to communicate, failure to assign a grievance number, and refusal to arbitrate without documented analysis falls outside the permissible range under O'Neill.

**124.** Under NLRB v. J. Weingarten, Inc., whether the right to representation includes meaningful assistance or merely physical presence, whether restricting a union representative to a silent "support person" satisfies the requirements articulated in Weingarten, and whether an employer can structure a meeting to avoid discussion of the very subject triggering representation rights.

**125.** Under ***Universal Camera Corp. v. NLRB,*** whether the Board must consider the entire record including evidence that detracts from its conclusions, and whether reliance on

unverifiable digital records satisfies the "substantial evidence" standard required under Universal Camera.

**126.** Under ***Motor Vehicle Manufacturers Association v. State Farm***, whether an agency decision is arbitrary and capricious if it fails to consider important aspects of the problem, and whether the Board failed to consider the reliability of digital evidence and the combined conduct of employer and union.

**127.** Whether parallel conduct between employer and union producing mutually beneficial outcomes constitutes evidence of unlawful support or coordination under Section 8(a)(2), and whether the absence of adversarial conduct by the union is evidence of potential collusion under Section 8(a)(2).

**128.** Under 7th Circuit precedent, whether the combination of temporal proximity and inconsistent explanations creates a ***triable issue of pretext***, and whether the employer's failure to provide consistent justification supports an inference of unlawful motive.

**129.** Where digital systems allow multi-user modification, whether entries can be reliably attributed to a single employee, whether failure to produce audit logs undermines the evidentiary weight of electronic records, and whether reliance on such records is consistent with due process principles requiring reliable evidence.

**130.** Under ***Goldberg v. Kelly***, whether due process requires a meaningful opportunity to be heard before deprivation of significant interests, and whether the charging party was provided a meaningful opportunity to challenge the evidence used against him.

**131.** Whether liability can arise where multiple actors independently contribute to a ***single unlawful outcome and/or multiple unlawful outcomes***, and whether the combination of employer retaliation and union inaction produces a legally cognizable deprivation of rights.

**132.** Under employment law principles, whether reliance on inaccurate or incomplete records invalidates disciplinary action, and whether the concept of good faith and fair dealing supports a heightened duty for unions controlling grievance access.

**133.** If the Board declines to find a violation here, how this case is distinguishable from Wright Line and Transportation Management, and if the union's conduct does not violate Vaca v. Sipes, what conduct would?

**134.** If restricting representation satisfies Weingarten, what limitation would violate it, and if the evidence in this case satisfies Universal Camera's substantial evidence standard, what evidence would not?

**135.** Under the applicable legal standard, what evidence supports the Board's conclusion when considering the full record including contradictory facts, and under what standard did the General Counsel decline to issue complaint despite prima facie evidence.

**136.** Whether the employee had exclusive control over the data used to justify discipline or did not—which is it—and either the union processed the grievance, or it did not—which is it?

**137.** Either the adverse actions were independent or they were connected—which is it—and either representation was meaningful or it was not—which is it.

**138.** What the probability is that multiple adverse actions occurred independently within days of protected activity, and if that probability cannot be calculated, whether retaliation is not the more likely explanation.

**139.** Whether the employer can identify a single coherent explanation that accounts for all adverse actions without relying on protected activity, explain how the union's inaction complied with its duty under Vaca v. Sipes, explain how reliance on modifiable digital records satisfies evidentiary standards, and explain how limiting representation complies with Weingarten.

**140.** What the primary reason for termination was, who verified that the entries were made exclusively by the employee, whether the system allows supervisors or others to modify entries, and how the employer can attribute those entries solely to the employee if such modification is possible.

**141.** Whether the reason for termination ever changed, and under ***Reeves v. Sanderson Plumbing Products, Inc.,*** whether a false explanation permits an inference of discrimination.

**142.** What the time gap was between the employee's complaint and termination, under ***Clark County School District v. Breeden*** whether close timing combined with other evidence supports causation, and whether the employer can identify another employee terminated within the same timeframe absent protected activity.

**143.** Why unrelated positions were affected, what factual nexus connects those roles to the alleged misconduct, and whether this is evidence of generalized animus rather than role-specific discipline?

**144.** Whether arbitration was considered, and if not, under Vaca v. Sipes whether a union can arbitrarily refuse to process a grievance, and if considered but denied, what documented analysis supports that decision.

**145.** How many times the member requested updates, and whether failure to respond is consistent with the duty of fair representation?

**146.** Whether the union controls access to grievance and arbitration, and if so, what safeguards ensure good faith decision-making?

**147.** Whether union representation was requested, whether the representative was allowed to actively participate, and under NLRB v. J. Weingarten, Inc., whether representation requires meaningful assistance—if a representative cannot speak, how is that representation.

**148.** Whether the Region evaluated this case as a unified system rather than isolated allegations, whether digital audit logs were requested and analyzed, how Universal Camera Corp. v. NLRB was applied in evaluating contradictory evidence, and under what standard the General Counsel declined to issue complaint despite prima facie evidence.

**149.** Whether this case is simply about an employer disciplining an employee for time records, or whether the employer relied on electronic data that was not exclusively controlled by the employee and failed to verify its accuracy through audit logs or forensic review, with disciplinary action followed by a cascade of adverse actions across unrelated roles that cannot be explained by a single alleged incident.

**150.** Whether an admission of discrepancy is an admission of falsification particularly where the system allows third-party modification, whether the employer bears the burden of proving intentional misconduct, whether attribution can be established without audit verification, and whether the extension of adverse actions across multiple unrelated positions lacks any rational nexus and suggests pretext under Reeves v. Sanderson Plumbing.

**151.** Whether employers are allowed to rely on their internal systems only to the extent that those systems produce reliable and attributable evidence, and where a system permits multiple users to alter entries and no audit trail is reviewed, whether reliance on such data fails to meet the "substantial evidence" standard required under Universal Camera Corp. v. NLRB.

**152.** Whether discretion is unbounded, whether under Vaca v. Sipes a union may act arbitrarily or in bad faith, whether failure to provide a grievance number, failure to communicate with the member, and refusal of arbitration without documented analysis falls outside the wide range of reasonableness described in Air Line Pilots Association v. O'Neill.

**153.** What the strongest single point is, whether the employer can reliably attribute the alleged misconduct to the employee, whether the employer imposed the most severe consequences across multiple roles immediately following protected activity, and whether the combination of unreliable evidence, extreme response, and temporal proximity compels a finding of pretext. Especially in cases where more than year old matters comes out of nowhere out of a sudden after protected activity.

**154.** How do under NLRA, Board can give justice for defamation against grieving party.

**155.** What legal error the Board committed, whether the Board failed to consider the case as a unified pattern of conduct, whether the Board improperly fragmented employer retaliation, union inaction, and evidentiary deficiencies into isolated issues, whether under Universal Camera the Board must consider the whole record including evidence that detracts from its conclusions, and whether the Board's decision is supported by substantial evidence given the interconnected nature of the actions and unreliability of the underlying data.

**156.** What principle should be adopted: whether statutory rights under the NLRA must be evaluated functionally not formally, and where employer conduct, union inaction, and unreliable evidence combine to deprive an employee of meaningful protection, whether the Act is violated even if each component is viewed as superficially compliant in isolation.

**157.** Whether this case is about retaliation supported by unreliable evidence and compounded by union failure, whether the legal standard is Wright Line burden-shifting plus substantial evidence under Universal Camera, whether the strongest fact is multiple

adverse actions within days of protected activity, and whether the weakest part of the employer's case is inability to attribute digital records.

**158.** What contemporaneous documentation supports each allegation, when it was created relative to the grievance filing, why certain allegations were not included in the original disciplinary notice but introduced later, who had access to and control over the documents relied upon, whether any documents were created, modified, or compiled after the grievance was filed, and why materials favorable to the employee were not disclosed.

**159.** Whether this case presents a coordinated and escalating pattern of retaliation initiated by a disputed timekeeping issue, amplified by the employee's engagement in **protected activities,** executed through procedurally defective disciplinary mechanisms, enabled by unreliable electronic data systems, and compounded by union inaction amounting to a breach of the duty of fair representation—constituting a systemic failure of statutory protections under the National Labor Relations Act.

**160.** Whether Section 7 protection extends to grievance activity that implicates both employment and academic status where the employer is a private university (alleged to be a state actor) exercising quasi-public functions, and where discipline imposed in a union role cascades into termination of academic status, whether that expands the scope of NLRA-protected harm beyond the traditional employment relationship.

**161.** Whether there is statutory ambiguity in applying Section 7 to employees whose bargaining-unit work is part-time but whose discipline affects full institutional standing, and whether the NLRA contemplates protection where retaliation is implemented through forced express termination.

**162.** What the correct legal definition of "motivating factor" under Wright Line is, whether the employer's burden is preponderance or clear and convincing evidence, and whether shifting justification automatically constitutes evidence of pretext sufficient to shift or satisfy burdens.

**163.** Whether the Board requires direct evidence of animus or whether circumstantial sequence—including temporal proximity, deviation from progressive discipline, and pattern of escalating adverse actions—is sufficient to establish retaliatory motive.

**164.** Whether the determination of retaliatory motive is primarily factual or a mixed question of law and fact subject to independent judicial review post-Loper Bright, and whether application of burden-shifting constitutes legal interpretation subject to de novo review.

**165.** Whether revival of year-old allegations following grievance filing is legally distinguishable from contemporaneous discipline, whether aggregation of minor infractions post-grievance constitutes unlawful escalation, and whether failure to issue written termination letters in union roles indicates procedural irregularity sufficient to support an inference of pretext.

**166.** Whether procedural acceleration itself constitutes a form of coercion under Section 8(a)(1), whether employer's inconsistent attribution of decision-making authority

undermines the Wright Line defense, and whether deviation from established disciplinary norms creates a presumption of retaliation.

**167.** What the threshold of arbitrariness under Vaca v. Sipes is when the grievance involves termination rather than minor discipline, whether failure to issue a grievance number is per se arbitrary, and whether failure to investigate an alleged retaliatory discharge is arbitrary as a matter of law.

**168.** Whether requesting repayment unrelated to the employer's charges constitutes evidence of hostility or abandonment by the union, whether union refusal to escalate a grievance constitutes bad faith where discharge followed protected activity, and whether coordinated inaction between union and employer constitutes a Section 8(b)(2) violation.

**169.** Whether the DFR imposes a heightened obligation where the employee faces loss of livelihood, whether the NLRA defines minimum investigatory standards for unions, whether there is ambiguity in the "perfunctory handling" threshold, and whether a union must provide legal support where grievance complexity exceeds lay competence.

**170.** What constitutes sufficient evidence of unlawful coordination under Section 8(b)(2), whether mutual benefit from grievance collapse demonstrates coordinated suppression, whether silence or failure to act is sufficient to infer collusion, and whether the Act addresses systemic union-employer alignment against individual grievants.

**171.** When the six-month limitation period begins in retaliation cases involving escalating discipline, whether the continuing violation doctrine applies where harm unfolds over months, and whether union's misleading assurance, grievance pendency, or concealment of decision-making tolls the limitations period.

**172.** Whether retaliation for grievance activity implicates Petition Clause rights, whether employer's reliance on grievance activity as a discipline basis implicates First Amendment concerns if the institution is sufficiently entwined with state funding, whether Board's refusal to issue complaint without full investigation violates procedural due process, and whether systemic suppression of grievance activity implicates associational rights.

**173.** After elimination of Chevron deference, whether the Board's interpretation of Section 7 is entitled only to Skidmore weight, whether the Board's interpretation of "concerted activity" is consistent across circuits, whether the Board has departed from precedent without explanation, whether there is circuit conflict regarding graduate employee protections, and whether ambiguity in Section 7 requires independent judicial construction.

**174.** Whether simultaneous termination from union and non-union roles amplifies discriminatory impact under the NLRA, whether escalation of discipline following grievance is independently coercive under Section 8(a)(1) even if the underlying termination might otherwise be defensible, and whether cancellation of an interview for an unrelated full-time position constitutes retaliatory discrimination.

**175.** Whether psychological coercion and reputational damage can constitute interference under Section 8(a)(1), whether absence of written termination in union roles undermines

the employer's defense, whether the use of alleged "excess hours" that were due to employers' requirement for forced labor is sufficient to establish pretext, and whether the university's exercise of internal adjudicatory power resembling quasi-judicial authority alters NLRA analysis.

**176.** Whether there are inconsistent Board precedents regarding whether individual grievance activity constitutes concerted activity, whether there is tension between Wright Line and cases emphasizing employer prerogative in discipline, whether the Board has inconsistently applied the DFR standard across circuits, and whether there is unresolved ambiguity in applying the NLRA to hybrid academic employees.

**177.** Whether the hon'ble Board misinterpreted Section 7 scope, misapplied Wright Line burden allocation, misstated the DFR legal standard, or improperly narrowed statutory protections—each being a legal error subject to de novo review.

**178.** Whether the Board's finding was supported by substantial evidence on the record as a whole, whether the Board ignored probative documentary evidence, whether the Board relied on speculative inference, whether credibility findings were contradicted by undisputed documents, and whether findings were irrational or unsupported by the record.

**179.** Why grievance numbers were never issued, why unrelated roles were cancelled post-grievance, why stale allegations were revived only after protected activity, why the union demanded extraneous repayment not alleged by the employer, why termination letters were absent in union roles, why progressive discipline was skipped, why explanations were inconsistent across contexts, why the grievance was not escalated to arbitration, and why comparator evidence was not addressed—and whether these unanswered questions collectively warrant an inference of unlawful motive under Wright Line.

**180.** Under Wright Line and NLRB v. Transportation Management Corp., what specific contemporaneously documented evidence demonstrates that each adverse action across multiple roles would have occurred absent protected activity, how does the employer reconcile that burden with temporal clustering and escalation, and does such multiplicity of simultaneous adverse actions across independent roles inherently undermine the employer's affirmative defense.

**181.** Under ***Reeves v. Sanderson Plumbing Products, Inc.,*** where the employer's justification relies on digital records lacking exclusive control and audit verification, whether the falsity or unreliability of that explanation compels an inference of pretext, and if not, what evidentiary standard is being applied instead—including how tribunals should reconcile the tension between ***St. Mary's Honor Center v. Hicks*** ("falsity does not compel judgment") and Reeves ("falsity permits inference") particularly where digital evidence reliability is disputed.

**182.** Under ***Universal Camera Corp. v. NLRB*** and later circuit interpretations that vary in deference to the Board, whether the Board evaluated the entire evidentiary record including evidence detracting from the employer's position such as shared-access system manipulation, and if not, how the decision can satisfy the substantial evidence standard.

**183.** Under ***Motor Vehicle Manufacturers Association v. State Farm***, whether the agency failed to consider critical aspects of the problem—namely digital evidence reliability, multi-role retaliation, and union inaction—thereby rendering its decision arbitrary and capricious, and how this aligns or conflicts with Chevron-style deference doctrines following Loper Bright Enterprises v. Raimondo.

**184.** Under ***Chevron U.S.A. Inc. v. Natural Resources Defense Council*** and its recent limitations in Loper Bright, whether courts should defer to NLRB interpretations where technological evidence standards are not explicitly addressed by statute, and under Skidmore v. Swift & Co., what weight should be given to NLRB interpretations when addressing novel technological issues not contemplated by the NLRA.

**185.** Under NLRB v. J. Weingarten, Inc., whether restricting a union representative to a passive or silent role during an discipline interview satisfies the requirement of meaningful assistance or constitutes constructive denial of representation rights, how this reconciles with Board cases that permit limited roles for representatives, and whether procedural structuring to avoid union participation constitutes bad faith circumvention of statutory rights.

**186.** Under Vaca v. Sipes and Air Line Pilots Association v. O'Neill, whether a union's failure to assign a grievance number, communicate with the member, or conduct a documented merits analysis before denying arbitration falls outside the permissible range of reasonableness, whether such inaction constitutes arbitrary or bad-faith conduct, and whether the "wide range of reasonableness" standard in O'Neill conflicts with fiduciary analogies derived from trust or insurance law requiring good faith and fair dealing.

**187.** Under ***Clark County School District v. Breeden*** and conflicting circuit interpretations on temporal proximity, when temporal proximity is extremely close and accompanied by escalation across multiple domains, whether the evidentiary weight of causation rises above mere inference to near-presumption, and how the employer rebuts that inference.

**188.** Under 7th Circuit precedent emphasizing "***convincing mosaic***" of circumstantial evidence, whether multi-role retaliation, digital inconsistency, and union failure collectively satisfy the evidentiary threshold, and how the employer reconciles inconsistent explanations, procedural deviations, and disproportionate discipline with the requirement that legitimate reasons be honest and consistently applied.

**189.** Whether the employer's reliance on a Workday-like system which permits multi-user modification satisfies evidentiary attribution requirements under ***Federal Rules of Evidence 901,*** what authentication methodology was used to link specific entries exclusively to the charging party, whether system audit logs were produced, and if not, whether the absence of audit trails creates a presumption of evidentiary unreliability or justifies an adverse inference under administrative evidentiary principles—including whether failure to preserve digital audit logs constitutes spoliation under principles articulated in ***Zubulake v. UBS Warburg LLC.***

**190.** Whether reliance on non-exclusive, modifiable digital inputs violates ***due process principles requiring that adverse action be based on reliable and verifiable evidence,*** whether discipline based on system-generated data can be sustained where the system architecture inherently allows third-party modification without traceable attribution, and whether failure to produce audit logs undermines the evidentiary weight of electronic records under emerging electronic evidence doctrines in federal courts.

**191.** Under a ***network causation model*** where multiple decision-makers—HR, supervisors, departments, unions—operate within an integrated system, whether the interconnected nature of decisions undermines any claim of independent action, whether adverse actions across multiple unrelated roles can be legally justified without demonstrating a specific factual nexus for each role, and whether such expansion constitutes evidence of generalized retaliatory animus sufficient to transform the evidentiary analysis from isolated incidents to systemic retaliation under Wright Line?

**192.** Whether statistical analysis of event clustering—termination, job loss, opportunity denial, academic impact within days—can be used as circumstantial evidence of unlawful motive, what probability threshold would negate coincidence, and under probabilistic reasoning and Bayesian inference models, what threshold of improbability is sufficient to infer intent and how that interacts with legal standards of proof.

**193.** Whether the employer's **failure to apply progressive discipline** constitutes deviation from established policy sufficient to support pretext, whether similarly situated employees with comparable discrepancies were treated differently, and how that disparity aligns with anti-discrimination principles under NLRA jurisprudence and McDonnell Douglas Corp. v. Green.

**194.** Whether the employer conducted a neutral and comprehensive investigation or whether the process was outcome-driven, whether exculpatory materials or alternative explanations—such as system errors or shared access—were considered, and if not, whether that omission invalidates the disciplinary decision.

**195.** Under due process principles articulated in **Goldberg v. Kelly and Mathews v. Eldridge,** whether the charging party was provided a meaningful opportunity to contest the evidence prior to deprivation of employment and academic interests, whether the hybrid student-employee status creates a constitutional due process conflict where different procedural standards are applied selectively, and whether the combination of economic and educational deprivation requires enhanced procedural safeguards.

**196.** Under ***Board of Regents v. Roth and Perry v. Sindermann,*** whether the employee possessed a property or liberty interest in continued employment or academic participation, whether selective denial of such interests without adequate process violates constitutional protections independent of NLRA claims, and under Cleveland Board of Education v. Loudermill, whether pre-deprivation process was adequate given the severity of consequences.

**197.** Whether the union's exclusive control over grievance and arbitration processes imposed a heightened fiduciary obligation analogous to insurer good-faith duties, whether a union's refusal to process a grievance without explanation can be analogized to bad faith denial of coverage in insurance law, what safeguards prevent such conduct, and whether the union's inaction effectively extinguished all contractual remedies thereby constituting restraint or coercion under Section 8(b)(1)(A).

**198.** Whether the employer benefited materially or procedurally from the union's failure to act, whether such benefit alignment supports an inference of coordinated conduct under Sections 8(a)(2) and 8(b), and whether parallel conduct—employer retaliation and union inaction—can be treated as circumstantial evidence of collusion absent direct proof of agreement which will be practically impossible to prove otherwise.

**199.** Under antitrust-style parallel conduct analysis articulated in Bell Atlantic Corp. v. Twombly, whether coordinated inaction can be inferred without explicit agreement, whether Twombly's skepticism of parallel conduct conflicts with NLRA's acceptance of circumstantial evidence, and whether such reasoning is transferable to NLRA cases.

**200.** Whether the NLRB Region failing to investigate critical evidentiary components such as digital audit logs, representation rights, and union conduct in violation of its obligations under the Casehandling Manuals, whether the General Counsel failed to issue complaint despite evidence satisfying prima facie elements constituting abuse of prosecutorial discretion, and whether related employer and union cases were improperly fragmented rather than consolidated thereby preventing holistic analysis of systemic conduct.

**201.** Whether fragmentation of claims undermines the statutory framework of collective representation by isolating inherently interconnected violations, whether the Board failed to consider cumulative evidence and instead improperly evaluated each allegation in isolation, and whether cumulative impact analysis can alter the outcome under Wright Line by amplifying inference of unlawful motive. Does that not dilute the claim of grieving party?

**202.** Whether the employer's selective classification of the charging party as "student" or "employee" depending on context constitutes dual-status exploitation that interferes with statutory rights, whether such classification toggling can be treated as a form of structural evasion of NLRA protections, and how conflicts between Yeshiva University and Columbia University precedent should be reconciled in hybrid roles.

**203.** Whether the presence of multiple protected activities—union, grievance, discrimination, whistleblowers—creates a compounded inference of retaliatory motive beyond ordinary analysis, whether the escalation of adverse actions following each protected activity can be modeled as a retaliatory cascade requiring heightened scrutiny, and whether the absence of contemporaneous documentation for key decisions undermines the credibility of the employer's justification.

**204.** Whether post hoc rationalizations can be distinguished from legitimate contemporaneous reasoning, what evidentiary markers establish that distinction, whether the employer's conduct created a chilling effect on other employees' exercise of protected

rights sufficient to establish a Section 8(a)(1) violation, and whether the union's failure to act amplified that chilling effect creating a combined coercive environment. Wheater this turn the NLRA case from a ULP case to a misconduct case looking at totality of circumstances, would that be considered as a unfair toggle against plaintiff rights to not discuss specifically about the ULP under NLRA.

**205.** Whether this case presents a question of first impression regarding evidentiary standards for digital systems in labor adjudication, whether courts should establish a "digital reliability doctrine" requiring attribution, auditability, and verification for electronic evidence, whether the Board's approach if upheld permits employers to rely on unverifiable digital systems to impose discipline without accountability, and whether failure to address emerging technological realities renders existing legal standards inadequate?

**206.** Under ***Burlington Northern & Santa Fe Railway Co. v. White,*** whether the broad definition of adverse action in retaliation jurisprudence extends to multi-role employment contexts under the NLRA, and whether Burlington Northern's "material adversity" standard conflicts with narrower NLRA interpretations of adverse action?

**207.** Under Staub v. Proctor Hospital, whether the "cat's paw" theory applies where biased actors within an integrated HR system influence final decision-makers, and whether the cat's paw doctrine can be extended to networked decision-making involving multiple departments and unions?

**208.** Under Gross v. FBL Financial Services, Inc. and mixed-motive jurisprudence, whether NLRA retaliation requires but-for causation or motivating factor analysis, how courts should reconcile Wright Line's burden-shifting with stricter causation standards articulated in Gross, and under Desert Palace, Inc. v. Costa and Price Waterhouse v. Hopkins, how mixed-motive frameworks interact with NLRA-specific standards?

**209.** Under ***University of Pennsylvania v. EEOC,*** whether academic freedom provides any shield against disclosure of evidence or compliance with labor law obligations, whether invocation of academic discretion conflicts with statutory obligations under the NLRA, and under NLRB v. Yeshiva University and Columbia University, how hon'ble courts/board should distinguish between managerial employees and protected employees in hybrid academic roles?

**210.** Under Epic Systems Corp. v. Lewis, how courts should interpret collective activity rights in modern employment structures, whether fragmentation of roles undermines collective activity protections, and under AT&T Mobility LLC v. Concepcion, whether contractual structure overrides statutory labor protections and how that interacts with union-controlled grievance systems?

**211.** Under Hoffman Plastic Compounds, Inc. v. NLRB and Sure-Tan, Inc. v. NLRB, how limitations on remedies interact with broader ***make-whole principles*** in multi-role employment contexts, whether Hoffman Plastic conflicts with expansive remedial theories

for systemic violations, and whether extension of harm into academic or non-traditional domains falls within NLRA scope?

**212.** Under ***EEOC v. Abercrombie & Fitch Stores, Inc***., whether motive inferred without explicit knowledge applies analogously to employer awareness of protected activity, under conflicting circuit standards on employer knowledge what level of awareness is sufficient to establish liability, and under Anderson v. Liberty Lobby, Inc., what evidentiary threshold is required to survive summary dismissal in administrative proceedings?

**213.** Under ***Garcetti v. Ceballos,*** how courts should distinguish between protected speech and employer-controlled activity, whether that distinction affects NLRA protections, under Pickering v. Board of Education balancing test whether academic or institutional interests can outweigh employee rights in this context, and under Connick v. Myers whether the nature of the speech or complaint affects protection under NLRA?

**214.** Under ***International Brotherhood of Teamsters v. United States,*** whether pattern or practice evidence can be used to establish systemic discrimination or retaliation, whether statistical and pattern evidence suffices to shift burdens in NLRA cases, and under Hazelwood School District v. United States, how statistical methodologies should be adapted for retaliation analysis?

**215.** Under ***Daubert v. Merrell Dow Pharmaceuticals, Inc.*** and Kumho Tire Co. v. Carmichael, whether expert analysis on digital systems or statistical probability can be admitted in administrative proceedings, whether Daubert applies or influences evidentiary standards in NLRB hearings, and whether technical expertise regarding system architecture can be used to challenge reliability of employer evidence?

**216.** Under ***SEC v. Chenery Corp. and Chenery II,*** whether the Board relied on reasoning not articulated in its decision, whether post hoc justification invalidates agency action, whether the Board relied on post hoc rationalizations rather than contemporaneous reasoning, and whether reliance on incomplete reasoning violates Chenery doctrine?

**217.** Under ***Bowen v. Georgetown University Hospital,*** whether agencies can apply new interpretations retroactively in adjudication, whether application of new evidentiary standards violates retroactivity principles, and under ***INS v. Ventura***, whether appellate courts should remand rather than decide issues not fully considered by the agency?

**218.** Under ***Alexander v. Gardner-Denver Co.,*** whether contractual grievance processes can limit statutory rights, whether union failure to arbitrate affects the employee's ability to pursue statutory claims, under Gilmer v. Interstate/Johnson Lane Corp. whether arbitration precludes statutory remedies, and whether union-controlled arbitration differs from individual arbitration in legal effect?

**219.** Under ***14 Penn Plaza LLC v. Pyett,*** whether unions can waive individual statutory rights, whether union inaction effectively nullifies statutory protections, and how courts should resolve tension between Pyett and Gardner-Denver regarding union control over claims?

**220.** Whether this case requires harmonization of conflicting precedents across Supreme Court, circuit courts, and NLRB decisions regarding evidence, retaliation, and representation rights, and ***whether failure to address key arguments constitutes reversible error*** under SEC v. Chenery Corp?

**221.** Under separation of powers principles, whether courts should limit agency discretion where statutory interpretation intersects with technological change, whether failure to adapt legal standards to modern systems creates constitutional or statutory gaps, and under NLRA policy objectives whether the outcome of this case risks undermining collective bargaining protections broadly?

**222.** If the Board declines to find a violation here, how this case is distinguishable from Wright Line and Transportation Management; if the union's conduct does not violate Vaca v. Sipes, what conduct would; if restricting representation satisfies Weingarten, what limitation would violate it; if this evidentiary record satisfies Universal Camera, what record would fail the substantial evidence test; if employer reliance on modifiable systems is upheld, what limiting principle prevents arbitrary discipline; and if cumulative retaliation across roles is insufficient to establish motive, what factual scenario would meet that standard?

**223.** Under ***NLRB v. Burnup & Sims, Inc.***, whether an employer can discipline an employee based on a mistaken belief of misconduct when the underlying conduct is protected, and how that applies where digital records are unreliable, disputed, or subject to system-level ***manipulation*****—**and whether employer good faith belief excuses reliance on unreliable evidence under Allentown Mack Sales & Service, Inc. v. NLRB requiring objectively reasonable beliefs?

**224.** Under ***Republic Aviation Corp. v. NLRB,*** whether employer conduct that interferes with protected activity must be explicitly anti-union or whether neutral policies applied discriminatorily suffice, and under ***Beth Israel Hospital v. NLRB,*** how employer property or operational interests should be balanced against employee Section 7 rights in institutional settings such as universities?

**225.** Under ***Eastex, Inc. v. NLRB*** *and* ***NLRB v. City Disposal Systems, Inc.,*** whether the scope of protected concerted activity extends to broader institutional complaints including those involving academic or administrative processes, whether an individual employee's assertion of contractual or statutory rights can constitute concerted activity even when acting alone, and how courts should reconcile Meyers Industries with broader interpretations in City Disposal for hybrid individual-collective conduct?

**226.** Under ***Sure-Tan, Inc. v. NLRB***, whether employer conduct that indirectly affects employment**—**including immigration status, academic discipline, or administrative barriers**—**falls within NLRA jurisdiction, and whether indirect coercion through non-employment channels constitutes interference under Section 8(a)(1)?

**227.** Under ***NLRB v. Erie Resistor Corp.*** *and* ***NLRB v. Great Dane Trailers, Inc.,*** whether conduct that is inherently **destructive** of employee rights can be presumed unlawful

without specific proof of anti-union intent, whether multi-role termination and systemic exclusion constitute "inherently destructive" conduct shifting the burden to the employer, and under American Ship Building Co. v. NLRB and NLRB v. Brown, how courts should distinguish between legitimate business decisions and actions motivated by anti-union animus? And how it works in the case of evidence for each activity?

**228.** Under ***Textile Workers Union v. Darlington Manufacturing Co.***, whether elimination of multiple roles functions as a constructive partial shutdown targeting protected activity, and under ***First National Maintenance Corp. v. NLRB,*** whether managerial discretion over operations extends to decisions that disproportionately impact protected employees—and where the boundary should be drawn between managerial prerogative and employee rights.

**229.** Under ***Phelps Dodge Corp. v. NLRB***, whether refusal to hire based on protected activity establishes liability even absent termination, under ***NLRB v. Fleetwood Trailer Co***. whether refusal to reinstate or rehire after adverse action constitutes an independent violation, and whether denial of future roles and opportunities across departments satisfies Phelps Dodge standards?

**230.** Under ***NLRB v. Gissel Packing Co.,*** whether employer conduct that undermines union effectiveness justifies extraordinary remedies, whether *combined employer retaliation and union failure meets the threshold for Gissel-type remedies or enhanced Board intervention,* and what scope of relief is appropriate for multi-role employment loss?

**231.** Under **Lechmere, Inc. v. NLRB** and **Republic Aviation Corp. v. NLRB**, how access to communication channels and rights should be evaluated, how access limitations should be evaluated in institutional environments, and whether limitation of access to grievance mechanisms constitutes interference?

**232.** Under **NLRB v. Curtin Matheson Scientific, Inc.,** how the Board should evaluate employee sentiment and inference of intent, whether lack of direct evidence of animus precludes finding of violation when circumstantial evidence is strong, and whether the perception of surveillance or retaliation suffices to establish a Section 8(a)(1) violation?

**233.** Under ***Allentown Mack Sales & Service, Inc. v. NLRB,*** whether the Board's inferences must be reasonable and supported by evidence, whether the Board applied that standard here, and under conflicting interpretations of Allentown Mack and Universal Camera Corp. v. NLRB, how reasonableness of inference should be assessed when alternative explanations such as shared-access system manipulation exist?

**234.** Under ***Fall River Dyeing & Finishing Corp. v. NLRB***, whether continuity of employment relationships extends across multiple roles within a single institution creating a unified employment relationship for NLRA purposes, and under ***Howard Johnson Co. v. Detroit Local Joint Executive Board,*** how continuity and successorship principles should apply within internal institutional structures?

**235.** Under NLRB v. Weingarten and conflicting Board interpretations, whether meaningful participation requires active advocacy by the representative, whether restricting a union representative to a passive or silent role satisfies the requirement of meaningful assistance

or constitutes constructive denial of representation rights, and whether procedural structuring to avoid union participation constitutes bad faith circumvention of statutory rights?

**236.** Under **Roadway Express, Inc. and Skelly Oil Co.**, whether denial of representation rights requires automatic invalidation of subsequent disciplinary action, whether the entire investigatory process is invalidated by representation denial, and how this reconciles with Board cases permitting limited roles for representatives?

**237.** Under ***NLRB v. Scrivener,*** whether employees are protected when providing information during investigations, whether retaliation for such participation applies here, and whether retaliation against an employee for participating in investigatory or reporting processes extends to internal institutional complaint mechanisms where multiple reporting channels exist?

**238.** Under *NLRB v. Illinois Tool Works*, how pretext should be evaluated where employer explanations are inconsistent or unsupported, and under conflicting 7th Circuit precedent on pretext, what evidentiary threshold is required to establish discriminatory motive—including whether lack of documentation alone suffices?

**239.** Under *Joll v. Valparaiso Community Schools*, whether a "convincing mosaic" of circumstantial evidence suffices to prove retaliation, whether the combination of temporal proximity, inconsistent explanations, and systemic actions satisfies the "convincing mosaic" standard, and under conflicting interpretations, what combination of circumstantial factors is legally sufficient?

**240.** Under *Ortiz v. Werner Enterprises, Inc.*, whether all evidence must be considered together rather than separated into categories, whether the adjudicator improperly compartmentalized evidence in violation of Ortiz, and whether the Board improperly fragmented the record rather than evaluating the totality?

**241.** Under *Hobgood v. Illinois Gaming Board,* how procedural irregularities should factor into pretext analysis, and under Coleman v. Donahoe, how comparator evidence should be analyzed in complex multi-role employment settings—including what constitutes "similarly situated" when roles differ but systems and decision-makers are shared?

**242.** Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, whether expert testimony on system architecture or statistical probability can be used to challenge employer evidence, under Kumho Tire Co. v. Carmichael whether technical expertise regarding digital systems can be used to assess reliability, and under conflicting applications of Daubert in administrative proceedings, what evidentiary standard governs NLRB proceedings?

**243.** Under Bell Atlantic Corp. v. Twombly and *Ashcroft v. Iqbal*, what level of plausibility is required for allegations of coordination or collusion, whether inference of coordination from parallel conduct requires additional contextual evidence beyond alignment of outcomes, whether NLRA practice allows a lower threshold for inference compared to federal pleading standards, and whether Twombly's skepticism of parallel conduct conflicts with NLRA's acceptance of circumstantial evidence?

**244.** Under International Brotherhood of Teamsters v. United States, whether pattern or practice evidence can be used to establish *systemic discrimination or retaliation* (Serial retaliation, and Serial Discrimination), whether statistical and anecdotal evidence can be combined, and under ***Hazelwood School District v. United States***, what statistical threshold is required to infer discrimination and whether statistical improbability of clustered adverse actions supports inference of retaliation.

**245.** Under McDonnell Douglas Corp. v. Green, how burden-shifting should interact with Wright Line in hybrid cases, and under conflicting frameworks between McDonnell Douglas and Wright Line, which governs NLRA retaliation analysis?

**246.** Under Price Waterhouse v. Hopkins and Desert Palace, Inc. v. Costa, how mixed-motive analysis should be applied in labor cases, under conflicting precedent between mixed-motive and but-for causation, what standard applies to NLRA claims, and under Gross v. FBL Financial Services, Inc., whether NLRA retaliation requires but-for causation or motivating factor analysis?

**247.** Under Mathews v. Eldridge, how the balancing test for procedural due process should apply where both employment and academic interests are implicated, whether combined deprivation of employment and academic interests requires heightened procedural safeguards, and under conflicting interpretations of Loudermill, what constitutes sufficient pre-termination hearing in hybrid employment contexts?

**248.** Under Board of Regents v. Roth and Perry v. Sindermann, whether the employee possesses a property or liberty interest in continued employment or academic participation, whether multi-role employment creates a stronger protected property interest, and whether selective denial of such interests without adequate process violates constitutional protections independent of NLRA claims?

**249.** Under Columbia University and NLRB v. Yeshiva University, how courts should resolve conflicting doctrines on student-worker status, whether selective classification of individuals creates a loophole undermining NLRA protections, and whether misclassification risks exclusion from NLRA protections in violation of statutory intent?

**250.** Under ***Alexander v. Gardner-Denver Co. and 14 Penn Plaza LLC v. Pyett***, whether contractual grievance processes can limit statutory rights, whether union-controlled grievance systems can limit or extinguish statutory rights, whether union inaction effectively waives or nullifies statutory protections, and what safeguards exist against union waiver of individual rights?

**251.** Under ***Hines v. Anchor Motor Freight, Inc***., whether union failure combined with employer misconduct invalidates the grievance process, whether systemic failure of representation justifies bypassing contractual remedies, and whether union failure combined with employer misconduct invalidates contractual remedies?

**252.** Under ***NLRB v. Katz,*** whether the employer implemented unilateral changes affecting working conditions—including job access, assignments, hours, or system privileges

without notice or bargaining, and whether such conduct independently violates Section 8(a)(5)?

**253.** Under ***Litton Financial Printing Division v. NLRB and Fibreboard Paper Products Corp. v. NLRB,*** whether post-termination conduct affecting employment opportunities falls within the scope of bargaining obligations, whether reallocation or elimination of roles constitutes a mandatory subject of bargaining, and under conflicting precedent between Fibreboard and First National Maintenance, how operational decisions should be distinguished from mandatory bargaining subjects?

**254.** Under NLRB v. Truitt Manufacturing Co. and NLRB v. Acme Industrial Co., whether the employer failed to provide relevant information necessary for grievance processing, whether such refusal constitutes independent violation, whether the union had a right to information necessary to evaluate grievances that was denied through union inaction, and under Detroit Edison Co. v. NLRB, how confidentiality concerns should be balanced against the duty to provide relevant information including digital audit logs?

**255.** Under Scofield v. NLRB, whether internal rules or policies can be enforced if they impair statutory rights, whether enforcement of institutional policies affecting timekeeping, discipline, or access violates Scofield principles, and when internal union or employer rules violate federal law?

**256.** Whether, in proceedings under the National Labor Relations Act, the National Labor Relations Board or a reviewing court may make determinations regarding whether alleged misconduct ***did or did not occur,*** where such findings are necessary to evaluate claims of unfair labor practices; and whether such determinations are limited to the extent required to assess motive, pretext, or protected activity, rather than constituting independent adjudication of misconduct against the individual employee? Did mentioning over about any academic misconduct is abuse of judicial authority?

**257.** Under NLRB v. Insurance Agents' International Union, how strategic inaction or partial action by unions should be evaluated as a form of economic pressure, and whether such doctrine conflicts with duty of fair representation standards?

**258.** Under ***Ford Motor Co. v. Huffman,*** what limits exist on union discretion where decisions disproportionately harm a single member, and under conflicting precedent between Huffman and Vaca v. Sipes, when permissible discretion becomes arbitrary conduct?

**259.** Under ***Humphrey v. Moore,*** how conflicts of interest within union representation should be evaluated, and whether union alignment with employer interests constitutes a breach of duty under Humphrey?

**260.** Under ***Marquez v. Screen Actors Guild,*** whether failure to properly inform or communicate with a member constitutes bad faith representation, and under conflicting interpretations, what threshold of communication failure constitutes a DFR violation?

**261.** Under ***Breininger v. Sheet Metal Workers and Teamsters Local 357 v. NLRB,*** whether denial of multiple employment opportunities functions as discriminatory referral, whether centralized institutional control creates a ***de facto referral system,*** and whether internal allocation of roles should be treated as a referral system subject to NLRA scrutiny?

**262.** Under NLRB v. General Motors Corp. and Communications Workers v. Beck, how union security arrangements affect obligations to represent members fairly, whether payment of dues without representation constitutes statutory inconsistency, and whether failure of representation implicates broader statutory rights?

**263.** Under NLRB v. Boeing Co. and Stericycle, Inc., how workplace rules affecting protected activity should be evaluated, and under conflicting Board precedent between Boeing and Stericycle, which standard governs evaluation of employer rules?

**264.** Under the evolving standards articulated in Purple Communications, Inc., 361 NLRB 1050 and Caesars Entertainment d/b/a Rio All-Suites Hotel and Casino, 368 NLRB No. 143, how should employee access to employer-owned communication systems be evaluated; and, in ***light of the tension between these precedents,*** how should digital access rights be balanced against employer property and managerial interests? In addition, whether restrictions on employee access to employer communication systems particularly where such systems constitute a primary or exclusive means of workplace communication may constitute unlawful interference, restraint, or coercion under Section 8(a)(1) of the National Labor Relations Act, especially where such restrictions impede employees’ ability to engage in protected concerted activity. Under NLRB v. Noel Canning, whether structural limits on Board authority affect validity of decisions, under Lucia v. SEC whether ALJs were properly appointed and if not whether that invalidates proceedings, under Carr v. Saul whether structural constitutional challenges can be raised late in proceedings, and under Axon Enterprise, Inc. v. FTC whether constitutional challenges to agency structure can be brought outside administrative process?

**265.** Under Thunder Basin Coal Co. v. Reich and Elgin v. Department of Treasury, whether parties must exhaust administrative remedies before raising constitutional claims, and under conflicting precedent between Thunder Basin and Axon, when parties can bypass administrative process?

**266.** Under West Virginia v. EPA, whether the major questions doctrine limits agency authority in novel contexts, whether application of NLRA to digital systems and hybrid roles raises a major questions issue, and under King v. Burwell, whether courts should independently interpret statutes in cases of major economic or political significance?

**267.** Under Department of Homeland Security v. Regents of the University of California, whether the agency considered reliance interests in its decision-making, under Encino Motorcars, LLC v. Navarro whether failure to provide reasoned explanation invalidates agency action, under FCC v. Fox Television Stations, Inc. whether agencies must provide detailed justification when changing policies, and what constitutes adequate explanation?

**268.** Under Heckler v. Chaney and Massachusetts v. EPA, whether agency refusal to act is reviewable, whether refusal to issue complaint falls within unreviewable discretion or is subject to challenge, and when agency inaction is reviewable where statutory duty exists?

**269.** Under NLRB v. Washington Aluminum Co., whether spontaneous employee conduct related to workplace concerns qualifies as protected activity even absent formal union involvement, and how that applies to informal complaints and communications in this case?

**270.** Under Parexel International, LLC, whether preemptive retaliation before protected activity fully manifests constitutes a violation, and whether anticipatory retaliation applies where employer actions occur in close temporal proximity to emerging complaints?

**271.** Under Intertape Polymer Corp., whether employer conduct that chills future protected activity violates Section 8(a)(1) even absent direct retaliation, and whether systemic removal of opportunities creates a chilling effect sufficient to establish independent violation?

**272.** Under Flexsteel Industries, Inc., how credibility determinations should be evaluated where employer testimony conflicts with documentary inconsistencies, and under conflicting Board precedent on credibility, what weight should be given to absence of documentation?

**273.** Under Shattuck Denn Mining Corp. v. NLRB, whether shifting explanation by the employer establishes pretext as a matter of law, and under conflicting circuit interpretations, whether inconsistency alone suffices or must be combined with other evidence?

**274.** Under NLRB v. Walton Manufacturing Co., how courts should evaluate employer credibility when testimony is self-serving and unsupported, and under NLRB v. Link-Belt Co., whether employer conduct that discourages union activity can be unlawful even absent explicit threats.

**275.** Under Richardson v. Perales, whether administrative findings can rely on hearsay or indirect evidence such as unaudited digital records, whether such reliance meets due process requirements, and whether reliance on partially verifiable digital evidence satisfies due process where direct attribution is lacking.

**276.** Under Zubulake v. UBS Warburg LLC and Federal Rule of Civil Procedure 37(e) analogs, whether failure to preserve electronic audit logs constitutes spoliation justifying adverse inference, whether failure to preserve digital evidence justifies sanctions, and whether loss of electronically stored information justifies adverse inference?

**277.** Under Lorraine v. Markel American Insurance Co., whether digital records were properly authenticated, whether lack of authentication undermines admissibility, and under evolving jurisprudence on electronic evidence, what minimum standards of integrity, attribution, and auditability are required.

**278.** Under Bayesian evidentiary frameworks, whether posterior probability of retaliation given ***observed temporal clustering, multi-role impact, and inconsistent employer explanations exceeds a legal threshold sufficient to satisfy preponderance of evidence,***

and under probabilistic causation theory, what the ***likelihood ratio comparing retaliation*** hypothesis versus independent lawful actions hypothesis is and whether that ratio meets evidentiary sufficiency standards?

**279.** Under causal inference frameworks using Directed Acyclic Graphs, whether the observed outcomes can be explained without including protected activity as a causal variable, under ***Pearl's do-calculus*** what the estimated causal effect of protected activity on probability of adverse action is, and under counterfactual analysis what would have occurred in absence of protected activity?

**280.** Under game theory, whether employer-union interaction reflects a Nash equilibrium of mutual non-action that minimizes exposure while disadvantaging the employee, whether repeated inaction by the union can be modeled as a dominant strategy indicating alignment of incentives with employer interests, and under mechanism design theory, whether union control over grievance processes creates structural incentives for under-enforcement of member rights?

**281.** Under algorithmic accountability principles, whether employers should be required to demonstrate explainability, auditability, and traceability of digital systems used for disciplinary decisions, and under emerging legal scholarship on "algorithmic due process," whether reliance on opaque or modifiable systems violates procedural fairness requirements?

**282.** Under cyber-forensics/digital forensics, and distributed systems standards, whether absence of immutable logs renders digital evidence inherently unreliable, whether multi-user access without strict access control invalidates attribution of actions to a single user, and under database integrity principles, whether lack of ACID-compliant audit logging undermines evidentiary reliability.

**283.** Under network theory, whether the graph of decision-makers and actions shows centralization indicative of coordinated control rather than independent decisions, and under causal inference frameworks, whether the observed outcomes can be explained without including protected activity as a causal variable?

**284.** Under comparative legal analysis, whether international labor law frameworks impose stricter standards on union representation and employer evidence, whether European Union labor law **analogies** would find violation of proportionality and fairness principles, whether ***UK employment law*** would reject reliance on unverifiable digital evidence under the "reasonable employer" test, and whether ***Canadian labor law*** would find union inaction constitutes breach of duty of fair representation? Whether or not Serial Retaliating institutions fail the reasonable employer and similar test?

**285.** Under legal realism and critical legal studies frameworks, whether institutional power asymmetry affects interpretation and enforcement of statutory rights, whether structural alignment between employer and union creates systemic disadvantage for individual employees, and whether complexity of multi-actor cases leads to under-enforcement or simplification bias by agencies?

**286.** Under law-and-economics and public choice theory analysis, whether the cost-benefit ***structure incentivizes employer retaliation and union inaction,*** whether agency behavior reflects institutional incentives that may bias enforcement decisions, and whether the administrative burden of complex cases affects enforcement patterns?

**287.** Per ***meta-doctrinal analysis***, whether this case exposes contradictions between formal legal standards and practical enforcement realities, whether this case requires development of a new doctrinal synthesis integrating labor law, administrative law, and technological evidence standards, and whether acceptance of unreliable digital evidence creates systemic risk across labor law enforcement?

**288.** Per ***normative legal theory,*** what principles should govern fairness in technologically mediated employment relationships, under Rawlsian justice principles whether the system disadvantages the least powerful participant, and under ***Dworkinian integrity theory*** whether the legal system maintains consistency in applying principles across domains?

**289.** Under ultimate doctrinal question, whether a legal system that permits discipline based on unverifiable digital evidence, combined with union inaction and fragmented adjudication, can be considered consistent with the foundational purposes of the NLRA?

**290.** Under ultimate synthesis of NLRB v. Transportation Management Corp., Reeves v. Sanderson Plumbing Products, Inc., and Universal Camera Corp. v. NLRB, whether a finding of no liability can stand where causation is strongly inferred, employer explanation is unreliable, and evidence is incomplete?

**291.** Under reconciliation of St. Mary's Honor Center v. Hicks and Reeves v. Sanderson Plumbing Products, Inc., whether falsity combined with systemic inconsistency compels judgment as a matter of law?

**292.** Under harmonization of NLRB v. Yeshiva University and Columbia University, whether hybrid classification creates a doctrinal contradiction requiring resolution by higher courts?

**293.** Under reconciliation of Alexander v. Gardner-Denver Co. and 14 Penn Plaza LLC v. Pyett, whether union-controlled processes can extinguish statutory rights without violating federal law?

**294.** Under tension between Bell Atlantic Corp. v. Twombly and NLRA circumstantial evidence doctrine, whether coordinated outcomes without explicit agreement can establish liability?

**295.** Under conflict between Gross v. FBL Financial Services, Inc. and Price Waterhouse v. Hopkins, what causation standard ultimately governs NLRA retaliation claims?

**296.** Under post-Loper Bright Enterprises v. Raimondo framework, whether courts should independently define evidentiary standards for digital systems rather than defer to NLRB.

**297.** Under reconciliation of West Virginia v. EPA and Chevron U.S.A. Inc. v. Natural Resources Defense Council, whether application of NLRA to technologically complex systems raises major questions concerns.

**298.** Per combined readings of Mathews v. Eldridge and Cleveland Board of Education v. Loudermill, whether cascading multi-domain deprivation requires a new procedural due process standard?

**299.** Under reconciliation of Zubulake v. UBS Warburg LLC and administrative evidentiary doctrine, whether failure to preserve digital audit logs mandates adverse inference in NLRB proceedings?

**300.** Under integration of Daubert v. Merrell Dow Pharmaceuticals, Inc. and NLRB practice, whether expert testimony on system reliability should be required where digital evidence is central?

**301.** Under conflict between Ortiz v. Werner Enterprises, Inc. and fragmented Board analysis, whether all evidence must be evaluated holistically? Under reconciliation of NLRB v. Great Dane Trailers, Inc. and American Ship Building Co. v. NLRB, whether systemic harm overrides asserted business justification?

**302.** Under jurisprudential synthesis, whether resolving this case requires integration of labor law, administrative law, constitutional law, and computational theory, and whether courts should establish new doctrines addressing digital evidence reliability, multi-role employment, and systemic retaliation?

**303.** Under synthesis of Vaca v. Sipes and Air Line Pilots Association v. O'Neill, whether union inaction at this scale exceeds permissible discretion, under reconciliation of Hines v. Anchor Motor Freight, Inc. and grievance finality doctrines whether combined employer-union failure invalidates the entire process, and under unified doctrinal analysis whether employer retaliation, union inaction, and unreliable evidence can be legally separated or must be treated as a single composite violation?

**304.** Per ultimate evidentiary question, whether a decision can be sustained where key facts depend on systems lacking verifiable attribution, auditability, and integrity; under ultimate causation question, whether multiple adverse actions temporally and structurally linked to protected activity can be explained without retaliation; and under ultimate procedural question, whether a process that limits representation, excludes evidence, and fragments claims can satisfy due process?

**305.** Under ultimate doctrinal conflict question, whether existing precedent can coherently resolve cases involving digital systems, hybrid roles, and systemic conduct; under ultimate constitutional question, whether the combination of agency discretion, union control, and employer authority creates a structure inconsistent with fundamental fairness; and under ultimate statutory purpose question, whether the outcome aligns with the NLRA's goal of protecting collective activity and preventing coercion?

**306.** Under ultimate jurisprudential question, whether this case requires development of a new unified doctrine addressing technological evidence, multi-role employment, and systemic retaliation; under ultimate adjudicative question, if all conflicting precedents are applied simultaneously whether any interpretation remains that permits the employer's conduct without contradiction; and under final synthesis question, whether it is logically, legally, and evidentially possible to reconcile all facts, precedents, and doctrines in a manner that results in a lawful outcome for the respondents?

**307.** Under advanced Bayesian hierarchical modeling, whether multiple layers of evidence temporal, structural, behavioral can be integrated into a single posterior probability of retaliation exceeding legal sufficiency thresholds; under Markov chain modeling, whether the sequence of events from complaint to escalation to multi-role loss exhibits transition probabilities inconsistent with independent lawful behavior; and under hidden Markov models, whether latent variables such as retaliatory intent can be inferred from observable sequences of actions?

**308.** Under Granger causality analysis, whether protected activity statistically "causes" subsequent adverse actions in a predictive sense; under structural equation modeling, whether relationships between protected activity, employer decisions, and union inaction can be quantified as causal pathways; and under econometric panel data analysis, whether comparison across time and roles can isolate the marginal effect of protected activity?

**309.** Under ***survival analysis and hazard rate modeling***, whether the risk of adverse action increases immediately after protected activity and whether there is a spike in "failure events" such as job loss temporally linked to protected activity?

**310.** Under clustering algorithms and anomaly detection models, whether adverse actions form a statistically significant cluster and whether the pattern of actions deviates significantly from baseline institutional behavior; and under outlier analysis, whether the actions against the employee are statistically extreme compared to peers?

**311.** Per graph theory and community detection algorithms, whether the interaction network between employer agents and union representatives reveals coordinated subgraphs indicative of coordination, whether decision-makers form tightly connected clusters, and under centralization metrics whether authority is concentrated in a manner inconsistent with independent decision-making?

**312.** Per spectral graph analysis, whether the structure of interactions indicates systemic rather than random behavior; under game-theoretic signaling models, whether union silence signals alignment with employer interests; and under repeated signaling equilibria, whether consistent inaction establishes credibility of non-enforcement.

**313.** Under Bayesian game theory, whether incomplete information and asymmetric knowledge favor coordinated outcomes; under contract theory, whether union control over grievance processes creates principal-agent divergence; under mechanism design theory, whether the grievance system is incentive-compatible for fair representation; and under

adverse selection and moral hazard analysis, whether union control allows selective processing and lack of accountability enables union inaction?

**314.** Under cyber-security frameworks and ***zero-trust architecture principles,*** whether lack of access control and logging creates vulnerabilities in data integrity, whether all system actions should be independently verifiable, and under auditability standards such as SOC 2 and ISO/IEC 27001, whether the system meets requirements for traceability, accountability, integrity, and security of information?

**315.** Per forensic computing standards, whether digital evidence can be validated through independent reconstruction; under chain-of-custody requirements, whether digital evidence was preserved without tampering; and under evidentiary reliability theory, whether digital evidence should be treated as presumptively unreliable absent verification?

**316.** Under ***epistemic uncertainty frameworks***, whether lack of knowledge about system integrity undermines confidence in conclusions; under decision theory, whether the employer's decision rule was optimized for fairness or biased toward risk minimization; and under risk analysis and cost-benefit analysis, whether the employer prioritized institutional risk over employee rights or gains from over-enforcement relative to under-enforcement.

**317.** Under behavioral economics, whether cognitive biases such as confirmation bias and ***anchoring influence employer decisions; under prospect theory, whether loss aversion drives disproportionate disciplinary responses; under bounded rationality,*** whether complexity of systems leads to simplified but flawed decision-making; and under organizational behavior theory, whether hierarchical structure influences decision outcomes.

**318.** Under ***institutional isomorphism***, whether similar organizations exhibit comparable patterns of behavior; under comparative federalism, whether state-level doctrines such as Illinois administrative law diverge from federal NLRA standards; and under Illinois Administrative Review Law, what standard of review applies to agency findings, and which governs hybrid claims especially keeping **TOTALITY** of circumstances in consideration?

**319.** Under comparative constitutional frameworks, whether other jurisdictions impose stricter due process requirements; under transnational labor standards such as ILO conventions, whether such conduct would violate international norms; under human rights frameworks, whether the conduct implicates rights to fair work and due process; and under jurisprudential pluralism, how overlapping legal regimes should be harmonized.

**320.** Under doctrinal synthesis theory, whether this case requires integration of labor, administrative, constitutional, and technological law; under meta-analytic legal reasoning, whether the case reveals systemic gaps in current doctrine; under forward-looking jurisprudence, whether courts should articulate new standards for digital evidence and multi-role employment; and under normative analysis, what principles should guide future adjudication of technologically mediated labor disputes?

**321.** Whether the Hon’ble NLRB failed to analyze a multi-actor, multi-role, multi-statute retaliation system as a unified legal phenomenon rather than fragmented allegations.

**322.** Whether an individual can simultaneously qualify as an "employee" under NLRA Section 2(3) while being treated as a student for disciplinary purposes, whether selective classification constitutes interference under Section 8(a)(1), and whether the employer selectively invoked student status to evade NLRA protections while enforcing employee obligations?

**323.** Whether multiple concurrent employment roles should be aggregated into a single employment relationship for purposes of Wright Line analysis, whether adverse action across multiple distinct roles establishes ***systemic animus*** rather than role-specific discipline, and whether retaliation across unrelated positions can be used to satisfy causation under Wright Line?

**324.** Whether centralized HR control such as Workday creates an ***integrated employer framework for NLRA liability***, whether ***accumulation of multiple protected activities strengthens inference of unlawful motive beyond standard Wright Line analysis,*** at what temporal threshold clustering of adverse actions becomes statistically incompatible with lawful coincidence, and whether sequential escalation of adverse actions establishes a presumption of retaliatory cascade requiring rebuttal?

**325.** Who had authority to create, edit, approve, or delete time records used for discipline, whether audit logs were generated, preserved, and reviewed for all relevant time entries, whether the employer can attribute specific time entries to the employee with certainty, whether reliance on modifiable digital records without audit verification meets evidentiary standards under administrative law, and whether use of shared-access digital systems without attribution violates substantial evidence requirements under Universal Camera?

**326.** Whether the meeting was investigatory or disciplinary in nature for purposes of Weingarten rights, whether the employee requested union representation and whether that request was meaningfully honored, whether the employer structured the proceeding to avoid triggering Weingarten protections, whether limiting a representative to a silent "support person" constitutes constructive denial of Weingarten rights, and whether procedural reframing of disciplinary proceedings can nullify statutory representation rights?

**327.** Whether a formal grievance was filed and assigned a tracking number by the union, whether absence of a grievance number constitutes procedural failure under duty of fair representation, how many times the employee requested updates from the union and what responses were provided, whether the union conducted any documented merits analysis before declining arbitration, and whether arbitration was denied based on cost without evaluating the merits of the claim?

**328.** Whether the union acted arbitrarily, discriminatorily, or in bad faith under Vaca v. Sipes; whether union failure to communicate and process grievances falls outside the "wide range of reasonableness" under Air Line Pilots v. O'Neill; whether a union's exclusive control over grievance mechanisms imposes fiduciary or insurer-like duties; whether refusal to

pursue a meritorious grievance can be analogized to bad faith denial of coverage in insurance law; and whether the union's inaction effectively deprived the employee of all contractual remedies?

**329.** Whether the employer benefited from the union's failure to act on the grievance, whether the union avoided adversarial conduct with the employer in a manner suggesting coordination, and whether parallel conduct between employer and union constitutes circumstantial evidence of collusion under Sections 8(a)(2) and 8(b)?

**330.** Whether the Region investigated the case as a unified pattern of conduct rather than isolated allegations, whether Workday audit logs were requested, preserved, and analyzed during investigation, whether the Region examined potential structural denial of Weingarten rights, what analysis was conducted regarding union duty of fair representation, why related CA and CB cases were not consolidated under 29 CFR § 102.33, and whether the General Counsel abused discretion by declining to issue complaint despite prima facie evidence?

**331.** Whether the employer met its burden under Wright Line to show same action absent protected activity, whether the presence of inconsistent explanations supports inference of pretext under Reeves v. Sanderson Plumbing, whether temporal proximity combined with other evidence establishes causation under Clark County v. Breeden and 7th Circuit precedent, and whether the employer deviated from progressive discipline policies?

**332.** Whether the employer can identify similarly situated employees treated more favorably under comparable circumstances, what the business justification is for extending discipline across unrelated roles, whether expansion of adverse actions beyond the original role demonstrates generalized retaliatory animus, whether any internal communication instructed departments not to hire or engage the employee, and whether hiring managers were informed of disciplinary actions affecting future employment opportunities?

**333.** Whether the employee was provided full notice of allegations and evidence prior to discipline, whether there was a meaningful opportunity to respond consistent with due process under Goldberg v. Kelly, whether the disciplinary process was impartial or outcome-driven, whether the employer relied on evidence that was incomplete, unverifiable, or subject to manipulation, and whether reliance on such evidence renders the decision arbitrary and capricious under State Farm.

**334.** Whether the Board considered all evidence that detracts from its conclusion as required under Universal Camera, whether the Board improperly fragmented employer and union conduct instead of analyzing systemic interaction, whether failure to consider combined liability undermines statutory protections under the NLRA, and whether institutional history of similar charges supports inference of motive under Wright Line.

**335.** What the statistical probability is that multiple adverse actions occurred independently within a narrow timeframe, whether network analysis of decision-makers demonstrates coordinated rather than independent action, and whether interconnected HR, supervisory, and union systems create a unified causal structure?

**336.** Whether the employer toggled between employee and student classifications to minimize liability, whether such dual-status manipulation constitutes interference with protected rights, whether student workers are covered employees under NLRA in this context, and whether the employer's academic structure facilitated evasion of NLRA obligations?

**337.** Whether remedies should include reinstatement across all affected roles rather than a single position, whether backpay should be calculated across all lost employment opportunities, whether front pay is appropriate where reinstatement is impracticable, whether academic status should be restored as part of make-whole relief, and whether the facts warrant special remedies due to egregious or systemic conduct?

**338.** Whether the Board failed to properly apply Wright Line burden shifting, whether the Board ignored evidence of temporal proximity and escalation pattern, whether reliance on digital records without audit verification was arbitrary and unsupported by substantial evidence, whether the Board failed to address procedural due process defects, whether liability can arise where multiple actors independently contribute to a single unlawful outcome, and whether combined employer retaliation and union inaction creates a legally cognizable deprivation of rights.

**339.** Whether the employer can identify a single non-retaliatory explanation that accounts for all adverse actions within the same timeframe, whether the employer can produce evidence that the employee had exclusive control over all data used for discipline, whether the union can explain how its inaction complied with duty of fair representation standards, whether the employer can explain how limiting representation satisfies Weingarten requirements, and whether the employer can explain how reliance on modifiable digital records meets evidentiary standards in administrative adjudication?

**340.** If this conduct does not violate Wright Line, what conduct would; if this union conduct does not violate Vaca v. Sipes, what conduct would; if this representation satisfies Weingarten, what limitation would violate it; and if this evidence satisfies Universal Camera, what evidence would fail to meet the standard?

**341.** Whether the employer's explanation satisfied the burden of persuasion under Wright Line as enforced in NLRB v. Transportation Management Corp., and whether the existence of multiple independent adverse actions undermines the employer's same-decision defense?

**342.** Whether shifting rationales alone establish pretext sufficient for liability under Reeves v. Sanderson Plumbing, whether the employer failed to preserve critical electronic evidence, whether litigation hold obligations were triggered and complied with, whether destruction or non-preservation of digital audit logs constitutes spoliation, and whether spoliation can support an independent inference of unlawful motive?

**343.** Whether the employer applied policies consistently across employees or selectively against the charging party, whether disciplinary standards were clearly defined and uniformly enforced, whether the employer deviated from established procedures in this

case, and whether deviation from internal policy can serve as evidence of pretext under 7th Circuit precedent?

**344.** Whether any supervisor expressed hostility toward protected activity directly or indirectly, whether circumstantial evidence of hostility can satisfy the animus requirement, whether any decision-maker relied on information from biased subordinates under cat's paw theory, and whether the cat's paw doctrine applies where multiple actors contributed to the decision?

**345.** Whether comparators were properly identified and analyzed by the employer, whether similarly situated employees received lesser discipline for comparable conduct, whether the employer failed to conduct a reasonable investigation before imposing discipline, whether the investigation outcome was predetermined prior to evidence review, and whether exculpatory materials were ignored or excluded from consideration?

**346.** Whether the employer failed to provide requested information relevant to grievance processing under Section 8(a)(5), whether there was any unilateral change in working conditions without bargaining, and whether the employer altered job assignments, hours, or access without notice to the union?

**347.** Whether the union requested relevant information from the employer and if not why, whether the union failed to pursue available contractual remedies beyond grievance filing, whether the union's decision-making process was documented and transparent, whether the union provided the employee an opportunity to participate in grievance discussions, and whether the union excluded the employee from meetings that affected their rights?

**348.** Whether the union conducted itself in a perfunctory manner as defined in DFR case law, whether the union's actions fell below minimum procedural standards required for fair representation, whether the union treated the employee differently than other members in similar situations, whether disparate treatment by the union can constitute discrimination under DFR doctrine, whether the union's inaction effectively ratified the employer's conduct, and whether union acquiescence can be treated as constructive participation in the adverse action?

**349.** Whether the employer and union shared information ***outside formal channels,*** whether there were communications suggesting alignment of interests between employer and union, whether the union discouraged or delayed grievance processing in a manner benefiting the employer, and whether absence of adversarial conduct supports inference of coordination?

**350.** Whether the NLRB failed to consider relevant Hon'ble ***Supreme Court precedent*** when evaluating evidence, whether the NLRB misapplied the substantial evidence standard under Universal Camera, whether the NLRB failed to address key arguments raised by the charging party, whether failure to address material arguments constitutes reversible error, and whether the NLRB improperly deferred to employer explanations without critical analysis?"

**351.** Whether the investigation was consistent with the Casehandling Manual requirements, whether the Region failed to test credibility of key witnesses, whether key witnesses were

not interviewed or evidence not collected, whether the Region improperly narrowed the scope of investigation, whether the charging party was given full opportunity to present evidence and arguments, whether procedural irregularities affected the fairness of the investigation, and whether failure to investigate key evidence justifies remand or reversal?

**352.** Whether the Board failed to consider cumulative evidence as required under administrative law, whether the Board improperly isolated each allegation instead of evaluating cumulative impact, whether cumulative impact analysis can change the outcome under Wright Line, whether the Board ignored the escalation pattern of adverse actions, whether the Board failed to consider statistical improbability of clustered events, and whether statistical inference can be used as circumstantial evidence of intent.

**353.** Whether the Hon’ble Board failed to consider emerging issues of digital evidence reliability, whether this case presents a question of first impression regarding electronic record attribution, whether courts should impose higher evidentiary standards for digital systems with shared access, whether the employer failed to authenticate electronic records under evidentiary standards, and whether unauthenticated records can be relied upon in administrative adjudication?

**354.** Whether the employer relied on assumptions rather than verified data, whether the decision-making process relied on incomplete or biased information, whether the employer failed to consider alternative explanations for the alleged discrepancy, whether the employer considered the employee's explanation or mitigating factors, whether the severity of discipline was proportionate to the alleged conduct, and whether disproportionate discipline supports inference of pretext.

**355.** Whether the employer imposed harsher penalties than industry norms, whether industry standards can be used to evaluate reasonableness of discipline, whether the employer's actions created a chilling effect on other employees, whether chilling effect alone can support Section 8(a)(1) violation, whether the employer engaged in conduct that would reasonably deter protected activity, whether the union's conduct contributed to the chilling effect, and whether combined employer-union conduct can amplify coercive impact. Weather frivolous inducement despite prior non discipline of more than year old matters constitutes to unlawful and illegal motives under the act?

**356.** Whether the employer failed to distinguish between intentional misconduct and inadvertent error, whether negligence or mistake can justify termination absent intent, whether the employer provided training or guidance on timekeeping systems, whether lack of training can undermine the basis for discipline, whether the employer's system design contributed to the alleged discrepancy, whether system flaws can shift responsibility away from the employee, and whether the employer audited other employees' records for similar discrepancies?

**357.** Whether enforcement was selective or targeted, whether the employer failed to apply consistent auditing procedures, whether the employer's actions aligned with business necessity or appeared punitive, whether the employer considered less severe alternatives before termination, whether failure to consider alternatives supports pretext, whether the

employer documented its decision-making process contemporaneously, whether post hoc justifications can undermine credibility, and whether lack of documentation can support adverse inference?

**358.** Whether the Board failed to apply proper standards of review for factual findings, whether the Board improperly substituted its judgment for that of the ALJ or vice versa, whether the Board failed to address credibility determinations, whether failure to address credibility issues warrants reversal, whether the Board ignored relevant circuit precedent, and whether deviation from circuit precedent can constitute reversible error?

**359.** Whether the case raised constitutional due process concerns not addressed by the Board, whether denial of fair procedure can invalidate the outcome regardless of merits, whether the Board failed to consider broader policy implications of its decision, whether allowing reliance on unverifiable digital systems creates systemic risk, whether this case requires clarification of legal standards for modern employment systems, whether courts should establish new doctrine addressing digital evidence reliability in labor law, and whether the combination of novel issues justifies heightened judicial scrutiny?

**360.** Whether the overall conduct of respondents undermined the statutory purpose of the NLRA, whether the outcome of this case affects enforcement of collective bargaining rights broadly, whether the case should be considered for higher-level review due to its systemic implications, and whether the ultimate conclusion is that existing doctrine cannot adequately address the convergence of digital evidence, hybrid roles, and coordinated inaction revealed by this case?

**361.** This is a final and significant question: depending on the determinations made by this Hon'ble Court and/or the Hon'ble NLRB in resolving the issues presented, whether there may arise additional questions or considerations that the Court deems necessary to address in the interest of justice, including those that may provide guidance for similarly situated individuals and contribute to the development of precedent?

**362.** The Charging Party further submits that, to the extent applicable, the questions presented herein are intended to be addressed by the National Labor Relations Board and/or any reviewing or appellate court. Certain questions were originally formulated in the context of other jurisdictions or broader legal frameworks; however, they are included here in adapted form to the extent they bear relevance to the issues arising under the National Labor Relations Act. The Charging Party respectfully requests that such questions be considered, where appropriate, within the scope of the Board's authority or for purposes of clarification, guidance, and preservation of issues for potential appellate review. Questions document link: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQDpuOfR-MqwRqbHCFQf4756ASV81O7KAzoyZX3bnPTT4WM?e=XNPSuk

## VI. RESERVATION OF RIGHTS

Complainant reserves the right to submit additional questions, amendments, and appeals as further information becomes available or as additional issues arise from the ongoing

adjudication of this matter. This submission is made without prejudice to any rights the Complainant may have under the National Labor Relations Act, applicable federal statutes, constitutional provisions, or common law.

## VII. PRAYER FOR RELIEF

WHEREFORE, Complainant respectfully requests that the Honourable National Labor Relations Board:

1. Address each of the foregoing questions in good faith and with due consideration of their legal and precedential significance;
2. Provide reasoned responses with appropriate citations to relevant case law, statutory provisions, regulations, or established precedents;
3. Evaluate this matter under the totality-of-the-circumstances approach as an integrated sequence of actions across multiple actors and roles;
4. Consider the novel legal theories presented herein, including the Retaliation Cascade Theory, Multi-Role Retaliation Framework, Digital Evidence Reliability Doctrine, Systemic or Integrated Liability Model, Dual-Status Exploitation Theory, and Union Fiduciary/Insurer Analogy;
5. Preserve all issues for further review or appeal as appropriate;
6. Grant such other and further relief as the Board deems just and proper.

--

Respectfully submitted,

Dipesh Singla

Charging Party/Complainant/Movant

Date: March 27, 2026 (India Date)

#184, NAC, Shivalik Enclave, Manimajra, Chandigarh, 160101, India

**From:**
Dipesh Singla

**To:**
National Labor Relations Board (NLRB),

Regional Office,

And to whom it may concern

**Via Email:** **dipeshsingla668@gmail.com** **(From)**

**Via Email:** Zachary.Manor@nlrb.gov, e-filing@nlrb.gov, NLRB@public.govdelivery.com, Servicedesk@nlrb.gov, OIG.Hotline@nlrb.gov, WebTeam@nlrb.gov, publicinfo@nlrb.gov, SM-Emergency Contact <emergency@nlrb.gov>, NLRBRegion13@nlrb.gov, dgecpC13@nlrb.gov **(To)**

**Sub: Urgent: Letter regarding Request for Clarification, Rules Reference, and Reasonable Accommodation**

Dear NLRB teams,

I am writing to follow up regarding our recent interaction. I was concerned that the meeting ended **abruptly**, and I would like to clarify my understanding to avoid any future misunderstandings and issues especially relating to all meritable claims.

During our previous discussion, you (respected Zachary) explained that although I am proceeding **pro se (without an attorney)**, I would still be able to file a charge irrespective of statue as charge against University of Chicago was filed timely. At that time, I expressed that this was a significant relief for me, particularly concerning statute-related concerns. Based on that conversation, I believed I was proceeding correctly. I am unsure how a misunderstanding arose, and I respectfully request clarification.

If there is a recording or transcript of our prior conversation whether or not consent was taken or required, I respectfully request full access to it, or alternatively, that the record be reviewed to confirm whether my recollection is accurate. I request full fee waiver for that data iff applicable.

I also kindly request that you share the relevant **NLRB rules or procedural guidance** applicable to my situation over the email (PDF, as link is accessible sometimes and sometimes not only from my locations). I state under **OATH** that I will fully comply as practicable with all NLRB rules and procedures.

Attached, I am submitting documentation demonstrating that I promptly informed the NLRB regarding union-related charges. I was advised by staff to follow up with the union after the funding freeze was lifted, which I attempted to do in good faith, and you have information about it.

During our prior discussions, it was stated that certain charges needed to be removed, updated or narrowed; due to **statute of limitations considerations** under the National Labor Relations Act they were all filed in right time (undisputed till date). Accordingly, after extensive discussion, the scope of the charges was reduced at that time.

However, I respectfully note that I did not memorialize in writing **each specific statutory or factual basis** that was discussed and finalized during that meeting. Therefore, I request that the **initial charge-filing record and the full discussion process** be considered controlling, particularly in the event that any important factual or legal point may have been inadvertently omitted by mistake or misunderstanding.

As we also discussed, it was stated that additional or overlapping charges, if newly filed, might be dismissed. I respectfully clarify and state for the record that **all relevant charges were in fact filed within the applicable statutory time limits**. Accordingly, I assert that these filings should

be considered **timely and preserved**, and that any applicable **tolling principles** should apply if, in the future, a court or reviewing authority were to question the timeliness of any particular charge.

During our prior discussion, it was stated that the University would likely assert that my termination was based on some other reasons than retaliation. I wish to clarify for the record that I had already disclosed these anticipated assertions, and that I had previously submitted evidence establishing a **causal connection** between my protected activity and the adverse action, including documentation that I believe demonstrates a **"but-for" relationship** sufficient to establish merit at this stage (Even allegedly at 3rd step of Mcdonnell's BS framework, and **wright line** test which is the test NLRB will apply to it most probably instead of any other).

Accordingly, I respectfully request that, going forward, our discussions focus not on speculative statements about what the University might claim, but rather on the actual defenses formally asserted by the University and its counsel, once they are presented. At the time of the prior meeting, the University had not appeared, submitted a position statement, or otherwise articulated its defense, and I was not providing testimony against myself.

I further note that during the prior discussion, certain charge modifications were made based on assumptions about what the University would say in its defense. Because the Respondent had not yet spoken, this approach effectively treated hypothetical defenses as established facts. I raised this concern at the time, as I do again here, because such assumptions formed the foundation for narrowing or removing certain allegations before the Respondent had an opportunity to assert its actual position.

By way of illustration, if a respondent were to concede or admit violations, it would be inappropriate to have preemptively limited charges based on unasserted defenses. While that is an extreme example, it underscores the concern that charge evaluation should be grounded in the **existing evidentiary record and the Respondent's actual submissions**, rather than conjecture.

This clarification is submitted to preserve the administrative record and to ensure that further evaluation of my charges proceeds based on evidence, applicable law, and formally asserted defenses, without reliance on speculative assumptions.

I further wish to clarify for the record that during our prior, extended discussion concerning the narrowing and shortening of certain charges, a **specific date in or around November 2024** was referenced by you as the operative date based on how the charges were being reduced or restructured at that time.

This date was discussed in the context of aligning the charges with statute-of-limitations considerations, as they were then understood. My understanding of that discussion was based on the guidance provided to me during that meeting, and it informed how the charge scope was subsequently adjusted.

I respectfully note this clarification to ensure the administrative record accurately reflects the substance of that discussion, particularly in the event that the relevance, accuracy, or impact of dates used during the charge-narrowing process is later reviewed. This statement is not intended to concede any timeliness issue, but rather to document the basis on which decisions were made during that discussion.

Additionally, as language and communication were discussed in our first meeting, I am **formally requesting reasonable accommodation** going forward. For any future meetings, I respectfully request:

- Assignment to another NLRB agent for all three charges, and
- The presence of an interpreter or staff member who understands **Hindi and Punjabi (preferably both)**.
- All communications go through the email and document each and every point going forward.

- Giving me more time to respond and think as non-attorney as documented disabled especially on meetings.

Despite my best efforts, I am experiencing difficulty ensuring that my points are fully understood. I am uncertain whether this difficulty is related to a disability or another factor; however, to ensure effective communication and fairness, I am making this request formally. Supporting disability-related documentation provided by the defendants is attached.

You previously indicated that multiple charges had been filed and that, consistent with Board procedures, they were consolidated or reduced, which initially resolved the issue. I complied in good faith often to help in effective process in good faith and also tried to reply in minutes. Unfortunately, this has since made it difficult for me to proceed without further clarification and processing of this matter promptly.

Before continuing further discussions, I intend to review the applicable **NLRB internal rules and procedures** to ensure full compliance. However, I respectfully submit that the requested accommodations are necessary and appropriate to prevent further misunderstandings.

I, **Dipesh Singla**, hereby state under oath that I will comply with all **National Labor Relations Board (NLRB)** rules, procedures, and directives **to the fullest extent practicable and in good faith**.

At this time, I **do not agree to withdraw or dismiss** the charge(s) filed against any of the three named parties, as was suggested during the meeting. This position remains unchanged **regardless of whether written confirmation is provided by the Regional Director, senior officials, or other representatives** concerning statements made during that meeting.

I expressly **reserve all rights available to me under law**, including but not limited to the right to:

- Amend or modify my statements or legal position,
- Supplement or clarify the factual record,
- Seek equitable tolling or other equitable relief if appropriate, and
- Take any procedural steps permitted under the **National Labor Relations Act (NLRA)** and applicable regulations.

Nothing in this statement shall be construed as a waiver of any statutory or procedural rights afforded to me as a charging party proceeding **pro se (Individual without attorney)**.

I submit this correspondence **in good faith and without fear of retaliation or reprisal**, and with the understanding that federal law prohibits adverse action against individuals who exercise protected rights or communicate concerns to a federal agency.

This communication is made with the expectation of protection under applicable **federal anti-retaliation and whistleblower-related statutes and policies**, including but not limited to:

- The **National Labor Relations Act**, which protects the rights of individuals who file or participate in unfair labor practice proceedings (**29 U.S.C. §§ 157, 158(a)(4)**);
- Federal anti-retaliation principles applicable to administrative proceedings;
- The **Rehabilitation Act of 1973**, **29 U.S.C. § 794**, with respect to disability-related accommodation requests; and
- The principles embodied in the **Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 (No FEAR Act)**, which reflect the federal government's policy against retaliation for protected activity.
- Nothing in this correspondence should be construed as consent to retaliation, reprisal, intimidation, or adverse treatment of any kind. This letter is submitted solely to preserve the administrative record, seek clarification, and request reasonable accommodation, and

it is not intended to interfere with or disrupt the lawful functions of the National Labor Relations Board.

In addition, I hereby expressly state that this correspondence is submitted **in good faith and without fear of retaliation or reprisal**, and with the understanding that I am protected under applicable federal law as a member of multiple **protected classes**.

Specifically, I invoke protection against discrimination, retaliation, or adverse treatment on the basis of, including but not limited to:

- **Disability**, under the *Rehabilitation Act of 1973*, **29 U.S.C. § 794**, and related federal protections;
- **Religion**, including my religious identity as **Hindu**, under *Title VII of the Civil Rights Act of 1964*, **42 U.S.C. § 2000e-2**;
- **Gender**, under *Title VII of the Civil Rights Act of 1964*, **42 U.S.C. § 2000e-2**;
- **National origin / nationality**, under *Title VII of the Civil Rights Act of 1964*, **42 U.S.C. § 2000e-2**; and
- Any **other protected characteristics** recognized under applicable federal anti-discrimination and anti-retaliation laws.

I further note that the **National Labor Relations Act** expressly prohibits retaliation against individuals who file charges, give testimony, or otherwise participate in Board proceedings (**29 U.S.C. § 158(a)(4)**), regardless of protected-class status.

This statement is made solely to preserve the administrative record and to ensure that no action taken in connection with my pending charges is influenced by prohibited considerations. Nothing herein is intended to accuse any party or the National Labor Relations Board of misconduct. I reserve the right to change my stance upon knowledge and interest of myself to exercise my rights to the fullest extent.

Please check under my name all charges are well nested in a single case as it appears: This are I believe right charge numbers:

13-CB-376043.

13-CB-376044.

13-CA-366016.

I further place on the record that the University has had **actual knowledge of my pending NLRB charges**, and that **subsequent to that knowledge**, Additional retaliatory conduct has occurred.

Specifically, I state for record-keeping and notice purposes that the University has engaged in actions including, but not limited to:

- Denying and restricting my access to my own employment and disciplinary records;
- Mishandling, altering, or improperly managing records relevant to my employment and the adverse actions taken against me;
- Adding, removing, or modifying documentation **after the fact**, including materials that were not part of the original disciplinary or adverse-action decision-making process;
- Creating or supplementing records or evidentiary materials **after the initiation of NLRB proceedings**, which were not relied upon at the time of the challenged actions.

I am not detailing all such conduct in this correspondence; however, I expressly state that **additional facts, evidence, and allegations may be presented at a later time** as appropriate. This statement is submitted to ensure that the National Labor Relations Board is now on **formal notice** of these concerns.

This notice is not intended to make final factual determinations or legal conclusions, but rather to **preserve the record**, document ongoing issues relevant to retaliation and credibility, and ensure that no adverse inference is drawn from the timing of future disclosures.

I respectfully state for the record that I **object to the dismissal, withdrawal, narrowing, or adverse disposition of any of my pending claims or allegations at this stage**.

It is my position that **all claims filed are meritorious**, supported by evidence, and were filed in good faith and within the applicable statutory timeframes. Accordingly, I respectfully request that **no claim be dismissed or prejudged** without full consideration of the complete evidentiary record, applicable law, and any defenses formally asserted by the Respondent.

This statement is made to preserve my rights and to ensure that:

- No claim is deemed abandoned, waived, or conceded by implication;
- No dismissal is entered based on assumptions, speculation, or incomplete information; and
- All claims receive full and fair evaluation through the appropriate investigatory and adjudicative process.

I understand that the National Labor Relations Board retains discretion under the **National Labor Relations Act** and applicable regulations; however, I expressly state that **I do not consent** to the dismissal of any claim and reserve the right to challenge any such action through all available administrative or judicial remedies.

This reservation is submitted in good faith and solely to preserve the administrative record and my statutory rights as a charging party.

Thank you for your time and consideration. I appreciate your assistance and look forward to resolving this matter appropriately and fastly.

Sincerely,

Dipesh Singla

#184, NAC, Shivalik enclave, Manimajra, Chandigarh, 160101

dipeshsingla668@gmail.com (Preferred)

+17734571046

***Note: More evidence may follow:***

**Dipesh Singla** <dipeshsingla668@gmail.com> Thu 28 Aug, 23:35

to Edward, me, Ava

Hi
I hope this email finds you well.
I wanted to ask a query, can I please ask what all checkboxes were selected mainly o basis of charge, also wanted to ask and confirm if I have filed both claims for employe union? Also wanted to ask if in case after you share all checkboxes with me can I ame without tampering the progress of this particular case? like adding more relevant checkboxes, and also selecting charges against both employer and union.
I wanted to request please in any case don't close this one at all. I just wanted to mak it's not something that I have not checked.
Thanks for your help. Regards
I asked this in good faith to accurately do things as a pro se plaintiff/complainant.
Kind regards.
I apologize if something is not clear but I kindly request to please ask me to clarify if something is unclear, I will try to promptly provide the relevant information.
Best.

•••

**Dipesh Singla** <dipeshsingla668@gmail.com> Mon 20 Oct, 00:26

to Edward, Ava, EmergencyContact, me

Hi

Can I get a copy of the charges I filed? I wanted to make sure, if those may need to l
updated

I want that data the main thing also is IDK if I have mentioned Unions but I have to c
them for not protecting me when it was needed the most.

- Graduate Student United: Univ of chicago
-Teamsters local 743

Please add those if you can and/or tell me the above asked questions by me so that
bring all the things here for minute amendments that may be needed.

best

•••

**SM-Emergency Contact** <emergenc... Mon 20 Oct, 20:14

to me

> **CAUTION:** This email and any attachments may contain Controlled Unclassified Information (CUI). National Archives and Records Administration (NARA) regulati 32 CFR Part 2002 apply to all executive branch agencies that designate or handl information that meets the standards for CUI.

Thank you for reaching out to the NLRB. You reference only one case number in you
Please find the charge in 13-CA-366016 attached.

---

**From:** Dipesh Singla <dipeshsingla668@gmail.com>
**Sent:** Sunday, October 19, 2025 11:56 AM
**To:** Castillo, J. Edward <Edward.Castillo@nlrb.gov>; Dipesh Singla <dipeshsingla668@gmail.com>; Szoke, Ava D. <Ava.Szoke@nlrb.gov>; SM-Emerge Contact <emergency@nlrb.gov>
**Subject:** Re: [EXTERNAL] Re: University of Chicago (13-CA-366016)

> **CAUTION:** The sender of this message is external to the NLRB network. Please care when clicking on links and responding with sensitive information. Forward suspicious emails to nlrbirc@nlrb.gov.

**Dipesh Singla** <dipeshsingla668@gmail.com> Mon 20 Oct, 20:22
to SM-Emergency

Thanks can you please add this somewhere, I don't think portal is working, if possible can you please kindly add charges against the unions
- Graduate Student United: Univ of chicago
-Teamsters local 743

Old message to specific read please :

Hi
I hope this email finds you well.
I wanted to ask a query, can I please ask what all checkboxes were selected mainly on the basis of charge, also wanted to ask and confirm if I have filed both claims for employer and union? Also wanted to ask if in case after you share all checkboxes with me can I amend this without tampering the progress of this particular case? like adding more relevant checkboxes, and also selecting charges against both employer and union.
I wanted to request please in any case don't close this one at all. I just wanted to make sure it's not something that I have not checked.
Thanks for your help. Regards
I asked this in good faith to accurately do things as a pro se plaintiff/complainant.
Kind regards.
I apologize if something is not clear but I kindly request to please ask me to clarify if something is unclear, I will try to promptly provide the relevant information.
Best.

Thank You so much for help

**SM-Emergency Contact** <emergenc... Mon 20 Oct, 20:48
to me

**CAUTION:** This email and any attachments may contain Controlled Unclassified Information (CUI). National Archives and Records Administration (NARA) regulations at 32 CFR Part 2002 apply to all executive branch agencies that designate or handle information that meets the standards for CUI.

It is unclear what you mean by add charges against the unions. Do you currently have charges against these entities or are you seeking to file new charges against two separate unions? If it's the latter then you need to complete charge forms, serve them on the charged parties and then mail or fax in the signed charge forms to Region 13. I am attaching a charge form and instructions on how to file during the shutdown if this is what you are seeking.

...

**2 attachment** • Scanned by Gmail   Add all to Drive

Form NLRB 508.pdf
Website Shutdow...

NLRB Charge 13-CA-366016 (University of Chicago) Inbox

**Manor, Zachary G.** <Zachary.Manor@nlrb.g... Tue 18 Nov, 20:49
to me

**CAUTION:** This email and any attachments may contain Controlled Unclassified Information (CUI). National Archives and Records Administration (NARA) regulations at 32 CFR Part 2002 apply to all executive branch agencies that designate or handle information that meets the standards for CUI.

Dipesh,

My supervisor, Ed Castillo, forwarded me an email you sent requesting to add two unions to a charge. This charge has been reassigned to me, so please direct all communications to me moving forward. I am available for a phone call at any time tomorrow. Do you have a time that might work best for you?

Thank you.

Respectfully,

Zachary (Zack) Manor
Field Examiner

---

**Disability UChicago.pdf**
404K

**Certificate of Service:**

I served this letter in good faith via an email to the abovementioned email addresses.

Zachary.Manor@nlrb.gov, e-filing@nlrb.gov, NLRB@public.govdelivery.com, Servicedesk@nlrb.gov, OIG.Hotline@nlrb.gov, WebTeam@nlrb.gov, publicinfo@nlrb.gov, SM-Emergency Contact <emergency@nlrb.gov>, NLRBRegion13@nlrb.gov, dgecpC13@nlrb.gov

----

Dipesh Singla

15 December 2025

+17734571046/ +917973996818 (Phone and WhatsApp)

dipeshsingla668@gmail.com (**Please use email for all communications**)